1   Mark A. Ozzello (SBN 116595)
    Mark.Ozzello@capstonelawyers.com
2   Tarek H. Zohdy (SBN 247775)
    Tarek.Zohdy@capstonelawyers.com
3   Cody R. Padgett (SBN 275553)
    Cody.Padgett@capstonelawyers.com
4   Trisha K. Monesi (SBN 303512)
    Trisha.Monesi@capstonelawyers.com
5   Capstone Law APC
    1875 Century Park East, Suite 1000
6   Los Angeles, California 90067
    Telephone:   (310) 556-4811
7   Facsimile:   (310) 943-0396

8   Russell D. Paul (admission pending)
    Amey J. Park (admission pending)
9   BERGER MONTAGUE PC
    1818 Market Street, Suite 3600
10  Philadelphia, PA 19103
    Tel.:   (215) 875-3000
11  Fax:   (215) 875-4604
    Email:  rpaul@bm.net
12          apark@bm.net

13  Attorneys for Plaintiffs

14              UNITED STATES DISTRICT COURT

15              SOUTHERN DISTRICT OF CALIFORNIA

16
    MATT GOLDSTEIN, PERCY          Case No.:  '19CV1778 H   BGS
17  SUTTON, JULIAN WILDER,
    LANA SAVAGE, GLADYS            **CLASS ACTION COMPLAINT FOR:**
18  TUBBS, KENDRA PIAZZA, and
    RAFAEL MARTINEZ, individually,  (1) Breach of Warranty pursuant to
19  and on behalf of a class of similarly      Magnuson-Moss Warranty Act
    situated individuals,          (2) Violation of California's Consumers
20                                         Legal Remedies Act
            Plaintiffs,            (3) Violation of California Unfair
21                                         Competition Law
            v.                     (4) Breach of Express Warranty pursuant to
22                                         Cal. Com. Code §§2313, 10210
    GENERAL MOTORS LLC, a          (5) Breach of Implied Warranty pursuant to
23  Delaware limited liability company,       Song-Beverly Consumer Warranty Act
                                   (6) Violation of Florida Deceptive and
24          Defendant.                     Unfair Trade Practices Act
                                   (7) Breach of Express Warranty pursuant to
25                                         F.S.A. §§672.31, 680.21
                                   (8) Breach of Implied Warranty pursuant to
26                                         F.S.A. §§672.314, 680.212
                                   (9) Violation of Michigan Consumer
27                                         Protection Law

28

(10)   Breach of Express Warranty pursuant to Mich. Comp. Laws §§440.2313, 440.2860
(11)   Breach of Implied Warranty pursuant to Mich. Comp. Laws §§440.2314, 440.2862
(12)   Breach of Express Warranty pursuant to Tex. Bus. & Com. Code §§2.313, 2A.210
(13)   Breach of Implied Warranty pursuant to Tex. Bus. & Prof. Code §§2.314, 2A.212
(14)   Unjust Enrichment

**DEMAND FOR JURY TRIAL**

**INTRODUCTION**

Plaintiffs Matt Goldstein, Percy Sutton, Julian Wilder, Lana Savage, Gladys Tubbs, Kendra Piazza, and Rafael Martinez ("Plaintiffs"), for themselves and on behalf of all others similarly situated, bring this action against General Motors, LLC ("GM" or "Defendant"). Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

**NATURE OF THE ACTION**

1.    This proposed class action is brought by plaintiffs alleging that GM concealed a known defect from its customers in the United States who purchased or leased 2013 to 2017 Cadillac ATS, SRX and XTS vehicles and 2014 to 2017 Cadillac CTS, ELR and Escalade vehicles equipped with GM's "Cadillac User Experience" navigation/radio touch screen display (the "CUE System") (collectively, "Class Vehicles"). The CUE Systems are defective, posing serious safety concerns.

2.    This action arises from Defendant's failure, despite its longstanding knowledge, to disclose to Plaintiff and other similarly situated customers that the Class Vehicles have defective CUE Systems that fail to function in a safe and reliable manner as expected.

3.    As explained below, the Class Vehicles were sold with defective CUE Systems. The CUE System possesses an innate and serious defect (the "Defect") that causes it to spontaneously delaminate, bubble or crack in a "spider-web" formation, rendering it useless. When this happens, the unit ceases to function properly. The CUE System handles climate, navigation, the back-up camera and audio/Bluetooth/communications.

4.    This Defect, which manifests itself within the limited warranty period or shortly after the limited warranty period expires, poses a serious safety risk to drivers, who can become dangerously distracted.

CLASS ACTION COMPLAINT

5.    GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covers all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty.

6.    Although GM has known about the Defect for years, instead of fixing it, GM continued to sell new Cadillac vehicles with the defect to customers without disclosing it and has forced its customers to spend at times $1,500.00 or more to replace the CUE once the Defect fully manifests. Moreover, when Class Members bring their vehicles to GM's authorized agents for repair, the defective CUE Systems or components are replaced with the same defective parts, ensuring that the defective replacement CUE will eventually suffer the same delamination and spider-webbing issues.

7.    The Defect is inherent in the CUE Systems and is present at the time of sale. Because the Defect is inherent in every CUE System, and GM has either been unable, or refused, to actually repair the Defect, it is impossible to correct the Defect by replacing one CUE System with another.

8.    Defendant knew, or should have known, of this critical defect at the time of sale or shortly thereafter when numerous members of the putative class began complaining of the defect at Defendant's authorized dealerships. Yet, notwithstanding this knowledge, GM has routinely failed to fully repair the Class Vehicles without charge when the defect manifests. Moreover, GM failed to disclose the Defect to Plaintiff and Class members through its advertising, including on vehicle window stickers or at the point of sale or lease.

9.    GM, an experienced and sophisticated vehicle manufacturer, learned

CLASS ACTION COMPLAINT

of the Defect through, *inter alia*, (1) records from the National Highway Traffic Safety Administration ("NHTSA"), (2) customer complaints, (3) its own records of customers' complaints, (4) dealership repair records and requests for technical assistance, (5) warranty and post-warranty claims, (6) pre- and post-release internal durability testing, (7) Technical Service Bulletins ("TSBs", and (8) other various sources, yet failed to notify consumers prior to purchase of the nature and extent of the Defect plaguing Class Vehicles, or provide any adequate post-purchase remedy.

10.    GM's efforts have been entirely inadequate in resolving the Defect or providing relief to the Class. Moreover, GM has failed to alert the Class Members of the true and unsafe nature of the Defect.

11.    Despite knowledge conveyed to Defendant by information from its affiliated dealerships, NHTSA consumer complaints, and its own internal records, including durability testing, Defendant has not recalled the Class Vehicles to repair the defective CUE Systems, offered its customers suitable repairs free of charge, or offered to reimburse consumers forced to pay for the repairs out-of-pocket.

12.    In fact, rather than redesigning the defective components and installing non-defective components, GM purports to "repair" the Class Vehicles by performing ineffectual or insufficient software updates, part replacements, and other procedures that fail to fully resolve the defects. Further, Class Vehicle owners incur or will incur out-of-pocket costs for these repairs because GM refuses to issue a recall to prevent them. GM thus unfairly shifts the costs to the Class Members, and benefits or will benefit from the revenue generated by repeat repairs. Accordingly, consumers will be required to pay hundreds, if not thousands, of dollars to repair or replace the CUE Systems that become damaged because of the Defect, and GM is unjustly enriched at their expense.

13.    Because of this failure, Plaintiffs and Class Members have been damaged.

## JURISDICTION AND VENUE

14.    This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

15.    In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that plaintiffs would ordinarily expect to try them in one judicial proceeding.

16.    GM, through its business of distributing, selling, and leasing the Class Vehicles, has established sufficient contacts in this district such that personal jurisdiction is appropriate.  Defendant is deemed to reside in this district pursuant to 28 U.S.C. § 1391(a).

17.    In addition, a substantial part of the events or omissions giving rise to these claims and a substantial part of the property that is the subject of this action are in this district.  Plaintiff Goldstein's Declaration, as required under California Civil Code §1780(d) but not pursuant to *Erie* and federal procedural rules, reflect that a substantial part of the events or omissions giving rise to the claims alleged herein occurred, or a substantial part of property that is the subject of this action is situated, in San Diego County, California.  Plaintiff Goldstein's Declaration is attached as Exhibit 1.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

## THE PARTIES

19.    Plaintiff Matt Goldstein is a California citizen who resides in Carlsbad, California. Plaintiff Goldstein purchased a 2013 Cadillac SRX in or around June 2016.

20.    Plaintiff Percy Sutton is a California citizen who resides in Long Beach, California and North Las Vegas, Nevada. Plaintiff Sutton purchased a used 2013 Cadillac XTS in or around September 2016.

21.    Plaintiff Julian Wilder is a California citizen who resides in Corona, California. Plaintiff Wilder purchased a new 2014 Cadillac SRX in 2014.

22.    Plaintiff Lana Savage is a Florida citizen who resides in Palm Coast, Florida. Plaintiff Savage purchased a new 2013 Cadillac SRX in or around July 2013.

23.    Plaintiff Gladys Tubbs is a Michigan citizen who resides in Battle Creek, Michigan. Plaintiff Tubbs purchased a new 2014 Cadillac SRX in or around September 2014.

24.    Plaintiff Kendra Piazza is a Texas citizen who resides in Dallas, Texas. Plaintiff Piazza purchased a new 2015 Cadillac SRX in or around December 2015.

25.    Plaintiff Rafael Martinez is a Texas citizen who resides in San Antonio, Texas. Plaintiff Martinez purchased a 2014 Cadillac CTS on or around in or around September 2017.

26.    Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48265. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. General Motors Holdings LLC's only member is General Motors Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC.

27.    General Motors LLC, itself and through its affiliates, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in California, Florida, Texas,

and Michigan. General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

28.    At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

## FACTUAL ALLEGATIONS

29.    GM designs, manufactures, markets, distributes, and warrants automobiles in the United States sold under various brand names, including the Buick, Cadillac, Chevrolet, and GMC brands. In 2018, GM sold 2,954,037 vehicles in the United States alone and "had the number one market share in . . . North America[.]"[1]

30.    GM has thousands of authorized dealerships across the United States, all of which are under GM's control. GM authorizes these dealerships to sell GM vehicles, parts, and accessories and to service and repair GM vehicles using GM parts.[2]

31.    GM designed, manufactured, and distributed the Class Vehicles. GM has sold or leased, directly or indirectly, through dealers and other retail outlets, hundreds of thousands of Class Vehicles equipped with the CUE System in California, Florida, Michigan, Texas, and other states.

32.    GM provided all purchasers and lessees of the Class Vehicles with a New Vehicle Limited Warranty with the purchase or lease of the Class Vehicles.

33.    The New Vehicle Limited Warranty for Cadillac-brand Class Vehicles (the "Warranty"), stated in relevant part:

---

[1]    *See* General Motors Company 2018 Annual Report (Form 10-K), at 2 (Feb. 6, 2019), available at: https://www.sec.gov/Archives/edgar/data/1467858/000146785819000033/gm2018 10k.htm (last accessed May 7, 2019).
[2]    *Id.* at 3.

**What Is Covered**

**Warranty Applies**
    This warranty is for GM vehicles registered in the United States and normally operated in the United States, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

**Repairs Covered**
    The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

**No Charge**
    Warranty repairs, including towing, parts, and labor, will be made at no charge.

**Obtaining Repairs**
    To obtain warranty repairs, take the vehicle to a Cadillac dealer facility within the warranty period and request the needed repairs. Reasonable time must be allowed for the dealer to perform necessary repairs.

**Warranty Period**
    The warranty period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period.

**Bumper-to-Bumper Coverage**
    The complete vehicle is covered for 4 years or 50,000 miles, whichever comes first, except for other coverages listed here under "What Is Covered" and those items listed under "What Is Not Covered" later in this section.

    ***

    **Other Terms**: This warranty gives you specific legal rights and you may also have other rights which vary from state to state. GM does not authorize any person to create for it any other obligation or liability in connection with these vehicles. **Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty. Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty. GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of this written warranty**.[3]

---

    [3] *See, e.g.*, 2015 Cadillac Limited Warranty and Owner Assistance Information at 2, 4, 12, available at https://my.gm.com/content/dam/gmownercenter/gmna/dynamic/manuals/2015/cadillac/Multiple%20Model%20PDFs/2015%20Limited%20Warranty%20and%20Owner%20Assistance%20Information.pdf (last accessed May 7, 2019) (emphasis in original).

34.     The warranties and representations contained in the Warranty were and are material to Plaintiffs because Plaintiffs would not have purchased their Class Vehicles or would not have paid as much as they did if the CUE Systems in their Class Vehicles were not covered by a full warranty.

**A.     The Defective CUE Systems**

35.     In 2011, GM began marketing the release of an in-vehicle "infotainment, navigation, and communication tools" to be included in 2012 (model year 2013) in Cadillac models XTS, ATS, and SRX.[4]

36.     "In-Vehicle Infotainment" or "Infotainment" is an automobile industry term that refers to vehicle systems that combine entertainment and information delivery to drivers. Infotainment systems use audio/video interfaces, touchscreens, keypads, and other types of devices to provide those services.[5]

37.     The CUE System is Cadillac's proprietary Infotainment System, which GM began developing in 2008.[6]

38.     The CUE System, which is built into the top of the vehicle's central instrument panel, includes a touch screen assembly or module. This requires a driver to use the CUE System's various functions by touching the screen.

39.     Accordingly, in order for a driver to access and use the vehicle's safety, navigation, communications, and entertainment features, the driver is required to use the touch screen, as the touch screen functions as the sole control system for those systems.

40.     The CUE System's touch screen defaults to a "Home Page", which has icons that depict the CUE System's various features. To access and control these

---

[4]     *See* GM press release, "Cadillac CUE: Intuitive and Connected Driving in 2012" dated October 12, 2011, available at: https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2011/Oct/1012cadillac.html (last accessed September 8, 2019).
[5]     *See, e.g.*, Burk, Michael. "The Evolution of In-Vehicle Infotainment Systems, part one." March 14, 2019, available at: https://www.micron.com/about/blog/2019/march/evolution-of-in-vehicle-infotainment-systems-part-one (last accessed September 8, 2019).
[6]     *See* n.4.

CLASS ACTION COMPLAINT

features, the user presses the desired icon on the touch screen. For example, the CUE System includes the following features:

41.    Voice Recognition: By pressing the "Voice Recognition" icon on the touchscreen display, the user enables the vehicle's voice recognition system, permitting "hands-free" operation within the navigation, audio, phone, and weather applications.

42.    Audio: By pressing the "Audio" icon on the CUE System touchscreen display, the user accesses different audio sources, including AM and FM radio, and SiriusXM Satellite Radio (if equipped), CD and MP3 player, USB/SD ports, Bluetooth7 and an auxiliary input.

43.    Phone: By pressing the "Phone" icon on the CUE touchscreen display, a user can use certain features of his or her cellular phone when paired to the CUE through Bluetooth. For example, a user can place and receive calls without using their hands, through the Cue System's voice- recognition system.

44.    Navigation: By pressing the "NAV" icon on the CUE touchscreen, a user can access a GPS system including maps, driving directions, routing preferences, current location, places of interest, traffic updates, an estimated arrival time, and other features.

45.    Climate: By pressing the "Climate" icon on the CUE touchscreen, a user can control the vehicle cabin's air temperature, including air conditioning, as well as mode settings that change air flow and direction (that is, through which air vents the air travels).

46.    Rear Vision Camera (or Backup Camera): Rather than being initiated by the user's touching an icon on the touchscreen, the Rear Vision Camera is a safety feature enabled whenever the vehicle is placed in Reverse. The touchscreen then converts into a video-type panel where the area behind the vehicle appears on the CUE touchscreen. According to NHTSA, using backup cameras could prevent

half of the deaths caused by accidents driving in reverse.[7]

47.    The CUE System's touchscreen has two primary components: a glass sheet with electrode panels, and a plastic cover. An interlayer of silicone-like material is between the touch screen glass and the plastic cover.

48.    The first component, the glass sheet, is a projected capacitance touch screen. The sheet has electrode patterns, which hold electrical charges, on both sides. When a user touches and presses the screen, the amount of charge at the point of contact is determined by circuits.

49.    The second component, the plastic cover, is placed in front of the projected capacitance touch screen and is the physical screen a user touches.

50.    The CUE System touch screen is defective in that the plastic cover is prone to delaminating or separating from the touch screen glass. When this happens, the silicone-like material coalesces and forms a spider-web-like pattern on the display, which breaks the underlying circuit and prevents a user's touch from being recognized by the CUE System. This, in turn, prevents a user from being able to access the Cue System's various features.

51.    The Defect that causes the plastic cover and touch screen glass to separate can occur as a result of (1) mechanical stress and (2) due to moisture ingress into the interlayer due to the hygroscopic nature of the interlayer material, which results in failure of the glass/interlayer bond. These conditions occur during normal operation of a vehicle.

52.    First, standard mechanical stress, due to the typical vibration and shaking a vehicle experiences during operation, causes the plastic cover to separate from the touch screen, rendering the CUE inoperative. Specifically, placement of the screws and rubberized gasket holding the plastic cover and glass screen together does not adequately stabilize and protect the component parts from moving

---

[7] https://www.autonews.com/article/20130620/OEM11/130629981/backup-camera-rule-for-cars-in-u-s-pushed- back-to-2015#axzz2iafFMKVW.

excessively when the vehicle shakes or vibrates under normal driving conditions. Consequently, the plastic cover prematurely separates from the glass sheet. When this occurs, the silicone-like material under the plastic cover spider-webs and cracks.

53.     Second, the stress is further exacerbated because the plastic cover and touch screen glass separates (also known as delamination), due to moisture ingress into the silicone-like interlayer. Temperature changes cause uneven thermal expansion, which in turn results in delamination between the plastic cover and the touch screen glass.

54.     GM marketed and sold its new CUE System as improving driver safety. In a press release dated October 12, 2011, it explained:

'CUE doesn't replace your smartphone or your iPod™,' said Micky Bly, executive director, Global Electric Systems, Infotainment and Electrification. "Rather it allows consumers to securely store those mobile devices while channeling the information on those devices, along with your navigation tools, weather maps with Doppler radar, AM/FM and XM radio, instant messages and emails, through a central portal in your Cadillac, keeping hands on the wheel and eyes on the road.'

The heart of CUE is the 8-inch LCD touch screen, seamlessly integrated into the top of the central instrument panel and a motorized fully capacitive faceplate at the bottom concealing a 1.8L storage area. The vibrant LCD screen displays CUE's home page, which resembles a smart phone's screen by using large, easy-to-target icons to execute commands. Capacitive refers to using electrodes to sense the conductive properties of objects, such as a finger.

****

To improve simplicity and connectivity for consumers, CUE will feature several auto industry firsts.

•      Proximity Sensing:  As the user's hand approaches the   LCD screen, command icons appear. Icons can be customized and arranged by consumers to improve ease of use.

•      Haptic Feedback: **Buttons on the fully capacitive faceplate pulse when pressed to acknowledge the driver's commands and helps keep the driver's eyes on the road.**

•      Multi-Touch Hand Gestures: interactive motions (tap, flick, swipe and spread) popularized by smartphones and tablets allow tasks on the LCD

Page 11

screen, such as scrolling lists, zooming maps and searching favorites to be easily accomplished.

- 12.3 in. LCD reconfigurable gauge cluster (on select models) offers four selectable displays – Simple, Enhanced, Balanced and Performance – that can mix traditional vehicle data such as a speedometer and fuel gauge with navigation, entertainment and 3D vehicle image.

- Natural Speech Recognition lets consumers speak logically with fewer specific commands to recall stored media or input navigation destinations. CUE's text-to-speech feature will also allow consumers to receive text messages by system voice and to send recorded text messages in return.

- Linux operating system, "open" software platform and ARM 11 3-core processor, each operating at 400 million of instructions (mips) per second. This hardware setup offers 3.5 times more processing power than current infotainment systems, and allow developers to write applications to CUE that be downloaded by consumers.[8]

55.     Additionally, GM repeatedly touted the Class Vehicles' advanced safety features specifically including the Rear Vision Camera feature, which the driver uses by viewing the camera's data on the CUE System's touchscreen. In one press release dated April 2, 2012, GM stated: "SRX is the latest to incorporate Cadillac's "control and alert" strategy that employs advanced technologies – including radar, cameras and ultrasonic sensors – to help prevent crashes." The Rear Vision Camera was included in the slate of these features.[9]

56.     Specifically, GM advertised its CUE System as safer than other navigation systems and promoting driver safety, stating in March 26, 2013 press release, "Most navigation systems prompt users to insert destination information by separately inputting state, city, street, and house number information. CUE users can manually or verbally input the entire destination address on one screen, saving

_____

[8]     *See* n.4 (emphasis added).
[9]     *See* GM press release, "Cadillac Enhances Technology and Design on 2013 SRX" dated April 2, 2012, available at: https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2012/Apr/0402_srx.html (last accessed September 8, 2019); see also GM Press Release, "Cadillac XTS Named Connected Car of the Year" dated February 23, 2012, available at: https://media.cadillac.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2012/Feb/0223_gm_xts.html (last accessed September 8, 2019).

1    time and keeping drivers focused on the road."[10]

2        57.    In that same press release, GM also stated that the "CUE is designed

3    to accommodate new features and enhancements and be highly customizable. It also

4    incorporates natural language voice recognition, which allows customers to safely

5    place calls, enter destinations, browse media, play music and control other functions

6    simply by telling the vehicle what to do."[11]

7        58.    In actuality, however, the CUE System fails to promote driver safety

8    or maintain a "fully capacitive faceplate pulse [that] when pressed to acknowledge

9    the driver's commands and helps keep the driver's eyes on the road." Instead, the

10   Defect causes drivers to become distracted, by impairing or rendering inoperative

11   many of the Cue System's safety features.

12       59.    For example, once the Defect has manifested, the driver is unable to

13   navigate to the proper menu because the touchscreen is inoperative. Thus, a driver

14   often cannot, among other things: (1) pair an electronic device to the CUE using

15   Bluetooth because s/he cannot navigate to the appropriate devices on the CUE

16   touchscreen menu; (2) answer calls through the touchscreen or to make calls using

17   the touchscreen, even if the driver's cellular phone was paired via Bluetooth before

18   the Defect manifested; or (3) use the navigation system by viewing nearby vendors,

19   such as gas stations, on the touchscreen, or entering destinations into the navigation

20   system using the touchscreen. These are only a few of the safety and technology

21   functions rendered inoperative due to the Defect.

22       60.    Even more troubling, the spider-webbing that results from the Defect

23   obscures the CUE display, which, in turn, distorts or masks the backup camera's

24   images, rendering the camera unusable. A backup camera is a NHTSA

25

26   ─────────────────────
     [10]    See GM press release, "2014 CTS Sedan Stretches Cadillac's
27   Design Philosophy," dated March 26, 2013, available at:
     https://media.gm.com/media/us/en/gm/autoshows/new_york.detail.html/content/
28   Pages/news/us/en/2013/Mar/nyas/26mar-cadillac/0326-cadillac-cts-design.html
     (last accessed September 8, 2019).
     [11]    *Id.*

1  recommended safety device in all cars.[12]

2    61.    In addition to the obvious risk of a backup camera that may not clearly

3  display obstructions or even small children or animals in the CUE touchscreen

4  display, the Defect causes distracted driving and presents an unreasonable safety

5  hazard instead of enhancing safety as advertised.

6    62.    In 2017, distracted driving killed 3,166 people. According to the

7  Centers for Disease Control, there are three types of distracted driving: (1) visual

8  (i.e., not focusing on the road); (2) cognitive (i.e., thinking about something other

9  than the road and immediate driving needs); and (3) manual (i.e., physically taking

10  one's hands off the steering wheel).[13]

11    63.    The Defect poses a safety risk by distracting drivers in all three ways

12  highlighted by the CDC: (1) drivers are unable to read or see the screen clearly,

13  causing them to divert their eyes from the road longer than under normal conditions;

14  (2) drivers become focused on, and frustrated by, the malfunctioning display while

15  driving; and (3) when the touchscreen works intermittently or inconsistently, drivers

16  must remove their hands from the steering wheel more frequently and for longer

17  periods of time than when the CUE functions as it was advertised to do.

18    **B.    GM's Knowledge of the Defect**

19    64.    Plaintiffs are informed and believe and based thereon allege that prior

20  to the sale of the Class Vehicles, GM knew, or should have known, about the Defect

21  through its exclusive knowledge of non-public, internal data about the Defect,

22  including: pre-release testing data; early consumer complaints about the Defect to

23  GM's dealers who are their agents for vehicle repairs; warranty claim data related

24  to the defect; aggregate data from GM's dealers; consumer complaints to the

25  NHTSA and resulting notice from NHTSA; dealership repair orders; testing

26

27  [12]    *See* NHTSA, https://www.nhtsa.gov/equipment/driver-assistance-technologies#backing-parking-30656 (last accessed September 9, 2019).

28  [13]    *See* NHTSA, "U Drive. U Text. U Pay" available at: https://www.nhtsa.gov/risky-driving/distracted-driving (last accessed September 9, 2019).

conducted in response to owner or lessee complaints; GM service bulletins applicable to the Class Vehicles; and other internal sources of aggregate information about the problem. Nevertheless, Defendant has actively concealed and failed to disclose this defect to Plaintiffs and Class Members at the time of purchase or lease and thereafter.

### a. GM's Press Releases Touting Extensive Research and Development of the CUE System Demonstrate Its Knowledge of the Defect Through Non-Public Pre-Sale Testing Exclusively in GM's Control.

65.    Well before the first Class Vehicle was sold, GM knew or should have known that the CUE Systems were defective in design and/or manufacture and that the Defect would adversely affect the drivability of the Class Vehicles and cause safety hazards, including driver distraction. Beginning development in 2008, GM repeatedly touted its "consumer-focused methodology" in designing the CUE System as early as this January 8, 2012 press release:

Among the many innovations to come from the research [behind the CUE System] was proximity sensing, natural voice recognition, haptic feedback and our unique capacitive touch screen with the concealed storage compartment behind the user interface.

'Cadillac CUE enables drivers to put the smartphone or tablet away, while channeling the capability and media from those devices through the car, via an elegant and intuitive user experience,' says Jim Vurpillat, Cadillac global marketing director.

Using a clean sheet approach, Cadillac revisited not just the hardware, but the entire interaction between driver and car. Topping the list was the user interface, which in the automotive industry has been an Achilles' heel for users and critics alike.

The CUE team, made up of designers, engineers and software developers, used a consumer-focused methodology called Contextual Design. It's a process in which interviewers immerse themselves into the lives of users to understand the most subtle aspects of how they use products, how they work around shortcomings, and how they'd wish for improvements.

So team members rode along with luxury car owners on daily commutes, tagged along on vacations and sometimes squeezed in the back seats with families and groceries. The team constantly sketched their observations, no matter how mundane. Sometimes the observations were troubling, such as cell phones stuffed into cup holders or door pockets for constant reference while driving.

CLASS ACTION COMPLAINT

1
2
3
4

> When the team members returned, they categorized thousands of observations, affixing them to a long wall at the General Motors Design Center in Warren, Mich. The CUE team would "walk the wall" to analyze driver frustrations, identify possible new capabilities, and look for common threads of where existing systems were failing or frustrating users. From there, they began to devise solutions.[14]

5
6
7
8

66.    In later press releases, GM continued to trumpet the extensive research and development it used to develop the CUE System, stating, "CUE development began in 2008 when Cadillac designers rode with 32 consumers for six months to study driver habits. Engineers and designers then used the data to develop CUE."[15]

9
10

**b.    GM's Own Service Bulletins Demonstrate Its Knowledge of the Defect as Early as September 1, 2014.**

67.    From December 2014 to August 2017, GM issued at least four service bulletins and service bulletin updates ("Service Bulletins," "Technical Service Bulletins," or "TSBs") to its dealers in the United States, but not its customers, acknowledging the Defect in the Class Vehicles.

11
12
13
14

68.    In December 2014, GM issued a TSB titled "Bulletin No.: PIC6055" titled "Integrated Center Stack Display Delaminating Distorted or Appears Cracked Behind Lens.". TSB PIC6055 further stated that "[s]ome customers may report that their radio screen appears bubbled, cracked, or is delaminating." The TSB directed its technicians, "If this concern is encountered, replace the ICS (Integrated Center Stack by following the SI replacement procedure."[16] This TSB included a "Warranty Information" section with a specific Labor Operation code for technicians to use when replacing the ICS.

15
16
17
18
19
20
21
22

69.    According to this TSB, the Defect affected the following models:

Cadillac ATS (model years 2013-2014)

Cadillac SRX (model years 2013-2014)

23
24
25

---

26
27
28

[14]    *See* GM press release, "Contextual Research Drives Innovative Tech Design," dated Jan. 8, 2012, available at: https://media.cadillac.com/media/us/en/cadillac/news.detail.html/content/Pages/news/us/en/2012/Jan/0108_cadillac_cue.html (last accessed September 8, 2019).
[15]    *See* n.4 (emphasis added).
[16]    https://static.nhtsa.gov/odi/tsbs/2014/SB-10073912-0699.pdf

Cadillac XTS (model years 2013-2014)

Cadillac CTS Vin A (model year 2014)

70.     From January 20, 2016 to October 2018, GM subsequently issued three more versions of PIC6055, numbered PIC6055A through PIC6055C, each time expanding the number of models and model years affected by the Defect.

71.     In or around April 2015, GM issued PIC6055A to include more vehicles, listing the following as affected models:

Cadillac ATS (model years 2013-2015)

Cadillac SRX (model years 2013-2015)

Cadillac XTS (model years 2013-2015)

Cadillac CTS Vin A (model years 2014-2015)

Cadillac ELR (model years 2014-2015)

72.     In or around October 2016, GM issued PIC6055B to include more vehicles, listing the following as affected models:

Cadillac ATS (model years 2013-2016)

Cadillac SRX (model years 2013-2016)

Cadillac XTS (model years 2013-2016)

Cadillac CTS Vin A (model years 2014-2016)

Cadillac ELR (model years 2014-2016)

Cadillac Escalade (model years 2014-2016)

73.     In or around August 2017, GM issued PIC6055C to include more vehicles, listing the following as affected models:

Cadillac ATS (model years 2013-2017)

Cadillac SRX (model years 2013-2017)

Cadillac XTS (model years 2013-2017)

Cadillac CTS Vin A (model years 2014-2017)

Cadillac ELR (model years 2014-2017)

Cadillac Escalade (model years 2014-2017)

CLASS ACTION COMPLAINT

74.     Each of the above bulletins demonstrates GM was aware of the Defect and recognized it was covered under its Warranty by including warranty codes to effectuate the repair.

      ***c.***     ***Numerous Consumer Complaints on the NHTSA Demonstrate That GM Was Aware of the Defect.***

75.     Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

76.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. Id. Thus, GM knew or should have known of the many complaints about the Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Defect.

77.     Hundreds, if not thousands, of purchasers and lessees of the Class Vehicles have experienced problems with the CUE System. Complaints that owners and lessees filed with the NHTSA demonstrate that the defect is widespread, contributes to driver distraction, and that it manifests without warning. The complaints also indicate GM's awareness of the problems with the CUE System and how potentially dangerous the defective condition is for consumers. The following is just a small sampling of the numerous complaints, often safety-related, describing the Defect (spelling and grammar mistakes remain as found in the original) (Safecar.gov, Search for Complaints (September 9, 2019), http://www-

odi.nhtsa.dot.gov/complaints/):

78.    The following incident dated May 13, 2016, NHTSA ID Number: 10871315, was reported:

ON MAY 13, 2014, AT 10 AM I HAD TO TRAVEL LESS THAN 2 MILES FROM MY OWN HOUSE TO MY PODIATRIC DOCTOR. THE CAR WAS STATIONARY UNTIL THE END OF MY APPOINTMENT ABOUT 30 MINUTES.

UPON GOING BACK TO MY HOUSE, I NOTICED SOME LIKE SCRATCHES ON THE DASHBOARD SCREEN THAT HOUSE ALL CONTROLS, SUCH TO PLAY A RADIO STATION ETC.

THE ARE ON THE RIGHT SIDE OF THE SUCH SCREEN ABOUT 2 INCHES WIDE AND ALL THE WAY TO THE TOP.

ON MAY/16/2016 I CALLED BAKER CADILLAC OF CHARLESTON SC, EXPLAIN WHAT IT HAD HAPPEN, WERE TOLD TO BRING THE CAR SO THEY COULD LOOK AT IT, SOME WE DID ON MAY/24/2016, WERE TOLD THAT WILL NEED TO ORDER THE PART AND WILL LET ME KNOW WHEN THEY HAD IT, I HAD TO INSIST FOR THE PERSON TO WRITE AN ORDER, SOME HE DID BUT NOT VEY HAPPY.

WHILE WE WERE WAITING FOR THE FORM TO BE READY ANOTHER EMPLOYEE TOLD US THAT IF WE SEE A RED LIGHT NOT TO DRIVE AND THAT HAD HAPPEN ON OTHER VEHICLES AND THEY ARE SEVERAL PIECES OF PLASTIC ON THAT CONFIGURATION, UPON RETURNING HOME A LONG ABOUT 1.1/4 INCH RED LIGHT APPEARED ON THE LEFT SIDE OF SUCH SCREEN, AS TODAY MAY/28/2016 THE VEHICLE IS NOT BEEN OUT OF MY GARAGE AND IT WILL BE THERE TILL THE TIME TO TAKE TO DEALER TO BE REPAIRED. . . .

79.    The following incident dated May 19, 2016, NHTSA ID Number: 10865844, was reported:

CADILLAC CUE SYSTEM AND CENTER STACK SYSTEM FREEZING AND UNRESPONSIVE. THE CADILLAC ELR'S HVAC, NAVIGATION, AUDIO AND OTHER SYSTEM FUNCTIONS ARE ALL CONTROLLED ONLY BY TOUCH SENSITIVE PANEL EITHER IN THE CUE SCREEN OR BELOW IT. WHEN CUE FREEZES OR LAGS AS IT OFTEN DOES THIS CAUSES A DANGEROUS OCCURRENCE WHERE THE DRIVER MUST DIVERT ATTENTION FROM THE ROAD TO OPERATE THE CAR'S SYSTEM. WHILE ON MY NORMAL COMMUTE THIS MORNING I WENT TO ADJUST MY AIR CONDITIONING WHEN THE SYSTEM FROZE. I WAITED FOR THE SYSTEM TO CATCH UP OR UN-FREEZE AND AS THE SCREEN STARTED TO RESPOND MY DISTANCE SENSOR SOUNDED AND I HAD TO SLAM ON MY BRAKES

CLASS ACTION COMPLAINT

TO AVOID HITTING A CAR THAT HAD SLOWED IN FRONT OF ME. THE
CONSTANT MALFUNCTION OF THIS SLOW OPERATING SYSTEM
DIVERTS ENTIRELY TOO MUCH ATTENTION AWAY FROM THE ROAD
AND CREATES AN UNSAFE DRIVING EXPERIENCE. THE
ALTERNATIVE IS TO NOT ENGAGE WITH AUDIO OR HVAC
CONTROLS WHILE DRIVING, WHICH IS NOT THE INTENDED DESIGN
OF THE CAR. THE LAGGING CUE SYSTEM HAS PERSONALLY
CAUSED DISTRESS AND NERVOUSNESS WHILE DRIVING THIS CAR.
I'VE ADDRESSED THESE CONCERNS WITH BOTH CADILLAC
EXECUTIVE TEAM AND TWO LOCAL DEALERSHIPS ALL OF WHICH
SAY THE SYSTEM FUNCTIONS AS DESIGNED.

80.     The following incident dated November 16, 2016, NHTSA ID
Number: 10935862, was reported:

INFORMATION CENTER CADILLAC CUE DOES NOT OPERATE.
BROUGHT TO DEALER ON 11/17/2016 AND WAS TOLD 30 DAYS TO
SEVERAL MONTHS ON BACK ORDER. TODAY IS 12/16/2016 CALLED
DEALER NO ESTIMATED COMPLETION TIME. CALLED CADILLAC
SAME ANSWER. THE CADILLAC CUE CONTROLS A/C, HEAT, RADIO
AND ALL THE ACCESSORIES. DOES THIS FALL UNDER THE LEMON
LAW? I HAVE BREATHING PROBLEMS AND CAN'T SAFELY DRIVE
THIS VEHICLE. TEMPERATURES THIS WEEKEND WILL BE -12
DEGREES FAHRENHEIT. PLEASE ADVISE WHAT ACTIONS I CAN
TAKE TO RESOLVE THIS ISSUE ASAP.

81.     The following incident dated October 3, 2017, NHTSA ID Number:
11031539 was reported:

THE COMPUTER ON THE DASH THAT CONTROLS THE BACKUP
CAM RADIO ETC. HAS BEEN REPLACED WHILE UNDER WARRANTY
BEGAN CRACKING FOR NO APPARENT REASON. CADILLAC WILL
NOT REPLACE THE PART AND CANNOT GUARANTEE THE PART WILL
NOT FAIL A 3RD TIME. TOLD MANY PEOPLE HAVE THIS PROBLEM.

82.     The following incident dated November 18, 2017 NHTSA ID Number:
11051698, was reported:

SHORTLY ARRIVING BEING MOVED TO TEXAS BY THE ARMY,
I NOTICED A HAIRLINE CRACK IN THE TOP LEFT CORNER OF MY
CUE NAVIGATION SYSTEM. AFTER A FEW DAYS THE CRACK
SPREAD AND BEGAN AFFECTING THE TOUCH SCREEN. INITIALLY A
SMALL SECTION AT THE BOTTOM OF THE SCREEN STOPPED
RESPONDING TO TOUCH. THUS, MAKING IT IMPOSSIBLE TO CHANGE
RADIO STATIONS OR ENTER AN ADDRESS INTO THE NAVIGATION.
APPROXIMATELY A WEEK LATER THE ENTIRE CUE STOPPED

WORKING. FROM WHAT I HAVE SEEN ONLINE, THIS IS A COMMON
ISSUE FOR THE CADILLAC CUE SHORTLY AFTER VEHICLES REACH
50K MILES.

83.    The following incident dated January 14, 2018, NHTSA ID Number:
11062747, was reported:

MY CADILLAC CUE TOUCH SENSE TOUCH SCREEN IS NO
LONGER FUNCTIONING AT ANY TIME, SITTING STILL OR WHILE THE
VEHICLE IS IN MOTION. THE SCREEN IS SPIDER WEBBED
(DELAMINATION OF CONDUCTIVE LAYER OF MATERIAL BEHIND
THE GLASS) AND NO LONGER ALLOWS ME TO SET THINGS LIKE THE
COLLISION AVOIDANCE, AUTO- BRAKING AND LANE DEPARTURE
OPTIONS AS WELL AS MANY OTHER NON-SAFETY RELATED
FEATURES. THIS IS CLEARLY A MANUFACTURING DEFECT AND I
HAVE READ AT ONE TIME CADILLAC HAD A BACKLOG OF OVER
4000 VEHICLES WAITING ON REPLACEMENT CUE MODULES BUT
YET NO VOLUNTARY RECALL. HOPEFULLY THE NHTSA CAN LOOK
INTO THIS MATTER AND REQUIRE CADILLAC TO CORRECT THIS
PROBLEM FOR OWNERS NO LONGER UNDER WARRANTY SINCE
SOME FUNCTIONS WITH THE TOUCH SCREEN ARE RELATED TO
VEHICLE SAFETY (COLLISION AVOIDANCE, AUTO-BRAKING AND
LANE DEPARTURE).

84.    The following incident dated June 1, 2018, NHTSA ID Number:
11099193, was reported:

TL*THE CONTACT OWNS A 2013 CADILLAC SRX. THE
CONTACT STATED THAT THE CADILLAC USER EXPERIENCE (CUE)
SCREEN WAS CRACKED. AS A RESULT, THE VARIOUS FUNCTIONS
THAT THE CUE SCREEN CONTROLLED WERE NO LONGER
FUNCTIONAL. THE FAILURE OCCURRED WHILE AT A GOODYEAR
REPAIR FACILITY. THE GOODYEAR TECHNICIAN INFORMED THE
CONTACT THAT THE FAILURE WAS DUE TO EXTREME
TEMPERATURES. THE VEHICLE WAS NOT TAKEN TO A DEALER FOR
DIAGNOSTIC TESTING OR REPAIRS. THE MANUFACTURER WAS
NOTIFIED AND DID NOT ASSIST. THE FAILURE MILEAGE WAS
APPROXIMATELY 61,000.

85.    The following incident dated June 15, 2018, NHTSA ID Number:
11102179, was reported:

THE CADILLAC CUE (INFORMATION/ NAVIGATION / AIR
CONDITION SYSTEM) DEVELOPED SPIDER WEB TYPE CRACKS
INSIDE THE SCREEN; THIS MAKES IT HARD TO SEE OR USE CONTROL
FEATURES. I WENT ONLINE AND FOUND HUNDREDS OF PEOPLE ARE

HAVING THE SAME ISSUE. ONE PERSON HAS ONLY 19,000 MILES AND HAS THE WEB LIKE CRACKS. IT WAS 90° WHEN I GOT INTO MY CAR AND SAW A FEW OF THESE CRACKS (THESE CRACKS ARE SMOOTH TO TOUCH ON SCREEN), BUT A WEEK LATER IT'S GOTTEN BIGGER. A SOURCE SAYS IT'S A FACTORY DEFECT, AND THAT THE CRACKS ARE THE GLUE OR ADHESIVE HAS DISSIPATED AND IS DETACHING THE SCREEN FROM THE ACTUAL COMPONENT. I HAVE 44,000 MILES ON MY VEHICLE ... IT STAYS UNDER THE CARPORT BUT IS STILL HAVING THIS ISSUE. WITH SO MANY PEOPLE COMPLAINING AND POSTING PICTURES ON GENERAL MOTORS DISCUSSION THREAD, ONE WOULD THINK SOMETHING WOULD'VE GOTTEN DONE. AS STATED BEFORE, IT WAS A SMALL LINE AND IT'S CONSTANTLY SPREADING THROUGHOUT THE CADILLAC CUE SCREEN. IT'S A SIMPLE ISSUE, BUT SHOULD CONSUMERS HAVE TO PAY THE DEALERSHIP FOR SOMETHING THEY HAVE NO CONTROL OVER? HERE IS THE  LINK WITH OTHERS COMPLAINING ABOUT THE SAME THING. HTTPS://WWW.CADILLACFORUM.COM/FORUM/CADILLAC-SRX-10/CUE- SCREEN-SPIDER-WEBBING-16740/

86.    The following incident dated June 18, 2018, NHTSA ID Number: 11102422, was reported:

MY 2014 CADILLAC CUE SCREEN HAS DEVELOPED A SPIDER WEB CRACKS WHICH PREVENT ME FROM SEEING THROUGH THE SCREEN. THIS HAS BECOME A SAFETY ISSUE BECAUSE I AM UNABLE TO VIEW THE BACKUP CAMERAS. THIS IS A KNOWN ISSUE WITH CADILLAC WITH NUMEROUS COMPLAINTS. I HAVE ONLY 35,000 MILES ON MY CAR. ONE DAY AFTER LEAVING MY CAR OUTSIDE DURING A HOT DAY, THE CRACKS APPEARED. CADILLAC/GM SHOULD BE RESPONSIBLE FOR THIS DEFECTIVE PRODUCT.

87.    The following incident dated August 5, 2018, NHTSA ID Number: 11115815, was reported:

THE CUE INFOTAINMENT SYSTEM IS STARTING TO FAIL. SEVERAL SELECTIONS I.E. "MEDIA" AND "SCAN" ARE NOT WORKING. THE CLEAR SCREEN COVER HAS STARTED TO CRACK. IT HAS COME TO MY ATTENTION THAT THIS IS A WIDESPREAD PROBLEM TO THE DEGREE THAT THE SYSTEM FAILS TOTALLY SHUTTING DOWN ALL THE MUSIC CAPABILITIES, REAR CAMERA, AND USE OF THE ON-STAR NAVIGATION SYSTEM AS WELL.

CLASS ACTION COMPLAINT

88. The following incident dated September 29, 2018, NHTSA ID Number: 11132253, was reported:

APPROXIMATELY 6 MONTHS AGO, I NOTICED A SMALL STRESS FRACTURE APPEAR IN THE BOTTOM LEFT CORNER OF THE CENTRAL DIGITAL DASHBOARD OF MY VEHICLE. THE DASHBOARD PROJECTS SAFETY, ENTERTAINMENT AND AUTOMOBILE OPERATING STATUS (E.G. DEFLATED TIRES, ONSTAR ALERTS, ETC.). AS THE FRACTURE GREW IT REVEALED A SPIDER WEB OF FRACTURES DISTORTING THE DASHBOARD AND AFFECTING THE SYSTEM'S OPERATION. THE SYSTEM WOULD SUDDEN BEGIN FLASHING DIFFERENT ICONS, SWIPING FROM SIDE TO SIDE WHICH IS VERY DISTRACTING. THE DIGITAL ICONS ARE NO LONGER FUNCTIONAL, YET THE FRACTURES CONTINUE TO GROW, AND THE DASHBOARD IS VERY DISTRACTING WHILE DRIVING.

WE REPORTED THE DEFECT TO MARVIN K. BROWN CADILLAC AND WAS INFORMED BY THE SERVICE ADVISOR, MERLE PORTER, SEVERAL OTHER SRX OWNERS HAVE REPORTED THE SAME ISSUE, IN WHICH GM RECOGNIZED AS A VEHICLE DEFECT. MR. PORTER REPORTED THE DEFECT TO GM, HOWEVER, GM DID NOT ACCEPT RESPONSIBILITY AND REFUSED TO RECALL THE COMPONENT OR REPLACE THE COMPONENT.

ON 09/29/2018, I SUBMITTED A COMPLAINT TO GM ASKING FOR A FURTHER INVESTIGATION (CASE# 84675794778).

THE ORIGIN OF THE FRACTURE IS LOCATED IN THE BOTTOM LEFT CORNER OF THE PANEL AND NO EXTERNAL FORCE OR IMPACT IS VISIBLE AND NO DAMAGE WAS OCCURRED BY ME OR MY PASSENGERS. I FEEL THIS DEFECT IS A CRITICAL SAFETY ISSUE DUE TO ITS DRIVER DISTRACTING RANDOMLY AND CONSISTING MOVING ICONS.

89. The following incident dated October 12, 2018, NHTSA ID Number: 11139973, was reported:

CUE RADIO, CLIMATE, NAVIGATION, BLUETOOTH SYSTEM, KEEPS FREEZING UP. NOW THE SCREEN HAS BEGUN TO SPIDER CRACK. THIS IS A VERY COMMON PROBLEM AMOUNT ALL CADILLAC'S MODELS USING THE CUE. IT IS STRANGE THAT THEY HAVEN'T A RECALL AND FIX.

### d.   Consumer Complaints on Internet Forums Demonstrate That GM Was Aware of the Defect

90.    Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread, causes safety risks, and that it can manifest without warning and/or suitable repair. The complaints also indicate GM's awareness of the problems with the CUE System and how potentially dangerous the defect is for consumers. The following are some = complaints specifically relating to the CUE System Defect (spelling and grammar mistakes remain as found in the original) (http://www.cadillacforums.com (September 9, 2019), http://www.cadillacforum.com (September 9, 2019)):

Complaints on CadillacForums.com

91.    On Cadillacfourms.com, many consumers complained about the Defect, including but not limited to the following complaints and responses by Cadillac Customer Care representatives:

(a)    On May 14, 2014, a consumer complained about the Defect:

 I have an 2013 ATS 2.0 and recently I discovered there is an INTERNAL, crack started on the lower left corner of the Cue. There were no scratches or damage to the peripheral area. I discovered this on the day I parked outside lot with a record heat of over 100 degree. Don't know if there is anything to do with it but it just happened. Interested to discover if anyone heard of such a case. Again, it is internal crack and only can be seen but no by touch. Thanks in advance.

(b)    On May 14, 2014, GM responded to the above complaint:

 Hello NewbieATS,

 I am sorry to hear of the crack you've recently noticed in your vehicle. I understand you are looking for advice from other forum members, but if you want your local Cadillac dealership to look into this for you, please feel free to send me a private message, I am more than happy to assist.

 Regards, Laura M.

 Cadillac Customer Care

(c)    On May 16, 2014, a consumer complained about the Defect:

Mine was brand new purchased March 2013. So far, my dealer seems good about it but will find out for sure tomorrow when I bring it in, but I don't expect any surprises. The cracking is getting worse, but the CUE still works fine.

(d)    On May 17, 2014, GM responded to the above complaint:

Hello bravnik,

If you would like to further discuss your situation or keep us updated after your dealership visit, please feel free to send us a private message. We are more than happy to assist anyway that we can!

Sincerely, Laura M.

Cadillac Customer Care

(e)    On July 7, 2014, a consumer complained about the Defect:

I took my XTS in for regular service and to take care of a recall and when I picked it up from the dealer (after hours) the glass over the radio/CUE was spider webbed from the inside. There is no impact mark or signs of excessive pressure, the outside surface is totally smooth. We are in New Orleans and it was about 95 outside when I picked up the car, so the only thing I can think of is the extreme heat caused it to break from the inside. I have to get the car in to have the dealer look at it and hopefully get it fixed thru warranty without a major headache.

Anyone heard of this happening?

It's been a rough couple of weeks with my Cadillacs and glass. My Escalade split a windshield sitting still in the driveway.

After jumping thru all the hoops Cadillac is going to replace it.

(f)    On July 9, 2014, GM responded to the above complaint:

Hello Edjeeg,

I hope I am not reaching out to you too late! Were you able to get your CUE screen fixed by your local dealership? If you are still in need of assistance, please let me know. I would be happy to help. Either way, I would like to know how things are going with the vehicle.

Katie O.

Cadillac Customer Care

CLASS ACTION COMPLAINT

(g)     On May 4, 2015, a consumer complained about the Defect:

One more cracked CUE screen. Semi-circular cracks were first [scr]ween on the left side and then after three days, the same appeared on the right side. I do have an appointment at Ed Morse Cadillac Brandon tomorrow and hopefully, they will resolve this time. I also have problems with my liftgate (2014 SRX); when I depress the button to open the lift-gate, I hear two quick clicks and cannot open the gate. I have to try several times to beat the second click. Hopefully, this item will also be resolved.

(h)     On May 5, 2015, GM responded to the above complaint:

Hello zoki.mbolekwa,

I am sorry to hear about each of these concerns with your SRX, but it is good to know that you will be working with the dealership to resolve them. Please let us know how the visit goes, and feel free to PM [private message] us if you require any additional assistance moving forward with this process.

Have a great day, Austin J.

Cadillac Customer Care

(i)     On June 15, 2015, a consumer complained about the Defect:

So, today was the hottest day in Atlanta so far this year…and since I bought my CTS last November. My car sat in my work parking lot for 9 hours today, closed windows and closed sunroof shade. I got in it, and drove to the gym, about 40 minutes. I had the air on, but nothing extreme. When I came out of the gym, the screen on my CUE display is "cracked" on the bottom right corner, sort of in a circular pattern…definitely "under" the glass (if that's what the material actually is). Has this happened to anybody else? I'll be going to the dealer tomorrow, but I thought I'd ask here, because I'm a little mad about it tonight! Thanks!

(j)     On June 16, 2015, GM responded to the above complaint:

Hello billrat,

We sincerely apologize for this inconvenience with your Cue screen but are happy to hear that you will be visiting the dealership today. Please keep us updated on your experience and feel free to reach out to us directly should you need further assistance with this concern.

Sincerely, Samantha N.

Cadillac Customer Care.

CLASS ACTION COMPLAINT

(k)     On April 19, 2016, GM responded to another complaint about the Defect:

 Hello mrtimstik and Jod,

We regret to hear that you both are experiencing this concern with the CUE display screen and understand how this may be frustrating. If you would like an additional layer of support while you work with your dealership towards a resolution, we would be happy to assist. If this is something of interest to you, please feel free to send us a private message. Kindly, Samantha N.

Cadillac Customer Care

Complaints on CadillacForum.com

92.     On CadillacForum.com, many consumers complained about the Defect, including but not limited to the following complaints and responses by Cadillac Customer Care representatives:

(a)     On February 21, 2016, a consumer complained about the Defect as follows:

 Hi,

I came out to my 2014 SRX yesterday after not driving it for a few days. I noticed that the cue screen on the left side had some spider webbing cracks in the scree[n], NO impact to the screen from objects and you can't feel the cracks with your nails. I drove it for about 1 hour with the heat on and it appears to have spread into longer cracks. What gives? I'm contacting my dealer and the Cadillac customer service department and see what they are going to do. I only have 17k on it. I HOPE they don't give me a problem and say it's from abuse or misuse, it is a touch screen and I see that other Cadillac's are having the same issue.

-Jim.

(b)     On February 23, 2016, GM responded to the above complaint:

 Hi Jim,

I'm very sorry to hear about these cracks in your CUE screen. Were you able to get this repaired by your local dealership? If you are still in need of assistance, please send us a private message; we would be happy to help.

Ashley R.

Cadillac Customer Care.

CLASS ACTION COMPLAINT

1    (c)    On January 20, 2018, a consumer complained about the Defect as
2    follows:

3        I have a 2013 Cadillac ATS with spider cracks on my cue screen I have
4    67,000 miles and I am out of warranty. When I drive and the sunlight hits it my
     radio goes Garza. I've read other forums and noticed this is an ongoing problem.
5    It was replaced once before when I was still under warranty and now it's
     happened again. Why does this continue to happen?
6

7    (d)    On March 27, 2018, GM responded to the above complaint:

8        Hi, Nathan. We regret to hear of your concern with your 2013 ATS Cue
     Screen. We understand how frustrating repeat concerns can be. We would like an
9    opportunity to review your situation further. Please e-mail us at
10   socialmedia@gm.com and include "ATT: Kell" in the subject line. We look
     forward to your reply there.
11
12       Kell S.
13       Cadillac Customer Care.

14   (e)    On March 14, 2018, in response to numerous consumer complaints
15   regarding the Defect, GM responded:

16       We regret to hear of your concerns with your CUE screen on your 2014
     SRX. We are here to help the best we can and review vehicle concerns on a case-
17   by-case basis. We would like an opportunity to address your situation further.
18   Please send us an e-mail at socialmedia@gm.com "ATTN: Kell" and we'll be
     able to assit you further. We look forward to your response there.
19
20       Kell S.
21       Cadillac Customer Care.

22   (f)    On May 24, 2018, GM responded to a consumer complaint about the
23   Defect, as follows:

24       Hello, Jonscott610. We regret to see the sentiments that you have
25   expressed. We strive to provide high quality, luxury vehicles that exceed our
     customers' expectations. Please know that your frustrations are certainly
26   recognized and has been do***ented within our internal system. Should you need
     further assistance, please email socialmedia@gm.com.
27

28   **e.    *GM's Knowledge of the Defect Through Customer Care Data and
            Vehicle Repair Data***

93.     GM was also made aware of the Defect based on the large number of repairs performed to The Cue System's exhibiting delamination and spider-webbing at its network of dealerships.

94.     In fact, with the introduction of the CUE System, GM announced a special customer care program with dedicated support staff trained with expertise on CUE Systems. For example, in this press release dated May 9, 2012, GM stated:

> Cadillac is launching CUE with training and support resources to enable dealers and customers to provide feedback, ask questions and access support in a number of ways. New customer care elements include:
>
> ****
>
> • Each U.S. Cadillac dealership has a trained technology expert to assist customers, providing a personal, local first line of contact during both the shopping and ownership experiences.
> • Twenty-five new Connected Customer Experts are being deployed across the United States. to support the launch of CUE. These connectivity experts provide a resource for in-car electronic technological training, sales and service assistance.
> • Cadillac's existing customer assistance services have added specific CUE experts to answer owner questions. Cadillac's customer assistance center in Austin, Texas, has specially selected and trained advisors who have expertise in infotainment and mobile devices to help answer questions.
> • OnStar, standard on every Cadillac, will have a direct link to these CUE experts as well, for any owners with questions or wishing to provide feedback.
>
> ****
>
> 'We're blending the advanced technology of CUE with the personal touches of a luxury experience,' Butler said. 'We've built a thorough approach, enabling customers to give us feedback on the technology as they use it, as well as providing support for dealers and buyers who have questions.'[17]

95.     In addition to the above, on information and belief, GM regularly compiles and analyzes detailed service information regarding such repairs. Indeed, on information and belief, GM requires dealers to maintain detailed and meticulous

---

[17] *See* GM press release, "Innovative Customer Care Comes With CUE Launch," dated May 9, 2012, available at: https://media.gm.com/media/us/en/gm/autoshows/detroit.detail.html/content/Pages/news/us/en/2012/May/0509_cue.html (last accessed September 9, 2019).

1    records for any such repairs.

2        **C.**    **Plaintiffs' Experiences**

3    *California Plaintiff Matt Goldstein (2013 Cadillac SRX)*

4        96.    In or around June 2016, Plaintiff Matt Goldstein ("Goldstein")

5    purchased a used 2013 Cadillac SRX from Fairfield Chevrolet, an authorized GM

6    dealer in Fairfield, California.

7        97.    Goldstein purchased his vehicle primarily for personal, family, or

8    household use. GM manufactured, sold, distributed, advertised, marketed, and

9    warranted the vehicle.

10       98.    Passenger safety, vehicle performance, gas mileage, and reliability

11   were all factors in Goldstein's decision to purchase the vehicle. Before purchasing

12   his Class Vehicle, Goldstein discussed his potential purchase with the authorized

13   dealer representative and researched the vehicle through various websites, including

14   Edmunds and Kelley Blue Book.  Goldstein requested a Vehicle Report that

15   revealed the CUE System was updated then replaced on or around June 19, 2013.

16       99.    Since mid-2018, Goldstein's CUE System has been unresponsive and

17   is entirely inoperative from the screen.  Shortly thereafter, Goldstein reported the

18   problems to GM and took his vehicle to an authorized GM dealer. The GM

19   technician confirmed that the CUE System was unresponsive and filed a claim with

20   GM requesting the GM cover the CUE System replacement under warranty.  GM

21   denied the claim and Goldstein was informed the repairs to the CUE System could

22   cost approximately $2,000.00.

23       100.  Goldstein's vehicle continues to exhibit the problems previously

24   reported to the authorized GM dealer.

25       101.  GM's authorized dealership has failed to adequately repair Goldstein's

26   vehicle or even acknowledge the CUE System Defect. Despite the diagnosis and

27   repair attempts by GM and its dealers, Goldstein's CUE System continues to be

28   inoperative and unresponsive.

102.   Had GM disclosed its knowledge of the Defect before Goldstein purchased his 2013 Cadillac SRX, Goldstein would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Goldstein. Like all Class Members, he would not have purchased his 2013 Cadillac SRX, or would not have paid the purchase price charged by GM, had he known that the CUE systems are prone to spontaneously delaminate, bubble or crack in a "spider-web" formation, rendering them useless.

103.   At all times, Plaintiff, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

***California Plaintiff Percy Sutton (2013 Cadillac XTS)***

104.   On or about September 6, 2016, Plaintiff Percy Sutton ("Sutton") purchased a used 2013 Cadillac XTS from Boulevard Cadillac, an authorized Cadillac dealer in Signal Hill, California.

105.   Plaintiff purchased his vehicle primarily for personal, family, or household use. GM manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

106.   The express written warranty was a material factor in Plaintiff's decision to purchase the vehicle.

107.   Passenger safety, vehicle performance, and reliability were all factors in Plaintiff Sutton's decision to purchase the vehicle. Before purchasing his Class Vehicle, Sutton test drove the vehicle, discussed the potential purchase with an authorized dealer representative, and reviewed the window, or Monroney, sticker on the vehicle.

108.   On or around August 2, 2019, with approximately 37,898 miles on the odometer of his Cadillac XTS, Sutton delivered his vehicle to Cadillac of Las Vegas West complaining that "radio screen is not working" and had cracked and bubbled. The technician inspected the vehicle and determined that the radio control assembly/CUE required replacement. Sutton paid $100 for the CUE System

1 | replacement.

2 | 109. Had GM disclosed its knowledge of the Defect before Sutton
3 | purchased his 2013 Cadillac XTS, Sutton would have seen such disclosures and
4 | been aware of them. Indeed, GM's omissions were material to Sutton. Like all Class
5 | Members, he would not have purchased his 2013 Cadillac XTS, or would not have
6 | paid the purchase price charged by GM, had he known that the CUE systems are
7 | prone to spontaneously delaminate, bubble or crack in a "spider-web" formation,
8 | rendering them useless.

9 | 110. At all times, Plaintiff, like all Class Members, has driven his vehicle in
10 | a foreseeable manner and in the manner in which it was intended to be used.

11 | ***California Plaintiff Julian Wilder (2014 Cadillac SRX)***

12 | 111. In 2014, Plaintiff Julian Wilder ("Wilder") purchased a new 2014
13 | Cadillac SRX from Mark Christopher Auto Center, an authorized Cadillac dealer in
14 | Ontario, California.

15 | 112. Plaintiff purchased his vehicle primarily for personal, family, or
16 | household use. GM manufactured, sold, distributed, advertised, marketed, and
17 | warranted the vehicle.

18 | 113. The express written warranty was a material factor in Plaintiff's
19 | decision to purchase the vehicle.

20 | 114. Passenger safety, vehicle performance, and reliability were all factors
21 | in Plaintiff Wilder's decision to purchase the vehicle.

22 | 115. Within the first four months after purchase, Plaintiff's CUE system
23 | began malfunctioning. Wilder brought his vehicle to an authorized GM dealership
24 | to inspect his vehicle's CUE system. The technician confirmed that the CUE system
25 | was unresponsive and malfunctioning and replaced the entire system under
26 | warranty.

27 | 116. Then, in 2018, Plaintiff's CUE system screen spontaneously cracked.
28 | Wilder brought his vehicle to Dutton Cadillac of Riverside, an authorized GM

CLASS ACTION COMPLAINT

dealership, to inspect his vehicle's CUE system. The GM technician informed him that the cost to repair the CUE system would be approximately $1,600. Goldstein's vehicle continues to exhibit the problems previously reported to the authorized GM dealer.

117. GM's authorized dealership has failed to adequately repair Wilder's vehicle or even acknowledge the CUE System Defect. Despite the diagnosis and repair attempts by GM and its dealers, Wilder's CUE System remains cracked and inoperative.

118. Had GM disclosed its knowledge of the Defect before Wilder purchased his 2014 Cadillac SRX, Wilder would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Wilder. Like all Class Members, he would not have purchased his 2014 Cadillac SRX, or would not have paid the purchase price charged by GM, had he known that the CUE systems are prone to spontaneously delaminate, bubble or crack in a "spider-web" formation, rendering them useless.

119. At all times, Plaintiff, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### *Florida Plaintiff Lana Savage (2013 Cadillac SRX)*

120. In or around July 2013, Plaintiff Lana Savage purchased a new 2013 Cadillac SRX from Premier Cadillac (now Fields Cadillac St. Augustine), a GM authorized Cadillac dealership in St. Augustine, Florida. Her vehicle was equipped with a CUE System.

121. Plaintiff purchased her vehicle primarily for personal, family, or household use. GM manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

122. The express written warranty was a material factor in Plaintiff's decision to purchase the vehicle.

123. At the time of purchase, the vehicle's CUE touchscreen did not exhibit

any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Plaintiff, at the time she purchased her vehicle, the CUE had the Defect. GM knew about the Defect at the time Plaintiff purchased the vehicle but did not disclose it to her. Plaintiff purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had Plaintiff known about the Defect, she would not have purchased the vehicle or would have paid less for it.

124.  In 2015, the CUE touchscreen of Plaintiff's vehicle began to crack and malfunction by becoming unresponsive to Plaintiff's touch.

125.  On or about July 23, 2015, with approximately 33,697 miles on the odometer, Plaintiff took her vehicle to Fields Cadillac, an authorized Cadillac dealer, complaining that the CUE System touchscreen was cracked and unresponsive. According to Plaintiff's repair records, the dealership technicians confirmed that they "found that cue screen was cracked[.]" They subsequently "ordered [a] new unit and installed [a] new unit." However, this did not resolve the Defect.

126.  Approximately one year later, the CUE System touch screen again cracked and became unresponsive. Plaintiff's husband returned to the Cadillac dealership to request repairs, but the repair technicians informed him that the repairs would not be covered. The repair technicians further estimated the cost of replacement at $1,200, which Plaintiff would have to pay at her own expense.

127.  GM's authorized dealership has failed to adequately repair Plaintiff's vehicle by replacing the defective CUE Systems with equally defective CUE Systems. Despite these repair attempts by GM and its dealers, Plaintiff's CUE System touchscreen continues to remain cracked and completely unresponsive.

128.  The Defect and its many deleterious consequences have created unsafe driving conditions.

129.  Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the Defect and/or the defective design prior to

her purchase.

130.   Had GM disclosed its knowledge of the Defect before Plaintiff purchased her 2013 Cadillac SRX, Plaintiff would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Plaintiff. Like all Class Members, Plaintiff would not have purchased her 2013 Cadillac SRX, or would not have paid the purchase price charged by GM, had she known that the CUE System touchscreens are prone to cracking, bubbling, delaminating, and spider-webbing, causing the System to malfunction.

131.   At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### *Michigan Plaintiff Gladys Tubbs (2014 Cadillac SRX)*

132.   On or about September 2014, Plaintiff Gladys Tubbs purchased a new 2014 Cadillac SRX from Stan Lassen Cadillac (now Superior Cadillac), which was an authorized Cadillac dealership in in Battle Creek, Michigan. Plaintiff purchased her vehicle primarily for personal, family, or household use. GM manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

133.   The express written warranty was a material factor in Plaintiff's decision to purchase the vehicle.

134.   At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Plaintiff, at the time she purchased her vehicle, the CUE had the Defect. GM knew about the Defect at the time Plaintiff purchased the vehicle but did not disclose it to her. Plaintiff purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had Plaintiff known about the Defect, she would not have purchased the vehicle or would have paid less for it.

135.   In 2018, the CUE touchscreen of Plaintiff's vehicle began to crack and malfunction by becoming unresponsive to Plaintiff's touch. Plaintiff was unable to control the temperature in her vehicle or use Bluetooth-paired devices.

136.   On or about June 21, 2019, with approximately 43,905 miles on the odometer, Plaintiff took her vehicle to Superior Cadillac, an authorized Cadillac dealer, complaining that the CUE System touchscreen was completely unresponsive. According to Plaintiff's repair records, she reported that the CUE System was webbing, and dealership technicians "replace[d] the display assembly." However, the dealership invoiced her for both labor and parts totaling $1,396.36, eventually reducing the amount Plaintiff paid out-of-pocket to $1,191.12 by applying a "coupon" discount.

137.   GM's authorized dealership has failed to adequately repair Plaintiff's vehicle by replacing the defective CUE Systems with equally defective CUE Systems. Despite these repair attempts by GM and its dealers, Plaintiff's CUE System touchscreen continues to manifest or will manifest cracking, bubbling, delaminating, spider-webbing, or malfunctioning.

138.   The Defect and its many deleterious consequences have created unsafe driving conditions.

139.   Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the Defect and/or the defective design prior to her purchase.

140.   Had GM disclosed its knowledge of the Defect before Plaintiff purchased his 2014 Cadillac SRX, Plaintiff would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Plaintiff. Like all Class Members, Plaintiff would not have purchased his 2014 Cadillac SRX, or would not have paid the purchase price charged by GM, had she known that the CUE System touchscreens are prone to cracking, bubbling, delaminating, and spider-webbing, causing the System to malfunction.

141.   At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### *Texas Plaintiff Kendra Piazza (2015 Cadillac SRX)*

142.   In or about December 2015, Plaintiff Kendra Piazza purchased a new 2015 Cadillac SRX from Garland Cadillac, a GM authorized Cadillac dealership in Garland, Texas. Her vehicle was equipped with a CUE System.

143.   Plaintiff purchased her vehicle primarily for personal, family, or household use. GM manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

144.   The express written warranty was a material factor in Plaintiff's decision to purchase the vehicle.

145.   At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Plaintiff, at the time she purchased her vehicle, the CUE had the Defect. GM knew about the Defect at the time Plaintiff purchased the vehicle but did not disclose it to her. Plaintiff purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had Plaintiff known about the Defect, she would not have purchased the vehicle or would have paid less for it.

146.   In or around August 2016, the CUE touchscreen of Plaintiff's vehicle began to crack and malfunction.

147.   On or about August 12, 2016, with approximately 5,896 miles on the odometer, Plaintiff took her vehicle to an authorized Cadillac dealer, complaining that the CUE entertainment System was malfunctioning. According to Plaintiff's repair records, she reported that the CUE System was "intermittently freezing up," and dealership technicians "replace[d] the center CUE radio control display" due to an "internal failure in CUE central radio display." However, this did not resolve the Defect.

148.   In or around June 2019, Plaintiff's CUE System malfunctioned again. On or about June 20, 2019, with approximately 24,042 miles on the odometer, Plaintiff took her vehicle back to an authorized Cadillac dealer due to the CUE System malfunction. According to Plaintiff's repair records, she reported that the

CLASS ACTION COMPLAINT

"CUE System [was] freezing up on lower button" and unresponsive. Again, dealership technicians "replace[d] the center CUE radio control display" due to an "internal failure in CUE central radio display." However, this did not resolve the Defect.

149.   GM's authorized dealership has failed to adequately repair Plaintiff's vehicle by replacing the defective CUE Systems with equally defective CUE Systems. Despite these repair attempts by GM and its dealers, Plaintiff's CUE System touchscreen continues to manifest or will manifest cracking, bubbling, delaminating, spider-webbing, or malfunctioning.

150.   The Defect and its many deleterious consequences have created unsafe driving conditions.

151.   Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the Defect and/or the defective design prior to her purchase.

152.   Had GM disclosed its knowledge of the Defect before Plaintiff purchased her 2015 Cadillac SRX, Plaintiff would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Plaintiff. Like all Class Members, Plaintiff would not have purchased her 2015 Cadillac SRX, or would not have paid the purchase price charged by GM, had she known that the CUE System touchscreens are prone to cracking, bubbling, delaminating, and spider-webbing, causing the System to malfunction.

153.   At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

***Texas Plaintiff Rafael Martinez (2014 Cadillac CTS)***

154.   In or around September 2017, Plaintiff Rafael Martinez purchased a used 2014 Cadillac CTS with approximately 25,792 miles on the odometer, from Ken Batchelor Cadillac, a GM authorized Cadillac dealership in San Antonio, Texas. His vehicle was equipped with a CUE System.

155.   Plaintiff purchased his vehicle primarily for personal, family, or household use. GM manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

156.   The express written warranty was a material factor in Plaintiff's decision to purchase the vehicle.

157.   At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Plaintiff, at the time he purchased his vehicle, the CUE had the Defect. GM knew about the Defect at the time Plaintiff purchased the vehicle but did not disclose it to him. Plaintiff purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable. Had Plaintiff known about the Defect, he would not have purchased the vehicle or would have paid less for it.

158.   In or around October 2018, the CUE touchscreen of Plaintiff's vehicle became intermittently unresponsive to Plaintiff's touching the screen.

159.   On or around October 5, 2018, with approximately 43,559 miles on the odometer, Plaintiff took his vehicle to Ken Batchelor, the authorized Cadillac dealer, complaining that the CUE System was malfunctioning. According to Plaintiff's repair records, he reported that the "CUE Screen [was]having trouble recognizing customer touch in the bottom middle area of the screen" and that he "tried recalibrating and that has not permanently helped at all." The dealership technicians eventually replaced the CUE radio control model, which was initially back-ordered. However, this did not resolve the Defect.

160.   In or around August 2019, Plaintiff's CUE System malfunctioned again. On or about August 7, 2019, with approximately 57,605 miles on the odometer, Plaintiff took his vehicle back to Ken Batchelor Cadillac due to the CUE System malfunction. According to Plaintiff's repair records, he reported that "when pressing the home button on the CUE screen the entire screen goes blank. The music will continue to play. The customer will press the home button multiple times before

the screen comes back on." The dealership technicians noted: "cause: screen to have [sic] internal fault" and "verified customer concern of CUE screen going blank at times[.]" The repair notes reflected that after various electrical circuits were tested and no faults were found, the CUE screen was replaced. However, this did not resolve the Defect.

161.  A few days later, Plaintiff's CUE System malfunctioned again. On or about August 17, 2019, with approximately 57,920 miles on the odometer, Plaintiff took his vehicle back to Ken Batchelor Cadillac due to the CUE System malfunction. According to Plaintiff's repair records, he reported that "when pressing the home button on the CUE screen, a blank gray screen appears and the screen completely freezes and the cust[omer] cannot control anything." The dealership technicians replaced the camera and control module, charging Plaintiff $45.00. However, this did not resolve the Defect.

162.  GM's authorized dealership has failed to adequately repair Plaintiff's vehicle by replacing the defective CUE Systems with equally defective CUE Systems. Despite these repair attempts by GM and its dealers, Plaintiff's CUE System touchscreen continues to manifest or will manifest cracking, bubbling, delaminating, spider-webbing, or malfunctioning.

163.  The Defect and its many deleterious consequences have created unsafe driving conditions.

164.  Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the Defect and/or the defective design prior to purchase.

165.  Had GM disclosed its knowledge of the Defect before Plaintiff purchased his 2014 Cadillac CTS, Plaintiff would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Plaintiff. Like all Class Members, Plaintiff would not have purchased his 2014 Cadillac CTS, or would not have paid the purchase price charged by GM, had he known that the CUE

System touchscreens are prone to cracking, bubbling, delaminating, and spider-webbing, causing the System to malfunction.

166. At all times, Plaintiff, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

## CLASS ACTION ALLEGATIONS

167. Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

168. Pursuant to Fed. R. Civ. Proc. 23(b)(2), (b)(3) or (c)(4), Plaintiffs assert classes based on the applicable state law of the plaintiffs. The Class and Sub-Classes are defined as:

**Nationwide Class**: All individuals in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

**California Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of California.

**Florida Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of Florida.

**Michigan Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of Michigan.

**Texas Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of Texas.

169. Excluded from the Class and Sub-Classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged

CLASS ACTION COMPLAINT

herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class or any Sub-Class should be expanded or otherwise modified.

170. **Numerosity**: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in GM's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

171. **Typicality**: Plaintiffs' claims are typical of the claims of the Class and Sub-Classes in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM, and equipped with the defective CUE Systems. The representative Plaintiffs, like all Class Members, have been damaged by GM's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective CUE System components. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class as a whole.

172. **Commonality**: There are numerous questions of law and fact common to Plaintiffs, the Class and Sub-Classes that predominate over any question affecting only individual Class Members. These common legal and factual issues include the following:

(a)    Whether Class Vehicles contain defects relating to the CUE System;

(b)    Whether the defects relating to the CUE System constitute an unreasonable safety risk;

(c)    Whether the defective nature of the CUE System constitutes a material fact;

(d)    Whether Defendant has a duty to disclose the defective nature of the

CUE System to Plaintiffs and Class Members;

(e)    Whether Plaintiffs and the other Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

(f)    Whether Defendant knew or reasonably should have known of the defects relating to the CUE System before it sold and leased Class Vehicles to Plaintiffs and Class Members and, if so, how long Defendant has known of the defect;

(g)    Whether Defendant should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective CUE System;

(h)    Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective CUE System; and

(i)    Whether Defendant breached the implied warranty of merchantability pursuant to the laws governing each of the Sub-Class jurisdictions; and

(j)    Whether Defendant breached express warranties pursuant to the laws governing each of the Sub-Class jurisdictions.

173.    **Adequate Representation**:    Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

174.    **Predominance and Superiority**:    Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of GM's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of

the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for GM's misconduct. Absent a class action, Class Members will continue to incur damages, and GM's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

175.    In the alternative, this action is certifiable under the provisions of Fed. R. Civ. Proc. 23(b)(1) and/or (b)(2) because:

(a)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for GM;

(b)    The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)    GM has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

176.    Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

**TOLLING OF THE STATUTES OF LIMITATIONS**

177.    Because the defect is undetectable until it manifests and GM failed to disclose or intentionally concealed the Defect, Plaintiffs and Class Members were

1   not reasonably able to discover the problem until after purchasing the Class

2   Vehicles, despite exercise of due diligence.

3        178.   Additionally, on information and belief, GM instructed its authorized

4   dealership employees and technicians to inform Class Members that the

5   manifestations of the Defect in the CUE Systems were normal, and therefore not a

6   defect as alleged herein.

7        179.   Plaintiffs and the Class Members had no realistic ability to discern that

8   the GM CUE Systems in Class Vehicles were defective. Therefore, the discovery

9   rule is applicable to the claims asserted by Plaintiffs and the Class Members.

10       180.   Plaintiffs are informed and believe and based thereon allege that GM

11  has known of the Defect since before the purchases of the Class Vehicles and has

12  concealed from or failed to alert owners and lessees of the Class Vehicles of the

13  defective nature of the CUE Systems.

14       181.   Any applicable statute of limitations has therefore been tolled by GM's

15  knowledge, active concealment, and denial of the facts alleged herein. Defendant is

16  further estopped from relying on any statute of limitations because of its

17  concealment of the Defect.

18                                 **COUNT I**
19       **Breach of Warranty Under the Magnuson-Moss Warranty Act**
                 **15 U.S.C. § 2303 *et seq*.**
20                 **(On Behalf of the Nationwide Class)**

21       182.   Plaintiffs incorporate by reference and re-allege the allegations

22  contained in paragraphs 1-181 of this Complaint.

23       183.   Plaintiffs bring this cause of action on behalf of themselves and on

24  behalf of all Class Members.

25       184.   The Class Vehicles are a "consumer product" within the meaning of

26  the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

27       185.   Plaintiffs and Class Members are "consumers" within the meaning of

28  the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

CLASS ACTION COMPLAINT

186.    GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

187.    GM's express warranty is a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

188.    GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

189.    GM provided all purchasers and lessees of Class Vehicles with express and implied warranties.

190.    Under the Warranty, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 4 years or 50,000 miles, whichever comes first, for the Class Vehicles.

191.    On information and belief, GM breached the express warranty by:

(a)     Extending the Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship, including the subject CUE System, at no cost to the owner or lessee;

(b)     Selling and leasing Class Vehicles with CUE Systems that were defective in material and workmanship, requiring repair or replacement within the warranty period;

(c)     Refusing to honor the express warranty by repairing or replacing, free of charge, the CUE System or any of its component parts or programming and instead charging for repair and replacement parts; and

(d)    Purporting to repair the Class Vehicles and/or performing inadequate, illusory repairs, including by falsely informing Class Members that there was no problem with their Class Vehicles, performing ineffective procedures including software updates, and/or replacing defective components in the CUE Systems with equally defective components, without actually repairing the Class Vehicles.

192.    Furthermore, GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things:  (i) a warranty that the Class Vehicles and their CUE Systems were manufactured, supplied, distributed, and/or sold by GM were luxury, safe, and reliable vehicles for providing transportation; and (ii) a warranty that the Class Vehicles and their CUE Systems would be fit for their intended use while the Class Vehicles were being operated.

193.    Contrary to the applicable implied warranties, the Class Vehicles and their CUE Systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and/or manufacture of their CUE Systems.

194.    GM's breach of express and implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

195.    The amount in controversy of the individual claims of each Plaintiff and Class member meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

196.    GM has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the CUE System.

197.    As a direct and proximate cause of GM's breach of express and implied warranties, Plaintiffs and Class Members sustained damages and other losses in an

1  amount to be determined at trial. GM's conduct damaged Plaintiffs and Class

2  Members, who are entitled to recover actual damages, consequential damages,

3  specific performance, diminution in value, costs, attorneys' fees, and/or other relief

4  as appropriate.

5  198.   As a result of GM's violations of the Magnuson-Moss Warranty Act as

6  alleged herein, Plaintiffs and Class Members have incurred damages.

7  **COUNT II**

8  **Violation of California's Consumers Legal Remedies Act**
   **CAL. CIV. CODE § 1750, *et seq.***

9  **(On Behalf of the California Sub-Class)**

10  199.   Plaintiffs incorporate by reference and re-allege the allegations

11  contained in paragraphs 1-181 of this Complaint.

12  200.   Plaintiffs Matt Goldstein, Percy Sutton, and Julian Wilder

13  (collectively, the "California Plaintiffs") bring this cause of action on their own

14  behalf and on behalf of the members of the California Sub-Class.

15  201.   GM is a "person" as defined by California Civil Code § 1761(c).

16  202.   California Plaintiffs and California Sub-class Members are

17  "consumers" within the meaning of California Civil Code § 1761(d) because they

18  purchased their Class Vehicles primarily for personal, family, or household use.

19  203.   By failing to disclose and concealing the defective nature of the CUE

20  Systems from California Plaintiffs and California Sub-class Members, Defendant

21  violated California Civil Code § 1770(a), as it represented that the Class Vehicles

22  and their CUE Systems had characteristics and benefits that they do not have and

23  represented that the Class Vehicles and their CUE Systems were of a particular

24  standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§

25  1770(a)(5) & (7).

26  204.   Defendant's unfair and deceptive acts or practices occurred repeatedly

27  in Defendant's trade or business, were capable of deceiving a substantial portion of

28  the purchasing public, and imposed a serious safety risk on the public.

CLASS ACTION COMPLAINT

1    205.   Defendant knew that the Class Vehicles and their CUE Systems

2    suffered from an inherent defect, were defectively designed, and were not suitable

3    for their intended use.

4    206.   Because of their reliance on Defendant's omissions, owners and/or

5    lessees of the Class Vehicles, including California Plaintiffs and California Sub-

6    class Members, suffered an ascertainable loss of money, property, and/or value of

7    their Class Vehicles. Additionally, because of the Defect, California Plaintiffs and

8    California Sub-class Members were harmed and suffered actual damages in that the

9    Class Vehicles' CUE Systems are substantially certain to fail before their expected

10   useful life has run.

11   207.   Defendant was under a duty to California Plaintiffs and California Sub-

12   class Members to disclose the defective nature of the CUE Systems and/or the

13   associated repair costs because:

14   (a)    Defendant was in a superior position to know the true state of facts

15   about the safety defect in the Class Vehicles' CUE Systems;

16   (b)    California Plaintiffs and California Sub-class Members could not

17   reasonably have been expected to learn or discover that their CUE Systems had a

18   defect with dangerous safety concerns until it manifested; and

19   (c)    Defendant knew that California Plaintiffs and California Sub-class

20   Members could not reasonably have been expected to learn of or discover the safety

21   defect.

22   208.   In failing to disclose the defective nature of CUE Systems, Defendant

23   knowingly and intentionally concealed material facts and breached its duty not to

24   do so.

25   209.   The facts Defendant concealed from or failed to disclose to California

26   Plaintiffs and California Sub-class Members are material in that a reasonable

27   consumer would have considered them to be important in deciding whether to

28   purchase or lease the Class Vehicles or pay less.  Had California Plaintiffs and

California Sub-class Members known that the Class Vehicles' CUE Systems were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

210.    California Plaintiffs and California Sub-class Members are reasonable consumers who do not expect the CUE Systems installed in their vehicles to exhibit problems such as the Defect. This is the reasonable and objective consumer expectation relating to a vehicle's CUE Systems.

211.    Because of Defendant's conduct, California Plaintiffs and California Sub-class Members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience problems such as the Defect.

212.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, California Plaintiffs and California Sub-class Members suffered and will continue to suffer actual damages.

213.    California Plaintiffs and California Sub-class Members are entitled to equitable relief.

214.    California Plaintiffs and California Sub-class Members provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a). If, within 30 days of the date of the notification letter, Defendants fail to provide appropriate relief for their violation of the CLRA, Plaintiffs will amend this Complaint to seek monetary, compensatory, and punitive damages, in addition to the injunctive and equitable relief they seek now.

### COUNT I
**Violation of California Business and Professional Code § 17200, *et seq.***
**(On Behalf of the California Sub-Class)**

215.    Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-181 of this Complaint.

216.    California Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the California Sub-Class.

217.   Because of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including California Plaintiffs and California Sub-class Members, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Defect, California Plaintiffs and California Sub-class Members were harmed and suffered actual damages in that the Class Vehicles' CUE Systems are substantially certain to fail before their expected useful life has run.

218.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

219.   California Plaintiffs and California Sub-class Members are reasonable consumers who do not expect their CUE Systems to be defective.

220.   Defendant knew the Class Vehicles and their CUE Systems were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

221.   In failing to disclose the Defect, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

222.   Defendant was under a duty to California Plaintiffs and California Sub-class Members to disclose the defective nature of the Class Vehicles and their CUE Systems because:

(a)    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' CUE Systems; and

(b)    Defendant actively concealed the defective nature of the Class Vehicles and their CUE Systems from California Plaintiffs and California Sub-class Members.

223.   The facts Defendant concealed from or failed to disclose to California Plaintiffs and California Sub-class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or

lease Class Vehicles. Had they known of the Defect, California Plaintiffs and California Sub-class Members would have paid less for Class Vehicles equipped with the subject CUE Systems or would not have purchased or leased them at all.

224.   Defendant continued to conceal the defective nature of the Class Vehicles and their CUE Systems even after Class Members began to report problems.

225.   Defendant's conduct was and is likely to deceive consumers.

226.   Defendant's acts, conduct, and practices were unlawful, in that they constituted:

(a)    Violations of California's Consumers Legal Remedies Act;

(b)    Violations of the Song-Beverly Consumer Warranty Act;

(c)    Violations of the Magnuson-Moss Warranty Act; and

(d)    Breach of Express Warranty under California Commercial Code section 2313.

227.   By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

228.   Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

229.   As a direct and proximate result of Defendant's unfair and deceptive practices, California Plaintiffs and California Sub-class Members have suffered and will continue to suffer actual damages.

230.   Defendant has been unjustly enriched and should be required to make restitution to California Plaintiffs and California Sub-class Members to §§ 17203 and 17204 of the Business & Professions Code.

**COUNT IV**
**Breach of Express Warranty**
**CAL. COM. CODE §§ 2313 and 10210**
**(On Behalf of the California Sub-Class)**

231.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-181 of this Complaint.

232.   California Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the California Sub-Class.

233.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

234.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

235.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

236.   GM provided all purchasers and lessees of the Class Vehicles with the express Warranty described herein, which became a material part of the bargain.

237.   Under the Warranty, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 4 years or 50,000 miles, whichever comes first, for the Class Vehicles.

238.   GM manufactured and/or installed the CUE Systems and the CUE Systems' component parts in the Class Vehicles, and the CUE Systems and their component parts are covered by the express Warranty.

239.   The Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to California Plaintiffs and California Sub-Class

1    Members.

2    240.   Plaintiffs relied on GM's express Warranty, which were a material part

3    of the bargain, when purchasing or leasing their Class Vehicles.

4    241.   Under the express Warranty, GM was obligated to correct the Defect

5    in the vehicles owned or leased by California Plaintiffs and California Sub-Class

6    Members.

7    242.   Although GM was obligated to correct the Defect, none of the

8    attempted fixes to the CUE Systems are adequate under the terms of the Warranty,

9    as they did not cure the defect.

10    243.   GM breached the express Warranty by performing illusory repairs.

11    Rather than repairing the vehicles pursuant to the express Warranty, GM falsely

12    informed California Sub-Class Members that there was no problem with their Class

13    Vehicles, performed ineffective procedures including software updates, and/or

14    replaced defective components in the CUE Systems with equally defective

15    components, without actually repairing the Class Vehicles.

16    244.   GM and its agent dealers have failed and refused to conform the CUE

17    Systems to the express Warranty. GM's conduct, as discussed throughout this

18    Complaint, has voided any attempt on its part to disclaim liability for its actions.

19    245.   Moreover, GM's attempt to disclaim or limit the express Warranty vis-

20    à-vis consumers is unconscionable and unenforceable under the circumstances here.

21    Specifically, GM's warranty limitation is unenforceable because it knowingly sold

22    a defective product without informing consumers about the defect.

23    246.   The time limits contained in GM's warranty period were also

24    unconscionable and inadequate to protect California Plaintiffs and California Sub-

25    Class Members. Among other things, California Plaintiffs and California Sub-Class

26    Members had no meaningful choice in determining these time limitations, the terms

27    of which unreasonably favored GM. A gross disparity in bargaining power existed

28    between GM and the Class members, and GM knew or should have known that the

1    Class Vehicles were defective at the time of sale.

2        247.   California Plaintiffs and California Sub-Class Members have complied

3    with all obligations under the Warranty, or otherwise have been excused from

4    performance of said obligations as a result of GM's conduct described herein.

5        248.   California Plaintiffs and California Sub-Class Members were not

6    required to notify GM of the breach because affording GM a reasonable opportunity

7    to cure its breach of written warranty would have been futile. GM was also on notice

8    of the Defect from the complaints and service requests it received from Plaintiffs

9    and the Class Members, from repairs and/or replacements of the CUE Systems or

10   components thereof, and through other internal and external sources.

11       249.   Because GM, through its conduct and exemplified by its own service

12   bulletins, has covered repairs of the Defect if GM determines the repairs are

13   appropriately covered under the Warranty, GM cannot now deny that the Warranty

14   covers the Defect.

15       250.   Because GM has not been able remedy the Defect, any limitation on

16   remedies included in the Warranty causes the Warranty to fail its essential purpose,

17   rendering it null and void.

18       251.   As a direct and proximate cause of GM's breach, California Plaintiffs

19   and California Sub-Class Members suffered damages and continue to suffer

20   damages, including economic damages at the point of sale or lease and diminution

21   of value of their Class Vehicles. Additionally, California Plaintiffs and California

22   Sub-Class Members have incurred or will incur economic damages at the point of

23   repair in the form of the cost of repair.

24       252.   As a direct and proximate result of GM's breach of express Warranty,

25   California Plaintiffs and California Sub-Class Members have been damaged in an

26   amount to be determined at trial.

27                            **COUNT II**
       **Breach of the Implied Warranty Pursuant to the Song-Beverly Consumer**
28                          **Warranty Act**

## CAL. CIV. CODE §§ 1792 and 1791.1, *et seq.*
## (On Behalf of the California Sub-Class)

253.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-181 of this Complaint.

254.   California Plaintiffs and the California Sub-Class Members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

255.   GM is and was at all relevant times a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

256.   The Class Vehicles are and were at all relevant times "are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

257.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Cal. Civ. Code §§ 1791.1(a) & 1792.

258.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the CUE Systems to customers through authorized dealers, like those from whom California Plaintiffs and the California Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to California Plaintiffs and the California Sub-Class Members, with no modification to the defective CUE Systems.

259.   GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

260.   GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their CUE Systems were manufactured, supplied, distributed, and/or sold by GM were luxury, safe, and reliable vehicles for providing transportation; and (ii) a warranty that the Class Vehicles and their CUE

1  Systems would be fit for their intended use while the Class Vehicles were being

2  operated.

3      261.   Contrary to the applicable implied warranties, the Class Vehicles and

4  their CUE Systems at the time of sale and thereafter were not fit for their ordinary

5  and intended purpose of providing Plaintiffs and Class Members with reliable,

6  durable, and safe transportation. Instead, the Class Vehicles are defective, including,

7  but not limited to, the defective design and manufacture of their CUE Systems and

8  the existence of the Defect at the time of sale or lease and thereafter. GM knew of

9  this defect at the time these sale or lease transactions occurred.

10     262.   As a result of GM's breach of the applicable implied warranties,

11  California Plaintiffs and the California Sub-Class Members of the Class Vehicles

12  suffered an ascertainable loss of money, property, and/or value of their Class

13  Vehicles. Additionally, as a result of the Defect, California Plaintiffs and the

14  California Sub-Class Members were harmed and suffered actual damages in that the

15  Class Vehicles' CUE System components are substantially certain to fail before

16  their expected useful life has run. Count III.

### COUNT VI
### Violation of Florida Deceptive and Unfair Trade Practices Act
### F.S.A. §§ 501.201-.213
### (On Behalf of the Florida Sub-Class)

20     263.   Plaintiffs incorporate by reference and re-allege the allegations

21  contained in paragraphs 1-181 of this Complaint.

22     264.   Plaintiff Lana Savage ("Florida Plaintiff") brings this cause of action

23  on her own behalf and on behalf of the members of the Florida Sub-Class.

24     265.   GM's business acts and practices alleged herein constitute unfair,

25  unconscionable and/or deceptive methods, acts or practices under the Florida

26  Deceptive and Unfair Trade Practices Act, § 501.201, et seq., Florida Statutes

27  ("FDUTPA").

28     266.   At all relevant times, Florida Plaintiffs and the Florida Sub-Class

1  Members were "consumers" within the meaning of the FDUTPA. F.S.A. §
2  501.203(7).

3      267.  GM's conduct, as set forth herein, occurred in the conduct of "trade or
4  commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

5      268.  The practices of GM, described above, violate the FDUTPA for, *inter*
6  *alia*, one or more of the following reasons:

7      (a)  GM represented that goods or services have sponsorship, approval,
8  characteristics, uses, and benefits that they do not have;

9      (b)  GM provided, disseminated, marketed, and otherwise distributed
10  uniform false and misleading advertisements, technical data and other information
11  to consumers regarding the performance, reliability, quality and nature of the CUE
12  Systems;

13      (c)  GM represented that goods or services were of a particular standard,
14  quality, or grade, when they were of another;

15      (d)  GM engaged in unconscionable commercial practices in failing to
16  reveal material facts and information about the CUE Systems, which did, or tended
17  to, mislead Florida Plaintiffs and the Florida Sub-Class Members about facts that
18  could not reasonably be known by the consumer;

19      (e)  GM failed to reveal facts that were material to the transactions in light
20  of representations of fact made in a positive manner;

21      (f)  GM caused Florida Plaintiffs and the Florida Sub-Class Members to
22  suffer a probability of confusion and a misunderstanding of legal rights, obligations,
23  and/or remedies by and through its conduct;

24      (g)  GM failed to reveal material facts to Florida Plaintiffs and the Florida
25  Class with the intent that Florida Plaintiffs and the Florida Sub-Class Members rely
26  upon the omission;

27      (h)  GM made material representations and statements of fact to Florida
28  Plaintiffs and the Florida Sub-Class Members that resulted in Florida Plaintiffs and

the Florida Sub-Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were;

(i)    GM intended that Florida Plaintiffs and the Florida Sub-Class Members rely on their misrepresentations and omissions, so that Florida Plaintiffs and the Florida Sub-Class Members would purchase vehicles equipped with the CUE Systems.

269.   GM's actions impact the public interest because Florida Plaintiffs and the Florida Sub-Class Members were injured in exactly the same way as thousands of others purchasing and/or leasing the vehicles with defective CUE Systems as a result of and pursuant to GM's generalized course of deception.

270.   Had Florida Plaintiffs and the Florida Sub-Class Members known of the defective nature of the CUE Systems, they would not have purchased or leased vehicles equipped with the CUE Systems or would have paid less for them.

271.   The foregoing acts, omissions and practices proximately caused Florida Plaintiffs and the Florida Sub-Class Members to suffer actual damages in the form of, *inter alia*, overpaying for the vehicles, as well as diminution in value of the vehicles equipped with CUE Systems, and they are entitled to recover such damages, together with all other appropriate damages, attorneys' fees and costs of suit.

### COUNT VII
### Breach of Express Warranty
### F.S.A. §§ 672.31, 680.21
### (On Behalf of the Florida Sub-Class)

272.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-181 of this Complaint.

273.   Florida Plaintiff brings this cause of action on her own behalf and on behalf of the members of the Florida Sub-Class.

274.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor

1  vehicles under § 672.103(1)(d).

2      275.   With respect to leases, GM is and was at all relevant times a "lessor"

3  of motor vehicles under F.S.A. § 680.1031(1)(p).

4      276.   The Class Vehicles are and were at all relevant times "goods" within

5  the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

6      277.   GM provided all purchasers and lessees of the Class Vehicles with the

7  express Warranty described herein, which became a material part of the bargain.

8      278.   Under the Warranty, GM expressly warranted the following: "The

9  warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or

10 other normal characteristics of the vehicle due to materials or workmanship

11 occurring during the warranty period." Accordingly, the warranty covered all

12 defects except for "slight noise, vibrations, or other normal characteristics of the

13 vehicle due to materials or workmanship occurring during the warranty period."

14 Because the Defect does not fall into any of the above excluded categories, it is

15 covered under GM's express warranty. GM agreed to provide such repairs

16 "including towing, parts, and labor . . . at no charge" for up to 4 years or 50,000

17 miles, whichever comes first, for the Class Vehicles.

18     279.   GM manufactured and/or installed the CUE Systems and the CUE

19 Systems' component parts in the Class Vehicles, and the CUE Systems and their

20 component parts are covered by the express Warranty.

21     280.   The Defect at issue in this litigation was present at the time the Class

22 Vehicles were sold or leased to Florida Plaintiff and the Florida Sub-Class

23 Members.

24     281.   Plaintiffs relied on GM's express Warranty, which were a material part

25 of the bargain, when purchasing or leasing their Class Vehicles.

26     282.   Under the express Warranty, GM was obligated to correct the Defect

27 in the vehicles owned or leased by Florida Plaintiff and the Florida Sub-Class

28 Members.

283.   Although GM was obligated to correct the Defect, none of the attempted fixes to the CUE Systems are adequate under the terms of the Warranty, as they did not cure the defect.

284.   GM breached the express Warranty by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranty, GM falsely informed Florida Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the CUE Systems with equally defective components, without actually repairing the Class Vehicles.

285.   GM and its agent dealers have failed and refused to conform the CUE Systems to the express Warranty. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

286.   Moreover, GM's attempt to disclaim or limit the express Warranty vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

287.   The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Florida Plaintiff and the Florida Sub-Class Members. Among other things, Florida Plaintiff and the Florida Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

288.   Florida Plaintiff and the Florida Sub-Class Members have complied with all obligations under the Warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

289.   Florida Plaintiff and the Florida Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure

CLASS ACTION COMPLAINT

its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the CUE Systems or components thereof, and through other internal and external sources.

290.   Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Defect if GM determines the repairs are appropriately covered under the Warranty, GM cannot now deny that the Warranty covers the Defect.

291.   Because GM has not been able remedy the Defect, any limitation on remedies included in the Warranty causes the Warranty to fail its essential purpose, rendering it null and void.

292.   As a direct and proximate cause of GM's breach, Florida Plaintiff and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiff and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

293.   As a direct and proximate result of GM's breach of express Warranty, Florida Plaintiff and the Florida Sub-Class Members have been damaged in an amount to be determined at trial.

**COUNT VIII**
**Breach of the Implied Warranty of Merchantability**
**F.S.A. §§ 672.314, 680.212**
**(On Behalf of the Florida Sub-Class)**

294.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-181 of this Complaint.

295.   Florida Plaintiff brings this cause of action on her own behalf and on behalf of the members of the Florida Sub-Class.

296.   GM is and was at all relevant times a "merchant" with respect to motor

vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

297.  With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

298.  The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

299.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under F.S.A. §§ 672.314 and 680.212.

300.  GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the CUE Systems to customers through authorized dealers, like those from whom Florida Plaintiff and the Florida Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiff and the Florida Sub-Class Members, with no modification to the defective CUE Systems.

301.  GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

302.  This implied warranty included, among other things:  (i) a warranty that the Class Vehicles and their CUE Systems were manufactured, supplied, distributed, and/or sold by GM were luxury, safe, and reliable vehicles for providing transportation; and (ii) a warranty that the Class Vehicles and their CUE Systems would be fit for their intended use while the Class Vehicles were being operated.

303.  Contrary to the applicable implied warranties, the Class Vehicles and their CUE Systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable,

durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their CUE Systems and the existence of the Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

304.   As a result of GM's breach of the applicable implied warranties, Florida Plaintiff and the Florida Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Florida Plaintiff and the Florida Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' CUE System components are substantially certain to fail before their expected useful life has run.

305.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of F.S.A. §§ 672.314 and 680.212.

306.   Florida Plaintiff and the Florida Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

307.   Florida Plaintiff and the Florida Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the CUE Systems or components thereof, and through other internal sources.

308.   As a direct and proximate cause of GM's breach, Florida Plaintiff and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiff and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the

form of the cost of repair.

309.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Florida Plaintiff and the Florida Sub-Class Members have been damaged in an amount to be proven at trial.

## COUNT IX
### Violation of Michigan Consumer Protection Act
### MICH. COMP. LAWS § 445.903 *et seq.*
### (On Behalf of the Michigan Sub-Class)

310.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-181 of this Complaint.

311.   Plaintiff Gladys Tubbs ("Michigan Plaintiff") brings this cause of action on her own behalf and on behalf of the members of the Michigan Sub-Class.

312.   Michigan Plaintiff and the Michigan Sub-Class Members are "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

313.   GM is a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS Laws § 445.902(1)(d).

314.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).

315.   GM participated in misleading, false, or deceptive acts that violated the

Michigan CPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of its business.

316.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

317.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

318.   GM knew that the Class Vehicles and their CUE Systems suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

319.   GM knew or should have known that its conduct violated the Michigan CPA.

320.   Michigan Plaintiff and the Michigan Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

321.   Had Michigan Plaintiff and the Michigan Sub-Class Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

322.   GM owed Michigan Plaintiff and the Michigan Sub-Class Members a duty to disclose the truth about the Defect because GM: (a) possessed exclusive knowledge of the design of the Class Vehicles and the Defect; (b) intentionally concealed the foregoing from Michigan Plaintiff and the Michigan Sub-Class Members; and/or (c)  made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Michigan Plaintiff and the Michigan Sub-Class Members that contradicted these representations.

323.   Due to GM's specific and superior knowledge that the CUE Systems in the Class Vehicles will fail due to the Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Michigan Plaintiff and the Michigan Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the CUE Systems will fail in Class Vehicles, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Michigan Plaintiff and the Michigan Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Michigan Plaintiff and the Michigan Sub-Class Members. Longevity, durability, performance, and safety are material concerns to consumers. GM represented to Michigan Plaintiff and the Michigan Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing CUE Systems of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the CUE Systems fail due to the Defect.

324.   Michigan Plaintiff and the Michigan Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, Michigan Plaintiff and the Michigan Sub-Class Members were harmed and suffered actual

1    damages in the form of the diminished value of their vehicles.

2    325.    As a result of GM's conduct, Michigan Plaintiff and the Michigan Sub-

3    Class Members were harmed and suffered actual damages as a result of GM's

4    misrepresentations and omissions with regard to their Class Vehicles' CUE Systems

5    because they purchased vehicles which do not perform as advertised.

6    326.    As a direct and proximate result of GM's unfair or deceptive acts or

7    practices, Michigan Plaintiff and the Michigan Sub-Class Members suffered and

8    will continue to suffer injury in fact and/or actual damages.

9    327.    Defendant's violations present a continuing risk to Michigan Plaintiff

10    and the Michigan Sub-Class Members as well as to the general public. Defendant's

11    unlawful acts and practices complained of herein affect the public interest.

12    328.    Michigan Plaintiff and the Michigan Sub-Class Members seek

13    monetary relief measured as the greater of (a) actual damages in an amount to be

14    determined at trial and (b) statutory damages in the amount of $250 per each

15    Plaintiff; and reasonable attorneys' fees; and any other just and proper relief

16    available.

17    **COUNT X**
   **Breach of Express Warranty**
18    **MICH. COMP. LAWS §§ 440.2313 and 440.2860**
   **(On Behalf of the Michigan Sub-Class)**
19

20    329.    Plaintiffs incorporate by reference and re-allege the allegations

21    contained in paragraphs 1-181 of this Complaint.

22    330.    Michigan Plaintiff brings this cause of action on his own behalf and on

23    behalf of the members of the Michigan Sub-Class.

24    331.    GM is and was at all relevant times a "merchant" with respect to motor

25    vehicles under MICH. COMP. LAWS §§ 440.2104(1) and a "seller" of motor vehicles

26    under § 440.2103(1)(c).

27    332.    With respect to leases, GM is and was at all relevant times a "lessor"

28    of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

333.   The Class Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

334.   GM provided all purchasers and lessees of the Class Vehicles with the express Warranty described herein, which became a material part of the bargain.

335.   Under the Warranty, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 4 years or 50,000 miles, whichever comes first, for the Class Vehicles.

336.   GM manufactured and/or installed the CUE Systems and the CUE Systems' component parts in the Class Vehicles, and the CUE Systems and their component parts are covered by the express Warranty.

337.   The Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Michigan Plaintiff and the Michigan Sub-Class Members.

338.   Plaintiffs relied on GM's express Warranty, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

339.   Under the express Warranty, GM was obligated to correct the Defect in the vehicles owned or leased by Michigan Plaintiff and the Michigan Sub-Class Members.

340.   Although GM was obligated to correct the Defect, none of the attempted fixes to the CUE Systems are adequate under the terms of the Warranty, as they did not cure the defect.

341.    GM breached the express Warranty by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranty, GM falsely informed Michigan Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the CUE Systems with equally defective components, without actually repairing the Class Vehicles.

342.    GM and its agent dealers have failed and refused to conform the CUE Systems to the express Warranty. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

343.    Moreover, GM's attempt to disclaim or limit the express Warranty vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

344.    The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Michigan Plaintiff and the Michigan Sub-Class Members. Among other things, Michigan Plaintiff and the Michigan Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

345.    Michigan Plaintiff and the Michigan Sub-Class Members have complied with all obligations under the Warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

346.    Michigan Plaintiff and the Michigan Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the CUE Systems or

components thereof, and through other internal and external sources.

347.   Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Defect if GM determines the repairs are appropriately covered under the Warranty, GM cannot now deny that the Warranty covers the Defect.

348.   Because GM has not been able remedy the Defect, any limitation on remedies included in the Warranty causes the Warranty to fail its essential purpose, rendering it null and void.

349.   As a direct and proximate cause of GM's breach, Michigan Plaintiff and the Michigan Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Michigan Plaintiff and the Michigan Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

350.   As a direct and proximate result of GM's breach of express Warranty, Michigan Plaintiff and the Michigan Sub-Class Members have been damaged in an amount to be determined at trial.

## COUNT XI
### Breach of the Implied Warranty of Merchantability
#### MICH. COMP. LAWS §§ 440.2314 and 440.2862
#### (On Behalf of the Michigan Sub-Class)

351.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-181 of this Complaint.

352.   Michigan Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Michigan Sub-Class.

353.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

354.   With respect to leases, GM is and was at all relevant times a "lessor"

1 of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

2    355.   The Class Vehicles are and were at all relevant times "goods" within

3 the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

4    356.   A warranty that the Class Vehicles were in merchantable condition and

5 fit for the ordinary purpose for which vehicles are used is implied by law under

6 MICH. COMP. LAWS §§ 440.2314 and 440.2862.

7    357.   GM knew or had reason to know of the specific use for which the Class

8 Vehicles were purchased or leased. GM directly sold and marketed vehicles

9 equipped with the CUE Systems to customers through authorized dealers, like those

10 from whom Michigan Plaintiff and the Michigan Sub-Class Members bought or

11 leased their vehicles, for the intended purpose of consumers purchasing the vehicles.

12 GM knew that the Class Vehicles would and did pass unchanged from the

13 authorized dealers to Michigan Plaintiff and the Michigan Sub-Class Members,

14 with no modification to the defective CUE Systems.

15    358.   GM provided Plaintiffs and Class Members with an implied warranty

16 that the Class Vehicles and their components and parts are merchantable and fit for

17 the ordinary purposes for which they were sold.

18    359.   This implied warranty included, among other things:  (i) a warranty

19 that the Class Vehicles and their CUE Systems were manufactured, supplied,

20 distributed, and/or sold by GM were luxury, safe, and reliable vehicles for providing

21 transportation; and (ii) a warranty that the Class Vehicles and their CUE Systems

22 would be fit for their intended use while the Class Vehicles were being operated.

23    360.   Contrary to the applicable implied warranties, the Class Vehicles and

24 their CUE Systems at the time of sale and thereafter were not fit for their ordinary

25 and intended purpose of providing Plaintiffs and Class Members with reliable,

26 durable, and safe transportation. Instead, the Class Vehicles are defective, including,

27 but not limited to, the defective design and manufacture of their CUE Systems and

28 the existence of the Defect at the time of sale or lease and thereafter. GM knew of

this defect at the time these sale or lease transactions occurred.

361.   As a result of GM's breach of the applicable implied warranties, Michigan Plaintiff and the Michigan Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Michigan Plaintiff and the Michigan Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' CUE System components are substantially certain to fail before their expected useful life has run.

362.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of MICH. COMP. LAWS §§ 440.2314 and 440.2862.

363.   Michigan Plaintiff and the Michigan Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

364.   Michigan Plaintiff and the Michigan Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the CUE Systems or components thereof, and through other internal sources.

365.   As a direct and proximate cause of GM's breach, Michigan Plaintiff and the Michigan Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Michigan Plaintiff and the Michigan Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

366.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Michigan Plaintiff and the Michigan Sub-Class

1  Members have been damaged in an amount to be proven at trial.

2  **COUNT XII**
3  **Breach of Express Warranty**
   **Tex. Bus. & Com. Code §§ 2.313 and 2A.210**
4  **(On Behalf of the Texas Sub-Class)**

5  367.  Plaintiffs incorporate by reference and re-allege the allegations
6  contained in paragraphs 1-181 of this Complaint.

7  368.  Texas Plaintiffs bring this cause of action on his own behalf and on
8  behalf of the members of the Texas Sub-Class.

9  369.  GM is and was at all relevant times a "merchant" with respect to motor
10 vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a
11 "seller" of motor vehicles under § 2.103(a)(4).

12 370.  With respect to leases, GM is and was at all relevant times a "lessor"
13 of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

14 371.  The Class Vehicles are and were at all relevant times "goods" within
15 the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

16 372.  GM provided all purchasers and lessees of the Class Vehicles with the
17 express Warranty described herein, which became a material part of the bargain.

18 373.  Under the Warranty, GM expressly warranted the following: "The
19 warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or
20 other normal characteristics of the vehicle due to materials or workmanship
21 occurring during the warranty period." Accordingly, the warranty covered all
22 defects except for "slight noise, vibrations, or other normal characteristics of the
23 vehicle due to materials or workmanship occurring during the warranty period."
24 Because the Defect does not fall into any of the above excluded categories, it is
25 covered under GM's express warranty. GM agreed to provide such repairs
26 "including towing, parts, and labor . . . at no charge" for up to 4 years or 50,000
27 miles, whichever comes first, for the Class Vehicles.

28 374.  GM manufactured and/or installed the CUE Systems and the CUE

Systems' component parts in the Class Vehicles, and the CUE Systems and their component parts are covered by the express Warranty.

375.   The Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Texas Plaintiffs and the Texas Sub-Class Members.

376.   Plaintiffs relied on GM's express Warranty, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

377.   Under the express Warranty, GM was obligated to correct the Defect in the vehicles owned or leased by Texas Plaintiffs and the Texas Sub-Class Members.

378.   Although GM was obligated to correct the Defect, none of the attempted fixes to the CUE Systems are adequate under the terms of the Warranty, as they did not cure the defect.

379.   GM breached the express Warranty by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranty, GM falsely informed Texas Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the CUE Systems with equally defective components, without actually repairing the Class Vehicles.

380.   GM and its agent dealers have failed and refused to conform the CUE Systems to the express Warranty. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

381.   Moreover, GM's attempt to disclaim or limit the express Warranty vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

382.   The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Texas Plaintiffs and the Texas Sub-Class Members. Among other things, Texas Plaintiffs and the Texas Sub-Class Members

had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

383.   Texas Plaintiffs and the Texas Sub-Class Members have complied with all obligations under the Warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

384.   Texas Plaintiffs and the Texas Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the CUE Systems or components thereof, and through other internal and external sources.

385.   Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Defect if GM determines the repairs are appropriately covered under the Warranty, GM cannot now deny that the Warranty covers the Defect.

386.   Because GM has not been able remedy the Defect, any limitation on remedies included in the Warranty causes the Warranty to fail its essential purpose, rendering it null and void.

387.   As a direct and proximate cause of GM's breach, Texas Plaintiffs and the Texas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiffs and the Texas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

388.   As a direct and proximate result of GM's breach of express Warranty, Texas Plaintiffs and the Texas Sub-Class Members have been damaged in an

amount to be determined at trial.

## COUNT XIII
### Breach of the Implied Warranty of Merchantability
### Tex. Bus. & Com. Code §§ 2.314 and 2A.212
### (On Behalf of the Texas Sub-Class)

389.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-181 of this Complaint.

390.   Texas Plaintiffs bring this cause of action on his own behalf and on behalf of the members of the Texas Sub-Class.

391.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

392.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

393.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

394.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

395.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the CUE Systems to customers through authorized dealers, like those from whom Texas Plaintiffs and the Texas Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Texas Plaintiffs and the Texas Sub-Class Members, with no modification to the defective CUE Systems.

396.   GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for

1    the ordinary purposes for which they were sold.

2         397.   This implied warranty included, among other things: (i) a warranty

3 that the Class Vehicles and their CUE Systems were manufactured, supplied,

4 distributed, and/or sold by GM were luxury, safe, and reliable vehicles for providing

5 transportation; and (ii) a warranty that the Class Vehicles and their CUE Systems

6 would be fit for their intended use while the Class Vehicles were being operated.

7         398.   Contrary to the applicable implied warranties, the Class Vehicles and

8 their CUE Systems at the time of sale and thereafter were not fit for their ordinary

9 and intended purpose of providing Plaintiffs and Class Members with reliable,

10 durable, and safe transportation. Instead, the Class Vehicles are defective, including,

11 but not limited to, the defective design and manufacture of their CUE Systems and

12 the existence of the Defect at the time of sale or lease and thereafter. GM knew of

13 this defect at the time these sale or lease transactions occurred.

14         399.   As a result of GM's breach of the applicable implied warranties, Texas

15 Plaintiffs and the Texas Sub-Class Members of the Class Vehicles suffered an

16 ascertainable loss of money, property, and/or value of their Class Vehicles.

17 Additionally, as a result of the Defect, Texas Plaintiffs and the Texas Sub-Class

18 Members were harmed and suffered actual damages in that the Class Vehicles' CUE

19 System components are substantially certain to fail before their expected useful life

20 has run.

21         400.   GM's actions, as complained of herein, breached the implied warranty

22 that the Class Vehicles were of merchantable quality and fit for such use in violation

23 of under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

24         401.   Texas Plaintiffs and the Texas Sub-Class Members have complied with

25 all obligations under the warranty, or otherwise have been excused from

26 performance of said obligations as a result of GM's conduct described herein.

27         402.   Texas Plaintiffs and the Texas Sub-Class Members were not required

28 to notify GM of the breach because affording GM a reasonable opportunity to cure

its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the CUE Systems or components thereof, and through other internal sources.

403.   As a direct and proximate cause of GM's breach, Texas Plaintiffs and the Texas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiffs and the Texas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

404.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Texas Plaintiffs and the Texas Sub-Class Members have been damaged in an amount to be proven at trial.

**COUNT XIV**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class or Alternatively, each of the State Sub-Classes)**

405.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-181 of this Complaint.

406.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

407.   As a direct and proximate result of Defendant's failure to disclose known defects and material misrepresentations regarding known defects, Defendant has profited through the sale and lease of said vehicles. Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

408.   Additionally, as a direct and proximate result of Defendant's failure to disclose known defects and material misrepresentations regarding known defects in

the Class Vehicles, Plaintiffs and Class Members have vehicles that require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

409.   Defendant has therefore been unjustly enriched due to the known defects in the Class Vehicles through the use of funds that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs and Class Members.

410.   As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

## REQUEST FOR RELIEF

411.   Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

(a)   An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class and their representative Sub-Classes, and designating the undersigned as Class Counsel;

(b)   A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the CUE Systems, including the need for period maintenance;

(c)   An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, and to remove and replace Plaintiffs and Class Members' CUE Systems with a suitable alternative product; enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement CUE System that does not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class members that such warranty has been reformed;

(d)   A declaration requiring Defendant to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

(e)   An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial, except that for now, the California Plaintiffs seek only equitable and injunctive relief with respect to their claims under California's Consumers Legal Remedies Act, California Civil Code §1750 *et seq.*;

(f)   Any and all remedies provided pursuant to the Song-Beverly Act, including California Civil Code §1794;

(g)   Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(h)   Any and all remedies provided pursuant to the state and federal consumer protection statutes herein alleged;

(i)   A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles, or make full restitution to Plaintiffs and Class Members;

(j)   An award of attorneys' fees and costs, as allowed by law;

(k)   An award of attorneys' fees and costs pursuant to California Code of Civil Procedure §1021.5;

(l)   An award of pre-judgment and post-judgment interest, as provided by law;

(m)   Leave to amend the Complaint to conform to the evidence produced at trial;

(n)   Plaintiffs demand that GM perform a recall, and repair all vehicles; and

(o)   Granting such other and further relief as the Court deems just and proper.

1

# JURY TRIAL DEMANDED

2

412.    Pursuant to Federal Rule of Civil Procedure 38(b) and Southern

3

District of California Local Rule 38.1, Plaintiffs demand a trial by jury of any and

4

all issues in this action so triable.

5

6

Dated:  September 16, 2019                          Respectfully submitted,

7

**CAPSTONE LAW APC**

8

By: /s/ Mark A. Ozzello

9

Mark A. Ozzello
Tarek H. Zohdy

10

Cody R. Padgett
Trisha K. Monesi

11

12

**BERGER MONTAGUE PC**

13

Russell D. Paul (admission pending)
Amey J. Park (admission pending)

14

Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT