Steven R. Weinmann (SBN 190956)
Steven.Weinmann@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 556-4811
Facsimile:   (310) 943-0396

Russell D. Paul *(admitted pro hac vice)*
Amey J. Park *(admitted pro hac vice)*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:   (215) 875-3000
Fax:   (215) 875-4604
Email:  rpaul@bm.net
          apark@bm.net

*[Additional counsel on signature page]*

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT GOLDSTEIN, PERCY SUTTON, VANESSA RODRIGUEZ, and BENITO GUZMAN,<br><br>individually, and on behalf of a class of similarly situated individuals,<br><br>        Plaintiffs,<br><br>        v.<br><br>GENERAL MOTORS LLC, a Delaware limited liability company,<br><br>        Defendant. | Case No.:  3:19-cv-01778-H-AHG<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>(1) Violation of California's Consumers Legal Remedies Act<br>(2) Breach of Implied Warranty pursuant to California Song-Beverly Consumer Warranty Act<br>(3) Breach of Implied Warranty (California) pursuant to Cal. Com. Code § 2314<br>(4) Violation of California Unfair Competition Law<br>(5) Fraudulent Concealment<br>(6) Unjust Enrichment<br><br>**DEMAND FOR JURY TRIAL** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs Matt Goldstein, Percy Sutton, Vanessa Rodriguez, and Benito Guzman, for themselves and on behalf of all others similarly situated, bring this action against General Motors, LLC ("General Motors," "GM," or "Defendant"). Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

**NATURE OF THE ACTION**

1.     In this omissions case, Defendant failed to disclose a material and dangerous defect to its customers who purchased or leased 2013 to 2017 Cadillac ATS, SRX and XTS vehicles and 2014 to 2017 Cadillac CTS, ELR and Escalade vehicles equipped with GM's "Cadillac User Experience" touch screen display (the "CUE System" or "CUE") (collectively, "Class Vehicles"). Among other things, the CUE System controls the vehicle's climate, navigation, audio/Bluetooth/communications, and back-up camera. GM's conduct is especially egregious because the defective CUE Systems pose serious safety risks.

2.     Accordingly, this action arises from Defendant's failure, despite its longstanding knowledge of the defect, to disclose to Plaintiffs and other similarly situated customers that the Class Vehicles have defective CUE Systems that do not function in a safe and reliable manner.

3.     As alleged in greater detail below, the Class Vehicles were sold with defective CUE Systems.  Specifically, the CUE System possesses an innate and serious safety defect (the "Defect") that causes it to spontaneously delaminate, bubble or crack in a "spider-web" formation. When this happens, the unit ceases to function properly and is rendered useless.

*///*



Defective CUE Screen

4.      This Defect, which manifests itself within the limited warranty period or shortly after the limited warranty period expires, poses a serious safety risk to drivers, who can become dangerously distracted.

5.      For all Class Vehicles, GM provided an express warranty: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covers all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Defect does not fall into any of the above excluded categories, it is

THIRD AMENDED CLASS ACTION COMPLAINT

covered under GM's express warranty.

6.     Although GM has known about the Defect for years, instead of fixing it, GM has continued to sell new Cadillac vehicles with the Defect to customers, failing to disclose it. GM has forced its customers to spend $1,500.00 or more to replace the CUE once the Defect manifests. Moreover, when Class Members bring their vehicles to GM's authorized dealers for repair, the defective CUE Systems or components are replaced with the same defective parts, ensuring that the defective replacement CUE will eventually suffer the same delamination and spider-webbing issues.

7.     The Defect is inherent in the CUE Systems and is present at the time of sale. Because the Defect is inherent in every CUE System, GM has either been unable, or has refused, to repair the Defect, because replacing one CUE System or its components with another CUE system or like components, cannot fix the Defect.

8.     GM, an experienced and sophisticated vehicle manufacturer, had knowledge of the Defect through, *inter alia*, (1) records from the National Highway Traffic Safety Administration ("NHTSA"), (2) customer complaints, (3) its own records of customers' complaints, (4) dealership repair records and requests for technical assistance, (5) warranty and post-warranty claims, (6) pre- and post-release internal durability testing, and (6) other various sources, yet failed to notify consumers prior to purchase of the nature and extent of the Defect plaguing Class Vehicles, or to provide any adequate post-purchase remedy.

9.     GM issued Technical Service Bulletins ("TSBs") to its dealers which also evidenced its early knowledge and testing of the Defect.

10.     Defendant knew, or should have known, of this critical Defect at the time of sale or shortly thereafter. Yet, notwithstanding this knowledge, GM has routinely failed to fully repair the Class Vehicles without charge when the Defect

THIRD AMENDED CLASS ACTION COMPLAINT

manifests. Moreover, GM failed to disclose the Defect to Plaintiffs and Class Members through its advertising, including on vehicle window stickers or at the point of sale or lease.

11.     GM's efforts have been entirely inadequate in resolving the Defect or providing relief to the Class. Moreover, GM has failed to alert Class Members of the true and unsafe nature of the Defect.

12.     Despite knowledge conveyed to Defendant by information from its affiliated dealerships, NHTSA consumer complaints, and its own internal records, including durability testing, Defendant has not recalled the Class Vehicles to repair the defective CUE Systems, has not offered its customers suitable repairs free of charge, and has not offered to reimburse customers forced to pay for the repairs out-of-pocket.

13.     In fact, rather than redesigning the defective components and installing non-defective components, GM purports to "repair" the Class Vehicles by performing ineffectual or insufficient software updates, part replacements, and other procedures that fail to fully resolve the Defect. Further, Class Vehicle owners incur or will incur out-of-pocket costs for these repairs because GM refuses to issue a recall to prevent the incurring of such costs. GM thus unfairly shifts the costs to the Class Members, and benefits or will benefit from the revenue generated by repeat repairs. Accordingly, consumers will be required to pay hundreds, if not thousands, of dollars to repair or replace the CUE Systems because of the Defect, and GM is unjustly enriched at their expense.

14.     Because of this failure, Plaintiffs and Class Members have been damaged.

## JURISDICTION AND VENUE

15.     This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the

number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

16.    In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

17.    GM, through its business of distributing, selling, and leasing the Class Vehicles, has established sufficient contacts in this district such that personal jurisdiction is appropriate.  Defendant is deemed to reside in this district pursuant to 28 U.S.C. § 1391(a).

18.    In addition, a substantial part of the events or omissions giving rise to these claims and a substantial part of the property that is the subject of this action are in this district.  Plaintiff Goldstein's Declaration, as required under California Civil Code §1780(d) but not pursuant to *Erie* and federal procedural rules, shows that a substantial part of the events or omissions giving rise to the claims alleged herein occurred, or a substantial part of property that is the subject of this action is situated, in San Diego County, California. Plaintiff Goldstein's Declaration is attached as Exhibit 1.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

**THE PARTIES**

20.    Plaintiff Matt Goldstein is a California citizen who resides in Carlsbad, California. Plaintiff Goldstein purchased a 2013 Cadillac SRX in or around June 2016.

21.    Plaintiff Percy Sutton is a California citizen who resides in Long Beach, California and North Las Vegas, Nevada. Plaintiff Sutton purchased a used 2013 Cadillac XTS in or around September 2016.

22.    Plaintiff Vanessa Rodriguez is a California citizen who resides in

Fresno, California. Plaintiff Rodriguez purchased a used 2013 Cadillac ATS on or around September 23, 2016.

23.    Plaintiff Benito Guzman is a California citizen who resides in Stockton, California. Plaintiff Guzman purchased a new 2016 Cadillac SRX on or around March 31, 2016.

24.    Defendant General Motors, LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48265. The sole member and owner of General Motors, LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. General Motors Holdings LLC's only member is General Motors Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC.

25.    General Motors, LLC, itself and through its affiliates, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in California, Florida, Texas, and Michigan. General Motors, LLC is the warrantor and distributor of the Class Vehicles in the United States.

26.    At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

## FACTUAL ALLEGATIONS

27.    GM designs, manufactures, markets, distributes, and warrants automobiles in the United States sold under various brand names, including the Buick, Cadillac, Chevrolet, and GMC brands. In 2018, GM sold 2,954,037 vehicles in the United States alone and "had the number one market share in . . .

North America[.]"[1]

28.     GM has thousands of authorized dealerships across the United States, all of which are under GM's control. GM authorizes these dealerships to sell GM vehicles, parts, and accessories and to service and repair GM vehicles using GM parts.[2]  In addition, GM underscores the importance of its dealerships, as follows: "The quality of GM dealerships and our relationship with our dealers and distributors are critical to our success as dealers maintain the primary sales and service interface with the end consumer of our products."[3]  Indeed, according to Mark Reuss, president of General Motors Company, "Our dealers are the face of GM to our customers[.]"[4]

29.     Plaintiffs and Class members are intended third-party beneficiaries of contracts between GM and its dealerships; specifically, they are the intended beneficiaries of GM's implied warranties. The dealerships are Defendant's agents for sales and repairs. The dealers were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers only.

30.     GM designed, manufactured, and distributed the Class Vehicles. GM has sold or leased, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles equipped with the CUE System in California.

31.     GM provided all purchasers and lessees of the Class Vehicles with a New Vehicle Limited Warranty with the purchase or lease of the Class Vehicles.

32.     The New Vehicle Limited Warranty for Cadillac-brand Class

---

[1]     *See* General Motors Company 2018 Annual Report (Form 10-K), at 2 (Feb. 6, 2019), available at: https://www.sec.gov/Archives/edgar/data/1467858/000146785819000033/gm2018 10k.htm (last accessed May 7, 2019).

[2]     *Id.* at 3.

[3]     *Id*.

[4] https://media.gm.com/media/us/en/gm/home.detail.html/content/Pages/news/us/en/2010/Aug/0805_dealer.html

THIRD AMENDED CLASS ACTION COMPLAINT

Vehicles (the "Warranty"), stated in relevant part:

**What Is Covered**

**Warranty Applies**
This warranty is for GM vehicles registered in the United States and normally operated in the United States, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

**Repairs Covered**
The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

**No Charge**
Warranty repairs, including towing, parts, and labor, will be made at no charge.

**Obtaining Repairs**
To obtain warranty repairs, take the vehicle to a Cadillac dealer facility within the warranty period and request the needed repairs. Reasonable time must be allowed for the dealer to perform necessary repairs.

**Warranty Period**
The warranty period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period.

**Bumper-to-Bumper Coverage**
The complete vehicle is covered for 4 years or 50,000 miles, whichever comes first, except for other coverages listed here under "What Is Covered" and those items listed under "What Is Not Covered" later in this section.

\*\*\*

**Other Terms**: This warranty gives you specific legal rights and you may also have other rights which vary from state to state. GM does not authorize any person to create

for it any other obligation or liability in connection with these vehicles. **Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty. Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty. GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of this written warranty**.[5]

### A.    The CUE

33.    In 2011, GM began marketing the release of an in-vehicle "infotainment, navigation, and communication tools" to be included in 2012 (model year 2013) Cadillac models XTS, ATS, and SRX.[6]



///

_____

[5]    *See, e.g.*, 2015 Cadillac Limited Warranty and Owner Assistance Information at 2, 4, 12, available at https://my.gm.com/content/dam/gmownercenter/gmna/dynamic/manuals/2015/cadillac/Multiple%20Model%20PDFs/2015%20Limited%20Warranty%20and%20Owner%20Assistance%20Information.pdf (last accessed May 7, 2019) (emphasis in original).

[6]    *See* GM press release, "Cadillac CUE: Intuitive and Connected Driving in 2012" dated October 12, 2011, available at: https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2011/Oct/1012cadillac.html (last accessed September 8, 2019).

34. GM makes available online material information regarding the characteristics, benefits, and quality of the Class Vehicles. It maintains a website regarding the Class Vehicles. It also broadly disseminates information regarding the characteristics, benefits, and quality of the Class Vehicles that is closely tracked and reported by a large array of informational outlets, including automotive-focused websites such as Edmunds.com, Kelley Blue Book, Auto Trader, among many others. GM knew that its consumers depended in part on these sources for information about its vehicles, and had GM disclosed the Defect, these sources would have likewise reported that material information.

35. Likewise, as GM's authorized agents, dealerships are also a primary source of information from GM to consumers regarding the vehicles, and GM exercises great control over the information that its authorized dealerships provided to the consuming public— Plaintiffs and Class members—regarding the Class Vehicles. In addition, GM communicates through its authorized dealerships to the purchasing public. Indeed, according to GM:

> "Our commitment to quality and customer satisfaction extends to the experience customers have when they visit our dealerships. It is essential that we maintain a consistent level of sales and service excellence to earn and maintain customer trust. . . . We provide both technical and nontechnical training and tools to dealerships to help them meet or exceed their customers' expectations. This training includes modules for sales, finance, front office and management staff; apps for sales and service; and various reference documents such as FAQ documents. Different departments in the dealership relating to sales, as well as service, must maintain a certain level of training performance by meeting technical and nontechnical criteria. For example, to self-authorize warranty claims, a dealer must maintain 100 percent training for technicians at all times. Our GM Internal Audit Staff ensures dealer compliance by auditing all dealerships on a rotating basis. Dealers are required to achieve third-party Automotive Service Excellence certification of their facilities, an industry standard and a customer-recognized seal of quality."[7]

36. Plaintiffs and Class members received information about the characteristics, benefits, and quality of the Class Vehicles from GM dealerships.

---

[7] https://www.gmsustainability.com/manage/customers.html

The dealerships sell the vehicles with Monroney stickers, also known as window stickers, that contain important, material information regarding the vehicles from GM. Likewise, dealerships provide prospective buyers with brochures and other similar materials with important, material information regarding the vehicles from GM. Additionally, the authorized dealerships' salespeople provide prospective purchasers with important, material information from GM regarding the vehicles. Furthermore, under the terms of GM's express warranty, Plaintiffs must bring their vehicles to GM dealerships to perform warranty repairs, and it is through its dealership network that GM circulated its technical service bulletins regarding the Defect. In sum, GM knew that its customers depended in part on its authorized dealerships for information about its vehicles, and GM's authorized dealerships would have disclosed the Defect had GM required it. Yet, GM omitted and failed to disclose the Defect through one of the many consumer-focused informational channels, including the vehicles' window stickers, brochures, and through other materials sold at the dealerships and provided to the salespeople.

37.     "In-Vehicle Infotainment" or "Infotainment" is an automobile industry term that refers to vehicle systems that combine entertainment and information delivery to drivers. Infotainment systems use audio/video interfaces, touchscreens, keypads, and other types of devices to provide those services.[8]

38.     The CUE System is Cadillac's proprietary Infotainment System, which GM began developing in 2008.[9]

39.     The CUE System, which is built into the top of the vehicle's central instrument panel, includes a touch screen assembly or module. This requires a driver to use the CUE System's various functions by touching the screen.

---

[8]     *See, e.g.*, Burk, Michael. "The Evolution of In-Vehicle Infotainment Systems, part one." March 14, 2019, available at: https://www.micron.com/about/blog/2019/march/evolution-of-in-vehicle-infotainment-systems-part-one (last accessed September 8, 2019).

[9]     *See* n.6.

40.     Thus, for a driver to access and use the vehicle's safety, navigation, communications, and entertainment features, the driver is required to use the touch screen, as the touch screen functions as the sole control system for those systems.

41.     The CUE System's touch screen defaults to a "Home Page," which has icons that depict the CUE System's various features. To access and control these features, the user presses the desired icon on the touch screen.



42.     For example, the CUE System includes the following features:

43.     Voice Recognition: By pressing the "Voice Recognition" icon on the touchscreen display, the user enables the vehicle's voice recognition system, permitting "hands-free" operation within the navigation, audio, phone, and weather applications.

44.     Audio: By pressing the "Audio" icon on the CUE System touchscreen display, the user accesses different audio sources, including AM and FM radio, and SiriusXM Satellite Radio (if equipped), CD and MP3 player, USB/SD ports, Bluetooth7 and an auxiliary input.

45.     Phone: By pressing the "Phone" icon on the CUE touchscreen display, a user can use certain features of his or her cellular phone when paired

to the CUE through Bluetooth. For example, a user can place and receive calls without using their hands, through the Cue System's voice-recognition system.

46.     Navigation: By pressing the "NAV" icon on the CUE touchscreen, a user can access a GPS system including maps, driving directions, routing preferences, current location, places of interest, traffic updates, an estimated arrival time, and other features.

47.     Climate: By pressing the "Climate" icon on the CUE touchscreen, a user can control the vehicle cabin's air temperature, including air conditioning, as well as mode settings that change air flow and direction (that is, through which air vents the air travels).

48.     Rear Vision Camera (or Backup Camera): Rather than being initiated by the user's touching an icon on the touchscreen, the Rear Vision Camera is a safety feature enabled whenever the vehicle is placed in Reverse. The touchscreen then converts into a video-type panel where the area behind the vehicle appears on the CUE touchscreen. According to NHTSA, using backup cameras could prevent half of the deaths caused by accidents involving driving in reverse.[10]  Indeed, beginning in 2018, the NHTSA required vehicle manufacturers to install backup cameras in all new vehicles, as more than 200 people are killed and over 12,000 more are injured each year due to "backover" crashes.[11]

---

[10] https://www.autonews.com/article/20130620/OEM11/130629981/backup-camera-rule-for-cars-in-u-s-pushed- back-to-2015#axzz2iafFMKVW.

[11] See 49 CFR § 571.111 2018; https://www.usatoday.com/story/money/cars/2018/05/02/backup-cameras/572079002/ (last accessed November 22, 2019).

49.     The CUE debuted in 2012 (model year 2013) in Cadillac models XTS, ATS, and SRX.  The CUE was then included in other models as they were introduced or refreshed. The following chart depicts the Cadillac models ("Class Vehicles") that contain the CUE at issue:

| Brand: | Model: | Model Years: |
|---|---|---|
| Cadillac | ATS | 2013 - 2017 |
| Cadillac | SRX | 2013 - 2017 |
| Cadillac | XTS | 2013 - 2017 |
| Cadillac | CTS Vin A | 2014 - 2017 |
| Cadillac | ELR | 2014 - 2017 |
| Cadillac | Escalade | 2014 - 2017 |

**B.     Defendant Promoted the CUE's Safety Features**

50.     Cadillac advertised the CUE as improving driver safety.  For example, Cadillac claimed "CUE doesn't replace your smartphone or your iPod. Rather it allows consumers to securely store those mobile devices while channeling the information on those devices, along with your navigation tools, weather maps with Doppler radar, AM/FM and XM radio, instant messages and emails, through a central portal in your Cadillac, keeping hands on the wheel and eyes on the road."[12]

51.     Similarly, Cadillac touted: "Most navigation systems prompt users to insert destination information by separately inputting state, city, street, and house number information.  CUE users can manually or verbally input the entire destination address on one screen, saving time and keeping drivers focused on

---

[12]
https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2011/Oct/1012cadillac.html
(internal citation and quotation marks omitted).

THIRD AMENDED CLASS ACTION COMPLAINT

1    the road."[13]

2          52.    Further, "[CUE] also incorporates natural language voice

3    recognition, which allows customers to safely place calls, enter destinations,

4    browse media, play music and control other functions simply by telling the

5    vehicle what to do."[14]

6          **C.     The Defect**

7          53.    In connection with this case, Plaintiffs engaged an expert, who

8    undertook a months-long investigation to understand the Defect.  As a result of

9    that investigation, which included substantial testing and analyses of different

10   defective CUE units, the expert was able to replicate and determine the Defect,

11   as more fully described herein.

12         54.    The touch screen module or assembly is made up of two major

13   components.

14         55.    The first component is a projected capacitance touch screen

15   comprised of a glass sheet with electrode patterns on both sides.  These electrode

16   patterns hold an electrical charge.  A user touching the screen changes the

17   amount of charge at the point of contact, permitting the touch point to be

18   determined by circuits.

19         56.    The second component is a plastic cover with channels.  The plastic

20   cover sits in front of the projected capacitance touch screen and is the physical

21   screen a user touches.

22

23

24   ///

25

26   ---

     [13]

     https://media.gm.com/media/us/en/cadillac/news.detail.html/content/Pages/news/
27   us/en/2013/Mar/0321CadillacUE.html.
     [14]

28   https://media.gm.com/media/us/en/gm/autoshows/new_york.detail.html/content/
     Pages/news/us/en/2013/Mar/nyas/26mar-cadillac/0326-cadillac-cts-design.html.

57.     Sandwiched in between the plastic cover and the touch screen glass is a silicone-like material.



58.     The CUE touch screen is defective in that the plastic cover is prone to delaminating or separating from the touch screen glass.  When this happens, the silicone-like material coalesces and forms a spider-web-like pattern on the display, which breaks the underlying circuit and prevents a user's touch from being registered.  This, in turn, prevents a user from being able to access the CUE's various features.

59.     The Defect that causes the plastic cover and touch screen glass to separate can occur as a result of either mechanical stress or thermal stress—both of which are commonly experienced during normal operation of a vehicle.

### a.     Mechanical Stress Failure

60.     Mechanical stress occurs as a result of the typical vibration and shaking a vehicle experiences during operation.   Because of the Defect, this standard mechanical stress can cause the plastic cover to separate from the touch

1    screen, rendering the CUE inoperable.

2        61.    The CUE was defectively designed because the placement of the

3    screws and rubberized gasket allow the plastic cover to become separated from

4    the frame of the CUE.  When this occurs, the silicone-like material under the

5    plastic cover will spider-web and crack.

6        62.    The CUE has a total of 8 screws that hold the plastic cover to the

7    touch screen. Six of the eight screws are located at the top of the screen, and only

8    two screws are placed at the bottom. As a result, the top portion of the plastic

9    cover is firmly attached to the touch screen.

10

11

12                            

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   ///

28   ///

THIRD AMENDED CLASS ACTION COMPLAINT

63.    In contrast, there are only two screws on the bottom portion of the plastic cover, which causes it to flex and move when pressure is applied. The figure below shows the space between the metal frame and the plastic cover. When the plastic cover is flexed or moved it will eventually spider-web and cause the unit to fail.



64.    The placement of the screws is a defective design, as it allows too much movement to occur.  This, in turn, renders the plastic cover prone to separating from the touch screen glass.  When this happens, the silicone-like material forms a spider-web-like pattern on the display, which breaks the underlying circuit and prevent a user's touch from being registered.  Another contributing factor to the mechanical failures is the inadequate rubber gasket. The way the gasket is cut allows for a gap between the touch screen and the plastic cover, which prevents a user's inputs from being registered by the touch screen.  This gap also allows for more flexibility in the plastic cover, which leads to the spider-webbing defect (see image on page 19).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



### b.    Thermal Stress Failure

65.    The second failure scenario is where the plastic cover delaminates or separates due to temperature fluctuations.

66.    Specifically, the touch screen assembly is made up of materials with different thermal expansion coefficients (e.g., a glass touch screen and a plastic cover).  Upon heating or cooling, thermal expansion mismatches can cause delamination between the plastic cover and the touch screen glass.

67.    One common source of these thermal fluctuations are weather conditions.  Hot weather can cause a vehicle's interior to become hot—much hotter, in fact, than what is experienced outside of the vehicle.  As a result, the various components in the vehicle need to be able to withstand hot temperatures.

68.    The Automotive Electronics Council ("AEC") was originally established by Chrysler, Ford, and Defendant to establish common part-qualification and quality-system standards.  The AEC guidelines for component parts used in automotive applications depicted below.   Pursuant to the AEC guidelines, at a minimum, the CUE must be able to withstand a temperature of 85-degrees Celsius.

THIRD AMENDED CLASS ACTION COMPLAINT

| GRADE | TEMPERATURE RANGE | | PASSIVE COMPONENT TYPE Maximum capability unless otherwise specified and qualified | TYPICAL/EXAMPLE APPLICATION |
|---|---|---|---|---|
| | MINIMUM | MAXIMUM | | |
| 0 | -50°C | +150°C | Flat chip ceramic resistors, X8R ceramic capacitors | All automotive |
| 1 | -40°C | +125°C | Capacitor Networks, Resistors, Inductors, Transformers, Thermistors, Resonators, Crystals and Varistors, all other ceramic and tantalum capacitors | Most underhood |
| 2 | -40°C | +105°C | Aluminum Electrolytic capacitors | Passenger compartment hot spots |
| 3 | -40°C | +85°C | Film capacitors, Ferrites, R/R-C Networks and Trimmer capacitors | Most passenger compartment |
| 4 | 0°C | +70°C | | Non-automotive |

69.    However, because of the defect, the CUE can experience delamination and spider-webbing—and is therefore rendered inoperative—when exposed to a temperature of 85-degrees Celsius. As a result, the CUE fails to satisfy Defendant's own minimum standards.

70.    In addition, once the delamination occurs, it will worsen when exposed even to temperatures lower than 85-degrees Celsius (185-degrees Fahrenheit).

**D.    The Defect Poses a Safety Risk and Causes Unsafe Driving**

71.    The CUE System fails to enhance driver safety or maintain, as marketed by GM, a "fully capacitive faceplate pulse [that] when pressed to acknowledge the driver's commands and helps keep the driver's eyes on the road." Instead, the Defect causes drivers to become distracted, by impairing or rendering inoperative many of the CUE System's safety features.

72.    For example, once the Defect has manifested, the driver is unable to navigate to the proper menu because the touchscreen is inoperative. Thus, a driver often cannot, among other things: (1) pair an electronic device to the CUE using Bluetooth because s/he cannot navigate to the appropriate devices on the CUE touchscreen menu; (2) answer calls through the touchscreen or to make calls using the touchscreen, even if the driver's cellular phone was paired via Bluetooth before the Defect manifested; or (3) use the navigation system by

THIRD AMENDED CLASS ACTION COMPLAINT

viewing nearby vendors, such as gas stations, on the touchscreen, or entering destinations into the navigation system using the touchscreen. These are only a few of the safety and technology functions rendered inoperative due to the Defect.

73.     Even more troubling, the spider-webbing that results from the Defect obscures the CUE display, which, in turn, distorts or masks the backup camera's images, rendering the camera unusable. A backup camera is a required safety device in all cars.[15]

74.     In addition to the obvious safety risk that an inoperable backup camera poses to drivers who may not see obstructions or the risk to small children and animals who would otherwise be visible in the CUE touchscreen display, the Defect causes distracted driving and presents an unreasonable safety hazard instead of enhancing safety as advertised.

75.     In 2017, distracted driving killed 3,166 people. According to the Centers for Disease Control, there are three types of distracted driving: (1) visual (i.e., not focusing on the road); (2) cognitive (i.e., thinking about something other than the road and immediate driving needs); and (3) manual (i.e., physically taking one's hands off the steering wheel).[16]

76.     The Defect poses a safety risk by distracting drivers in all three ways highlighted by the CDC: (1) drivers are unable to read or see the screen clearly, causing them to divert their eyes from the road longer than under normal conditions; (2) drivers become focused on, and frustrated by, the malfunctioning display while driving; and (3) when the touchscreen works intermittently or inconsistently, drivers must remove their hands from the steering wheel more frequently and for longer periods of time than when the CUE functions as it was

---

[15]     *See* 49 CFR § 571.111 2018; https://www.usatoday.com/story/money/cars/2018/05/02/backup-cameras/572079002/ (last accessed November 22, 2019).NHTSA/NHTSA
[16]     *See* NHTSA, "U Drive. U Text. U Pay" available at: https://www.NHTSA.gov/risky-driving/distracted-driving (last accessed September 9, 2019).

THIRD AMENDED CLASS ACTION COMPLAINT

advertised to do.

### E.   GM's Knowledge of the Defect

77.   Plaintiffs are informed and believe and based thereon allege that prior to the sale of the Class Vehicles, GM knew, or should have known, about the Defect through its exclusive knowledge of non-public, internal data about the Defect, including: pre-release testing data; early consumer complaints about the Defect to GM's dealers who are their agents for vehicle repairs; warranty claim data related to the defect; aggregate data from GM's dealers; consumer complaints to the NHTSA and resulting notice from NHTSA; dealership repair orders; testing conducted in response to owner or lessee complaints; GM service bulletins applicable to the Class Vehicles; and other internal sources of aggregate information about the problem. Nevertheless, Defendant has actively concealed and failed to disclose the Defect to Plaintiffs and Class Members at the time of purchase or lease and thereafter.

#### a.   *GM's Press Releases Touting Extensive Research and Development of the CUE System Demonstrate Its Knowledge of the Defect Through Non-Public Pre-Sale Testing Exclusively in GM's Control.*

78.   Well before the first Class Vehicle was sold, GM knew or should have known that the CUE Systems were defective in design and/or manufacture and that the Defect would adversely affect the drivability of the Class Vehicles and cause safety hazards, including driver distraction. Beginning development in 2008, GM repeatedly touted its "consumer-focused methodology" in designing the CUE System as early as this January 8, 2012 press release:

> Among the many innovations to come from the research [behind the CUE System] was proximity sensing, natural voice recognition, haptic feedback and our unique capacitive touch screen with the concealed storage compartment behind the user interface.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

'Cadillac CUE enables drivers to put the smartphone or tablet away, while channeling the capability and media from those devices through the car, via an elegant and intuitive user experience,' says Jim Vurpillat, Cadillac global marketing director.

Using a clean sheet approach, Cadillac revisited not just the hardware, but the entire interaction between driver and car. Topping the list was the user interface, which in the automotive industry has been an Achilles' heel for users and critics alike.

The CUE team, made up of designers, engineers and software developers, used a consumer-focused methodology called Contextual Design. It's a process in which interviewers immerse themselves into the lives of users to understand the most subtle aspects of how they use products, how they work around shortcomings, and how they'd wish for improvements.

So team members rode along with luxury car owners on daily commutes, tagged along on vacations and sometimes squeezed in the back seats with families and groceries. The team constantly sketched their observations, no matter how mundane. Sometimes the observations were troubling, such as cell phones stuffed into cup holders or door pockets for constant reference while driving.

When the team members returned, they categorized thousands of observations, affixing them to a long wall at the General Motors Design Center in Warren, Mich. The CUE team would "walk the wall" to analyze driver frustrations, identify possible new capabilities, and look for common threads of where existing systems were failing or frustrating users. From there, they began to devise solutions.[17]

---

[17]   *See* GM press release, "Contextual Research Drives Innovative Tech Design," dated Jan. 8, 2012, available at: https://media.cadillac.com/media/us/en/cadillac/news.detail.html/content/Pages/news/us/en/2012/Jan/0108_cadillac_cue.html (last accessed September 8, 2019).

79.     In later press releases, GM continued to trumpet the extensive research and development it used to develop the CUE System, stating, "CUE development began in 2008 when Cadillac designers rode with 32 consumers for six months to study driver habits. Engineers and designers then used the data to develop CUE."[18]

### b.     GM's Own Service Bulletins Demonstrate that GM Has Known About the Defect for Years.

80.     From December 2014 to August 2017, GM issued at least four service bulletins and service bulletin updates ("Service Bulletins," "Technical Service Bulletins," or "TSBs") to its dealers in the United States, but not its customers, acknowledging the Defect in the Class Vehicles.

81.     In December 2014, GM issued a TSB titled "Bulletin No.: PIC6055" titled "Integrated Center Stack Display Delaminating Distorted or Appears Cracked Behind Lens." TSB PIC6055 further stated that "[s]ome customers may report that their radio screen appears bubbled, cracked, or is delaminating." The TSB directed its technicians, "If this concern is encountered, replace the ICS (Integrated Center Stack by following the SI replacement procedure."[19] This TSB included a "Warranty Information" section with a specific Labor Operation code for technicians to use when replacing the ICS.

82.     According to this TSB, the Defect affected the following models:

Cadillac ATS (model years 2013-2014)

Cadillac SRX (model years 2013-2014)

Cadillac XTS (model years 2013-2014)

Cadillac CTS Vin A (model year 2014)

83.     From January 20, 2016 to October 2018, GM subsequently issued three more versions of PIC6055, numbered PIC6055A through PIC6055C, each

---

[18]     *See* n.6 (emphasis added).
[19]     https://static.NHTSA.gov/odi/tsbs/2014/SB-10073912-0699.pdf

1    time expanding the number of models and model years affected by the Defect.

2       84.   In or around April 2015, GM issued PIC6055A to include more

3    vehicles, listing the following as affected models:

4       Cadillac ATS (model years 2013-2015)

5       Cadillac SRX (model years 2013-2015)

6       Cadillac XTS (model years 2013-2015)

7       Cadillac CTS Vin A (model years 2014-2015)

8       Cadillac ELR (model years 2014-2015)

9       85.   In or around October 2016, GM issued PIC6055B to include more

10   vehicles, listing the following as affected models:

11      Cadillac ATS (model years 2013-2016)

12      Cadillac SRX (model years 2013-2016)

13      Cadillac XTS (model years 2013-2016)

14      Cadillac CTS Vin A (model years 2014-2016)

15      Cadillac ELR (model years 2014-2016)

16      Cadillac Escalade (model years 2014-2016)

17
        86.   In or around August 2017, GM issued PIC6055C to include more
18
     vehicles, listing the following as affected models:
19
        Cadillac ATS (model years 2013-2017)
20
        Cadillac SRX (model years 2013-2017)
21
        Cadillac XTS (model years 2013-2017)
22
        Cadillac CTS Vin A (model years 2014-2017)
23
        Cadillac ELR (model years 2014-2017)
24
        Cadillac Escalade (model years 2014-2017)
25
        87.   Each of the above bulletins demonstrates GM was aware of the
26
     Defect and recognized it was covered under its Warranty by including warranty
27
     codes to effectuate the repair.
28

THIRD AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### c. *Numerous Consumer Complaints to NHTSA Demonstrate That GM Was Aware of the Defect.*

88.   Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

89.   In fact, according to GM, "Externally, GM maintains an open dialogue with the National Highway Traffic Safety Administration (NHTSA), including monthly meetings with senior agency officials, with expedited discussions as needed, covering field investigations, safety recalls and other issues. GM also participates in periodic meetings with NHTSA and other stakeholders to advance safety discussions that benefit the industry as a whole."[20]

90.   Automakers have a legal obligation to promptly identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects.  *Id.* Thus, GM knew or should have known of the many complaints about the Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Defect.

91.   Complaints that owners and lessees filed with the NHTSA demonstrate that the Defect is widespread, contributes to driver distraction, and that it manifests without warning. The complaints also indicate GM's awareness

---

[20] https://www.gmsustainability.com/manage/safety.html

of the problems with the CUE System and the safety concerns that the Defect poses. The following is just a small sampling of the numerous complaints, often expressly safety-related, describing the Defect (spelling and grammar mistakes remain as found in the original, capitalization changed from original all-caps format with capitalization-related edits added) (Safecar.gov, Search for Complaints (September 9, 2019), http://www-odi.NHTSA.dot.gov/complaints/).

    a.  **DATE OF INCIDENT:** May 13, 2016
        **DATE COMPLAINT FILED:** May 28, 2016
        **NHTSA/ODI ID:** 10871315
        **SUMMARY:**

On May 13, 2014, at 10 am I had to travel less than 2 miles from my own house to my podiatric doctor. The car was stationary until the end of my appointment about 30 minutes.

Upon going back to my house, I noticed some like scratches on the dashboard screen that house all controls, such to play a radio station etc.

The are on the right side of the such screen about 2 inches wide and all the way to the top.

On may/16/2016 I called baker Cadillac of Charleston SC, explain what it had happen, were told to bring the car so they could look at it, some we did on may/24/2016, were told that will need to order the part and will let me know when they had it, I had to insist for the person to write an order, some he did but not vey happy.

While we were waiting for the form to be ready another employee told us that if we see a red light not to drive and that had happen on other vehicles and they are several pieces of plastic on that configuration, upon returning home a long about 1.1/4 inch red light appeared on the left side of such screen, as today may/28/2016 the vehicle is not been out of my garage and it will be there till the time to take to dealer to be repaired. . . .

b. **DATE OF INCIDENT:** May 19, 2016
   **DATE COMPLAINT FILED:** May 19, 2016
   **NHTSA/ODI ID:** 10865844
   **SUMMARY:**

Cadillac CUE system and center stack system freezing and unresponsive. The Cadillac ELR's HVACHVAC, navigation, audio and other system functions are all controlled only by touch sensitive panel either in the CUE screen or below it. When CUE freezes or lags as it often does this causes a dangerous occurrence where the driver must divert attention from the road to operate the car's system. While on my normal commute this morning I went to adjust my air conditioning when the system froze. I waited for the system to catch up or un-freeze and as the screen started to respond my distance sensor sounded and I had to slam on my brakes to avoid hitting a car that had slowed in front of me. The constant malfunction of this slow operating system diverts entirely too much attention away from the road and creates an unsafe driving experience. The alternative is to not engage with audio or HVAC controls while driving, which is not the intended design of the car. The lagging CUE system has personally caused distress and nervousness while driving this car. I've addressed these concerns with both Cadillac executive team and two local dealerships all of which say the system functions as designed.

c. **DATE OF INCIDENT:** September 12, 2016
   **DATE COMPLAINT FILED:** October 3, 2017
   **NHTSA/ODI ID:** 11031539
   **SUMMARY:**

The computer on the dash that controls the backup cam radio etc. Has been replaced while under warranty began cracking for no apparent reason. Cadillac will not replace the part and cannot guarantee the part will not fail a 3rd time. Told many people have this problem.

THIRD AMENDED CLASS ACTION COMPLAINT

d. **DATE OF INCIDENT:** November 16, 2016
**DATE COMPLAINT FILED:** December 16, 2016
**NHTSA/ODI ID:** 10935862
**SUMMARY:**

Information center Cadillac CUE does not operate. Brought to dealer on 11/17/2016 and was told 30 days to several months on back order. Today is 12/16/2016 called dealer no estimated completion time. Called Cadillac same answer. The Cadillac CUE controls A/C, heat, radio and all the accessories. Does this fall under the lemon law? I have breathing problems and can't safely drive this vehicle. Temperatures this weekend will be -12 degrees Fahrenheit. Please advise what actions I can take to resolve this issue asap.

e. **DATE OF INCIDENT:** September 12, 2016
**DATE COMPLAINT FILED:** October 3, 2017
**NHTSA/ODI ID:** 11031539
**SUMMARY:**

The computer on the dash that controls the backup cam radio etc. Has been replaced while under warranty began cracking for no apparent reason. Cadillac will not replace the part and cannot guarantee the part will not fail a 3rd time. Told many people have this problem.

f. **DATE OF INCIDENT:** November 18, 2017
**DATE COMPLAINT FILED:** December 1, 2017
**NHTSA/ODI ID:** 11051698
**SUMMARY:**

Shortly arriving being moved to Texas by the army, I noticed a hairline crack in the top left corner of my CUE navigation system. After a few days the crack spread and began affecting the touch screen. Initially a small section at the bottom of the screen stopped responding to touch. Thus, making it impossible to change radio stations or enter an address into the navigation. Approximately a week later the entire CUE stopped working. From what I have seen online,

THIRD AMENDED CLASS ACTION COMPLAINT

this is a common issue for the Cadillac CUE shortly after vehicles reach 50k miles.

g. **DATE OF INCIDENT:** December 18, 2017
**DATE COMPLAINT FILED:** January 14, 2018
**NHTSA/ODI ID:** 11062747
**SUMMARY:**

My Cadillac CUE touch sense touch screen is no longer functioning at any time, sitting still or while the vehicle is in motion. The screen is spider webbed (delamination of conductive layer of material behind the glass) and no longer allows me to set things like the collision avoidance, auto-braking and lane departure options as well as many other non-safety related features. This is clearly a manufacturing defect and I have read at one time Cadillac had a backlog of over 4000 vehicles waiting on replacement CUE modules but yet no voluntary recall. Hopefully the NHTSA can look into this matter and require Cadillac to correct this problem for owners no longer under warranty since some functions with the touch screen are related to vehicle safety (collision avoidance, auto-braking and lane departure).

h. **DATE OF INCIDENT:** June 30, 2017
**DATE COMPLAINT FILED:** June 1, 2018
**NHTSA/ODI ID:** 11099193
**SUMMARY:**

Tl*the contact owns a 2013 Cadillac SRX. The contact stated that the Cadillac user experience (cue) screen was cracked. As a result, the various functions that the CUE screen controlled were no longer functional. The failure occurred while at a goodyear repair facility. The goodyear technician informed the contact that the failure was due to extreme temperatures. The vehicle was not taken to a dealer for diagnostic testing or repairs. The manufacturer was notified and did not assist. The failure mileage was approximately 61,000.

1

2      i.   **DATE OF INCIDENT:** June 8, 2018
            **DATE COMPLAINT FILED:** June 15, 2018
3           **NHTSA/ODI ID:** 11102179
4           **SUMMARY:**

5
            The Cadillac CUE (information/ navigation / air condition
6           system) developed spider web type cracks inside the screen;
            this makes it hard to see or use control features. I went
7           online and found hundreds of people are having the same
            issue. One person has only 19,000 miles and has the web
8           like cracks. It was 90° when I got into my car and saw a few
9           of these cracks (these cracks are smooth to touch on
            screen), but a week later it's gotten bigger. A source says it's
10          a factory defect, and that the cracks are the glue or adhesive
11          has dissipated and is detaching the screen from the actual
12          component. I have 44,000 miles on my vehicle ... It stays
            under the carport but is still having this issue. With so many
13          people complaining and posting pictures on general motors
14          discussion thread, one would think something would've
            gotten done. As stated before, it was a small line and it's
15          constantly spreading throughout the Cadillac CUE screen.
16          It's a simple issue, but should consumers have to pay the
            dealership for something they have no control over? Here is
17          the link with others complaining about the same thing.
18          Https://www.Cadillacforum.com/forum/Cadillac-SRX-
            10/cue- screen-spider-webbing-16740/
19

20     j.   **DATE OF INCIDENT:** June 6, 2018
            **DATE COMPLAINT FILED:** June 18, 2018
21          **NHTSA/ODI ID:** 11102422
22          **SUMMARY:**

23
            My 2014 Cadillac CUE screen has developed a spider web
24          cracks which prevent me from seeing through the screen.
            This has become a safety issue because I am unable to view
25          the backup cameras. This is a known issue with Cadillac
26          with numerous complaints. I have only 35,000 miles on my
            car. One day after leaving my car outside during a hot day,
27          the cracks appeared. Cadillac/GM should be responsible for
28          this defective product.

k.  **DATE OF INCIDENT:** May 12, 2018
    **DATE COMPLAINT FILED:** August 5, 2018
    **NHTSA/ODI ID:** 11115815
    **SUMMARY:**

    The CUE infotainment system is starting to fail. Several
    selections i.e. "media" and "scan" are not working. The
    clear screen cover has started to crack. It has come to my
    attention that this is a widespread problem to the degree that
    the system fails totally shutting down all the music
    capabilities, rear camera, and use of the on-star navigation
    system as well.

l.  **DATE OF INCIDENT:** March 1, 2018
    **DATE COMPLAINT FILED:** September 29, 2018
    **NHTSA/ODI ID:** 11132253
    **SUMMARY:**

    Approximately 6 months ago, I noticed a small stress
    fracture appear in the bottom left corner of the central
    digital dashboard of my vehicle. The dashboard projects
    safety, entertainment and automobile operating status (e.g.
    Deflated tires, OnStar alerts, etc.). As the fracture grew it
    revealed a spider web of fractures distorting the dashboard
    and affecting the system's operation. The system would
    sudden begin flashing different icons, swiping from side to
    side which is very distracting. The digital icons are no
    longer functional, yet the fractures continue to grow, and
    the dashboard is very distracting while driving.

    We reported the defect to Marvin K. Brown Cadillac and
    was informed by the service advisor, merle porter, several
    other SRX owners have reported the same issue, in which
    GM recognized as a vehicle defect. Mr. Porter reported the
    defect to gm, however, GM did not accept responsibility
    and refused to recall the component or replace the
    component.

    On 09/29/2018, I submitted a complaint to GM asking for a
    further investigation (Case# 84675794778).

The origin of the fracture is located in the bottom left corner of the panel and no external force or impact is visible and no damage was occurred by me or my passengers. I feel this defect is a critical safety issue due to its driver distracting randomly and consisting moving icons.

m. **DATE OF INCIDENT:** October 1, 2018
**DATE COMPLAINT FILED:** October 12, 2018
**NHTSA/ODI ID:** 11139973
**SUMMARY:**

CUE radio, climate, navigation, Bluetooth system, keeps freezing up. Now the screen has begun to spider crack. This is a very common problem amount all Cadillac's models using the cue. It is strange that they haven't a recall and fix.

**n.      *Consumer Complaints on Internet Forums—and GM'S Responses Thereto—Demonstrate That GM Was Aware of the Defect***

92.     Similarly, complaints posted by consumers on internet forums demonstrate that the Defect is widespread, poses serious safety risks, and can manifest without warning and/or suitable repair. Moreover, these complaints conclusively establish that GM was aware of the problems years ago given that *GM monitored and responded to these complaints, as demonstrated below.* What follows is just a sampling of numerous such complaints and GM's responses (spelling and grammar mistakes remain as in original).

## Complaints on CadillacForums.com

93.     Scores of consumers complained about the Defect on Cadillacfourms.com, including but not limited to the following complaints and responses by Cadillac Customer Care representatives:

a. On May 14, 2014, a consumer complained about the Defect:

*I have an 2013 ATS 2.0 and recently I discovered there is an INTERNAL, crack started on the lower left corner of the Cue. There were no scratches or damage to the peripheral area. I discovered this on the day I parked outside lot with a*

*record heat of over 100 degree. Don't know if there is anything to do with it but it just happened. Interested to discover if anyone heard of such a case. Again, it is internal crack and only can be seen but no by touch. Thanks in advance.*

b.  On May 14, 2014, an official representative of GM with Cadillac Customer Care responded to the complaint:

*Hello NewbieATS,*

*I am sorry to hear of the crack you've recently noticed in your vehicle. I understand you are looking for advice from other forum members, but if you want your local Cadillac dealership to look into this for you, please feel free to send me a private message, I am more than happy to assist.*

*Regards, Laura M.*

*Cadillac Customer Care*

c.  On May 16, 2014, a consumer complained about the Defect:

*Mine was brand new purchased March 2013. So far, my dealer seems good about it but will find out for sure tomorrow when I bring it in, but I don't expect any surprises. The cracking is getting worse, but the CUE still works fine.*

d.  On May 17, 2014, GM responded to the above complaint:

*Hello bravnik,*

*If you would like to further discuss your situation or keep us updated after your dealership visit, please feel free to send us a private message. We are more than happy to assist anyway that we can!*

*Sincerely, Laura M.*

*Cadillac Customer Care*

1

2      e.  On July 7, 2014, a consumer complained about the Defect:

3

4      *I took my XTS in for regular service and to take care of a*
5  *recall and when I picked it up from the dealer (after hours)*
    *the glass over the radio/CUE was spider webbed from the*
6  *inside. There is no impact mark or signs of excessive*
    *pressure, the outside surface is totally smooth. We are in*
7  *New Orleans and it was about 95 outside when I picked up*
8  *the car, so the only thing I can think of is the extreme heat*
    *caused it to break from the inside. I have to get the car in to*
9  *have the dealer look at it and hopefully get it fixed thru*
10  *warranty without a major headache.*

11      *Anyone heard of this happening?*

12      *It's been a rough couple of weeks with my Cadillacs and*
13  *glass. My Escalade split a windshield sitting still in the*
    *driveway.*
14
15      *After jumping thru all the hoops Cadillac is going to*
    *replace it.*
16
17      f.  On July 9, 2014, GM responded:

18      *Hello Edjeeg,*

19      *I hope I am not reaching out to you too late! Were you able*
20  *to get your CUE screen fixed by your local dealership? If*
    *you are still in need of assistance, please let me know. I*
21  *would be happy to help. Either way, I would like to know*
22  *how things are going with the vehicle.*

23      *Katie O.*

24      *Cadillac Customer Care*

25

26

27

28

THIRD AMENDED CLASS ACTION COMPLAINT

g. On March 25 and April 2, 2015, two consumers complained about the Defect:

*I just discovered the same problem on my 2014 CTS V-Sport. Dealer says they have to look at it first to see if its covered by warranty. My fear is they will try to claim I broke it.*

*I just discovered the same issue on my CTS when I came out of work today the crack is on top right cover inside the glass. Carlos did the dealer fix yours?*

h. On April 3, 2015, Defendant responded:

*Hello FLCadillacGuy,*

*I'm sorry to learn you are experiencing concerns with your CUE display. Please let me know if I can provide an additional layer of support while you're working with the dealership. Just send me a private message with your full contact information, VIN, mileage and the name of your dealership.*

*Katie O.*
*Cadillac Customer Care"*

i. On May 4, 2015, a consumer complained about the Defect:

*One more cracked CUE screen. Semi-circular cracks were first [scr]ween on the left side and then after three days, the same appeared on the right side. I do have an appointment at Ed Morse Cadillac Brandon tomorrow and hopefully, they will resolve this time. I also have problems with my liftgate (2014 SRX); when I depress the button to open the lift-gate, I hear two quick clicks and cannot open the gate. I have to try several times to beat the second click. Hopefully, this item will also be resolved.*

j. On May 5, 2015, GM responded:

> Hello zoki.mbolekwa,
>
> I am sorry to hear about each of these concerns with your SRX, but it is good to know that you will be working with the dealership to resolve them. Please let us know how the visit goes, and feel free to PM [private message] us if you require any additional assistance moving forward with this process.
>
> Have a great day, Austin J.
>
> Cadillac Customer Care

k. On June 15, 2015, a consumer complained about the Defect:

> So, today was the hottest day in Atlanta so far this year...and since I bought my CTS last November. My car sat in my work parking lot for 9 hours today, closed windows and closed sunroof shade. I got in it, and drove to the gym, about 40 minutes. I had the air on, but nothing extreme. When I came out of the gym, the screen on my CUE display is "cracked" on the bottom right corner, sort of in a circular pattern...definitely "under" the glass (if that's what the material actually is). Has this happened to anybody else? I'll be going to the dealer tomorrow, but I thought I'd ask here, because I'm a little mad about it tonight! Thanks!

l. On June 16, 2015, GM responded:

> Hello billrat,
>
> We sincerely apologize for this inconvenience with your Cue screen but are happy to hear that you will be visiting the dealership today. Please keep us updated on your experience and feel free to reach out to us directly should you need further assistance with this concern.
>
> Sincerely, Samantha N.
>
> Cadillac Customer Care.

THIRD AMENDED CLASS ACTION COMPLAINT

m. On April 19, 2016, GM responded to another complaint about the

Defect:

 Hello mrtimstik and Jod,

*We regret to hear that you both are experiencing this
concern with the CUE display screen and understand how
this may be frustrating. If you would like an additional
layer of support while you work with your dealership
towards a resolution, we would be happy to assist. If this is
something of interest to you, please feel free to send us a
private message. Kindly, Samantha N.*

*Cadillac Customer Care*

Complaints on CadillacForum.com

94.    Below are a sampling of customer complaints and official responses
by GM's "Cadillac Customer Care" representatives:

a. On February 21, 2016, a consumer complained about the Defect as

follows:

*Hi,*

*I came out to my 2014 SRX yesterday after not driving it for
a few days. I noticed that the CUE screen on the left side
had some spider webbing cracks in the scree[n], NO impact
to the screen from objects and you can't feel the cracks with
your nails. I drove it for about 1 hour with the heat on and
it appears to have spread into longer cracks. What gives?
I'm contacting my dealer and the Cadillac customer service
department and see what they are going to do. I only have
17k on it. I HOPE they don't give me a problem and say it's
from abuse or misuse, it is a touch screen and I see that
other Cadillac's are having the same issue.*

*-Jim.*

b.  On February 23, 2016, GM responded to the above complaint:

 *Hi Jim,*

*I'm very sorry to hear about these cracks in your CUE screen. Were you able to get this repaired by your local dealership? If you are still in need of assistance, please send us a private message; we would be happy to help.*

*Ashley R.*

*Cadillac Customer Care.*

c.  On January 20, 2018, a consumer complained about the Defect as follows:

*I have a 2013 Cadillac ATS with spider cracks on my CUE screen I have 67,000 miles and I am out of warranty. When I drive and the sunlight hits it my radio goes Garza. I've read other forums and noticed this is an ongoing problem. It was replaced once before when I was still under warranty and now it's happened again. Why does this continue to happen?*

d.  On March 27, 2018, GM responded to the above complaint:

*Hi, Nathan. We regret to hear of your concern with your 2013 ATS Cue Screen. We understand how frustrating repeat concerns can be. We would like an opportunity to review your situation further. Please e-mail us at socialmedia@gm.com and include "ATT: Kell" in the subject line. We look forward to your reply there.*

*Kell S.*

*Cadillac Customer Care.*

e.  On March 14, 2018, in response to numerous consumer complaints regarding the Defect, GM responded:

*We regret to hear of your concerns with your CUE screen on your 2014 SRX. We are here to help the best we can and review vehicle concerns on a case-by-case basis. We would like an opportunity to address your situation further. Please*

*send us an e-mail at socialmedia@gm.com "ATTN: Kell"
and we'll be able to assist you further. We look forward to
your response there.*

*Kell S.*

*Cadillac Customer Care.*

f.  On May 24, 2018, GM responded to a consumer complaint about the
Defect, as follows:

*Hello, Jonscott610. We regret to see the sentiments that you
have expressed. We strive to provide high quality, luxury
vehicles that exceed our customers' expectations. Please
know that your frustrations are certainly recognized and
has been do\*\*\*ented within our internal system. Should you
need further assistance, please email* socialmedia@gm.com.

**General Online Complaints**

95.  In addition to the numerous consumer complaints detailing the
Defect on the Cadillac Websites, consumers also described how the defect
negatively affected the CUE's features.

96.  For example, consumers posted the following complaints on the
Cadillac Owner/Enthusiast Website and Forum:

a.  December 7, 2016

*I have a 2016 SRX Premium. My CUE started acting
erratically and was unresponsive to touch though it jumped
all by itself. I went to the dealer who informed me there was a
heat crack on the screen (which I did not see due to the glare)
and that's what caused the issue. He said a part would be
ordered. Its been almost a month...this is extremely annoying
that I cannot answer calls and have ended up using OnStar
minutes for calls because the screen would not allow me to
dial using my linked phone. I fail to understand...why this*

1         *part is not in stock given the common complaint of this issue*

2         *(reading this thread).*

3         b. September 23, 2018

4         *Two weeks ago, my wife noticed what started out as a small*

5         *web crack in the right lower corner of the CUE display. None*

6         *of the touch controls were affected. Since that time, the size of*

7         *the cracking has expanded and now touch controls are*

8         *erratic. Steering wheel controls are still working. I'm out of*

9         *warranty so any repair is on my dime. Based on the posts I've*

10        *read here on the forum, I'm fairly certain the touchscreen is*

11        *going, but would like to attempt a hard reset. Are there any*

12        *instructions available on how to perform a hard reset?*

13    97. Consumers also posted the following complaints on the Cadillac

14  Forum:

15        a. March 2, 2017:

16        *Hello Ashley,*

17        *My name is Fabian zuniga and I own a beautiful 2013*

18        *ATS 2.0 but I am also having this issue. With dropping*

19        *temperatures and using my heat my screen has cracked. First*

20        *with a small spider web like crack and now it has taken over*

21        *about 35% of the screen making some of the*

22        *radio/heating/cooling options unavailable. There is no*

23        *physical crack or damage to the screen itself but to the*

24        *interior glass. I'm hoping you can point me in the correct*

25        *direction to fixing this issue. I have 41985 currently miles on*

26        *my vehicle.*

27        *Fabian Zuniga*

28

THIRD AMENDED CLASS ACTION COMPLAINT

b.      May 25, 2018:

*I have a 2014 ATS with 32k miles on it. I got into to my car after work and I noticed that for no reason my Cue is spider webbing and I cannot use it like the whole thing is stuck on the home screen. I see that is a frequent problem. My warranty expired a few months ago. It is imperative I get this fixed due to the dangers of its spider webbing all the way through and I will not be able to use the backup camera. What steps can I take on getting this issue fixed?*

c.      September 27, 2018:

*Hello,*

*I have a 2014 ATS 2.0 Turbo and I am having the same problem with my vehicle. This is the second time that I had to fix the touchscreen. Today I went to the dealership and it will cost me $1,300.00 to get it fixed. The dealership representative said, "this is a manufacturing defect and he does not know why Cadillac has not issued a recall." The spider cracks on the bottom left side of the touchscreen are affecting the A/C, heating controls, radio functions and the hands-free phone controls. Why should I pay for a manufacture defect? Can anyone please direct me to the right person/department at Cadillac to resolve this issue?*

*Thank you in advance, your help is appreciated.*

*Rudy Arredondo, Tx.*

THIRD AMENDED CLASS ACTION COMPLAINT

d.      November 17, 2018:

    i.      *My dealer said it was past 3 years, so they want $1500 to fix the cracked screen. I personally know 3 other Cadillac owners this happened to. I even bought a 100,000-mile warranty but the Cadillac dealer sold me one that was not by GM. I only have 25k miles on my garaged XTS. This should be recall repair.]   [ I have my 2014 SRX at my dealership today and was told it would cost $1,060 to replace the cracked CUE screen. I keep my car parked in a garage both at home and work. With the volume of individuals who have this issue, the response by Cadillac is extremely disappointing. Unfortunately, I do not think I will invest in another Cadillac as a result.]*

    ii.      *Hi! Did you find a solution? I also have a 2014 with the webbing, my screen no longer works. So frustrating.*

### g.      *GM's Knowledge of the Defect Through Customer Care Data and Vehicle Repair Data*

98.      GM was also made aware of the Defect based on the large number of repairs performed to the CUE System's exhibiting delamination and spider-webbing at its network of dealerships.

99.      In fact, with the introduction of the CUE System, GM announced a special customer care program with dedicated support staff trained with expertise on CUE Systems. For example, in this press release dated May 9, 2012, GM stated:

> Cadillac is launching CUE with training and support resources to enable dealers and customers to provide feedback, ask questions and access support in a number of ways. New customer care elements include:
>
> ****

• Each U.S. Cadillac dealership has a trained technology expert to assist customers, providing a personal, local first line of contact during both the shopping and ownership experiences.

• Twenty-five new Connected Customer Experts are being deployed across the United States. to support the launch of CUE. These connectivity experts provide a resource for in-car electronic technological training, sales and service assistance.

• Cadillac's existing customer assistance services have added specific CUE experts to answer owner questions. Cadillac's customer assistance center in Austin, Texas, has specially selected and trained advisors who have expertise in infotainment and mobile devices to help answer questions.

• OnStar, standard on every Cadillac, will have a direct link to these CUE experts as well, for any owners with questions or wishing to provide feedback.

****

'We're blending the advanced technology of CUE with the personal touches of a luxury experience,' Butler said. 'We've built a thorough approach, enabling customers to give us feedback on the technology as they use it, as well as providing support for dealers and buyers who have questions.'[21]

100.   In addition to the above, on information and belief, GM regularly compiles and analyzes detailed service information regarding such repairs. Indeed, on information and belief, GM requires dealers to maintain detailed and meticulous records for any such repairs.

---

[21] *See* GM press release, "Innovative Customer Care Comes With CUE Launch," dated May 9, 2012, available at: https://media.gm.com/media/us/en/gm/autoshows/detroit.detail.html/content/Pages/news/us/en/2012/May/0509_cue.html (last accessed September 9, 2019).

### F.     Plaintiffs' Experiences

***California Plaintiff Matt Goldstein (2013 Cadillac SRX)***

101.   In or around June 2016, Plaintiff Matt Goldstein ("Goldstein") purchased a used 2013 Cadillac SRX from Fairfield Chevrolet, an authorized GM dealer in Fairfield, California.

102.   Goldstein purchased his vehicle primarily for personal, family, or household use. GM manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

103.   Passenger safety, vehicle performance, gas mileage, and reliability were all factors in Goldstein's decision to purchase the vehicle. Before purchasing his Class Vehicle, Goldstein discussed his potential purchase with the authorized dealer representative and researched the vehicle through various websites, including Edmunds and Kelley Blue Book. Mr. Goldstein also exchanged emails with a Fairfield Cadillac salesperson, and reviewed an email from the Fairfield Cadillac salesperson containing detailed information about the Cadillac SRX's price and features. Additionally, Goldstein requested a Vehicle Report that revealed the CUE System was updated then replaced on or around June 19, 2013.

104.   Since mid-2018, Goldstein's CUE System has been unresponsive and is entirely inoperative from the screen.  Shortly thereafter, Goldstein reported the problems to GM and took his vehicle to an authorized GM dealer. The GM technician confirmed that the CUE System was unresponsive and filed a claim with GM requesting the GM cover the CUE System replacement under warranty.  GM denied the claim and Goldstein was informed the repairs to the CUE System could cost approximately $2,000.00.

105.   Goldstein's vehicle continues to exhibit the problems previously reported to the authorized GM dealer.

106.   GM's authorized dealership has failed to adequately repair Goldstein's vehicle or even acknowledge the CUE System Defect. Despite the diagnosis and repair attempts by GM and its dealers, Goldstein's CUE System continues to be inoperative and unresponsive.

107.   Had GM disclosed its knowledge of the Defect before Goldstein purchased his 2013 Cadillac SRX, Goldstein would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Goldstein. Like all Class Members, he would not have purchased his 2013 Cadillac SRX, or would not have paid the purchase price charged by GM, had he known that the CUE systems are prone to spontaneously delaminate, bubble or crack in a "spider-web" formation, rendering them useless.

108.   At all times, Plaintiff, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### *California Plaintiff Percy Sutton (2013 Cadillac XTS)*

109.   On or about September 6, 2016, Plaintiff Percy Sutton ("Sutton") purchased a used 2013 Cadillac XTS from Boulevard Cadillac, an authorized Cadillac dealer in Signal Hill, California.

110.   Plaintiff purchased his vehicle primarily for personal, family, or household use. GM manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

111.   The express written warranty was a material factor in Plaintiff's decision to purchase the vehicle.

112.   Passenger safety, vehicle performance, and reliability were all factors in Plaintiff Sutton's decision to purchase the vehicle. Before purchasing his Class Vehicle, Sutton test drove the vehicle, discussed the vehicle with an authorized dealer representative, and reviewed the window, or Monroney, sticker on the vehicle, which listed information about the vehicle's features, options, and price. As discussed *supra*, GM could and should have disclosed the existence of

the Defect in these materials and directed its authorized dealership salespeople to disclose the Defect.

113.   In or around July 2019, Sutton noticed that his CUE screen was failing, cracking, and bubbling. On or around August 2, 2019, with approximately 37,898 miles on the odometer of his Cadillac XTS, Sutton delivered his vehicle to Cadillac of Las Vegas West complaining that "radio screen is not working" and had cracked and bubbled. The technician inspected the vehicle and determined that the radio control assembly/CUE required replacement. Sutton paid $100 for the CUE System replacement.

114.   Had GM disclosed its knowledge of the Defect before Sutton purchased his 2013 Cadillac XTS, Sutton would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Sutton. Like all Class Members, he would not have purchased his 2013 Cadillac XTS, or would not have paid the purchase price charged by GM, had he known that the CUE systems are prone to spontaneously delaminate, bubble or crack in a "spider-web" formation, rendering them useless.

115.   At all times, Plaintiff, like all Class Members, has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### *California Plaintiff Vanessa Rodriguez (2013 Cadillac ATS)*

116.   Plaintiff Vanessa Rodriguez is a resident of Fresno, California.

117.   On September 23, 2016, Ms. Rodriguez purchased a used 2013 Cadillac ATS sedan from the Michael Cadillac dealership, which is a franchised and authorized Cadillac dealership located in Fresno, California.

118.   Ms. Rodriguez still owns her vehicle. At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Ms. Rodriguez, at the time she purchased her vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Ms. Rodriguez purchased the vehicle but did not disclose it to

her. Ms. Rodriguez purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had GM disclosed its knowledge of the Defect before Ms. Rodriguez purchased her vehicle, Ms. Rodriguez would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Ms. Rodriguez. Like all Class Members, had Ms. Rodriguez known about the Defect, she would not have purchased the vehicle or would have paid less for it.

119.   In or around October 2018, Ms. Rodriguez first noticed spider-webbing on the lower-left side of the CUE touchscreen.

120.   Since Ms. Rodriguez first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

121.   After first observing the spider-webbing, Ms. Rodriguez has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

122.   On other occasions when Ms. Rodriguez's phone was paired to the CUE, the CUE touchscreen controls failed to operate properly. The State of California makes it illegal to talk on a cellphone without a hands-free device, the violation of which can be a fine of more than $150 for first-time offenders. Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Rodriguez was unable to select the desired vents.

///

123.   In fact, the Defect and its many deleterious consequences have created unsafe driving conditions. For example:

- Ms. Rodriguez could not clearly see the CUE screen while driving because of the spiderwebbing, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.
- While reversing her vehicle, Ms. Rodriguez was unable to see properly because the backup camera was obscured by the Defect.
- While attempting to make or answer a call, Ms. Rodriguez had to repeatedly press the CUE screen, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen been functioning properly.
- While attempting to use the navigational feature in the CUE, Ms. Rodriguez had to repeatedly press the CUE screen, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen been functioning properly.

124.   Consequently, the Defect adversely affected Ms. Rodriguez's ability to concentrate and to drive safely.

125.   Ms. Rodriguez has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

126.  Before purchasing her vehicle, Ms. Rodriguez visited Michael Cadillac to look at their inventory, including the Cadillac ATS models. Before her purchase, Ms. Rodriguez test drove the 2013 Cadillac ATS with a dealership salesperson. Before purchase, Ms. Rodriguez also reviewed the vehicle's window sticker, which described the vehicle's features, options, and price. Neither Defendant, nor any of its agents, dealers, or other representatives informed Ms. Rodriguez of the existence of the Defect and/or the defective design prior to her purchase.  Similarly, none of the advertising materials Ms. Rodriguez reviewed contained any information concerning the Defect.

***California Plaintiff Benito Guzman (2016 Cadillac SRX)***

127.  Plaintiff Benito Guzman is a resident of Stockton, California.

128.  On March 31, 2016, Mr. Guzman purchased a new 2016 Cadillac SRX from the Kuni Cadillac Dealership, which is a franchised and authorized Cadillac dealership located in Sacramento, California.

129.  As an authorized Cadillac dealership, Kuni Cadillac is one of GM's agents for sales and repairs. GM's authorized dealerships, including Crestview Cadillac, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

130.  Mr. Guzman still owns his vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Mr. Guzman, at the time he purchased his vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Mr. Guzman purchased the vehicle but did not disclose it to him. Mr. Guzman purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable. Had GM disclosed its knowledge of the Defect before Mr. Guzman purchased his vehicle, Mr. Guzman would have seen such disclosures and been aware of them. Indeed, GM's omissions were material

to Mr. Guzman. Like all Class Members, had Mr. Guzman known about the Defect, he would not have purchased the vehicle or would have paid less for it.

131.   In or around January 2018, Mr. Guzman first noticed spider-webbing on the lower-right side of the CUE touchscreen. He brought his vehicle to Mataga Buick GMC in Stockton, California, an authorized GM dealership, to complain about the CUE touchscreen failure. The GM dealership refused to repair the CUE under warranty and quoted him $2,300 for the repair.

132.   Since Mr. Guzman first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

133.   After first observing the spider-webbing, Mr. Guzman has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

134.   Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Guzman was unable to select the desired vents.

135.   In fact, the Defect and its resulting manifestations have created unsafe driving conditions. For example:

- Mr. Guzman could not clearly see the CUE screen while driving because of the spiderwebbing, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.

THIRD AMENDED CLASS ACTION COMPLAINT

- While reversing his vehicle, Mr. Guzman was unable to see properly because the backup camera was obscured by the Defect.
- While attempting to make or answer a call, Mr. Guzman had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.
- While attempting to use the navigational feature in the CUE, Mr. Guzman had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.

136.   Consequently, the Defect adversely affected Mr. Guzman's ability to concentrate and to drive safely.

137.   Mr. Guzman has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

138.   Before purchasing his vehicle, Mr. Guzman saw advertisements by Kuni Cadillac showcasing Cadillac vehicles in general. Additionally, before purchase, Mr. Guzman visited the dealership and spoke with an authorized dealership salesperson regarding the CUE's features and how to operate it. Mr. Guzman also reviewed the vehicle's window sticker before purchase, which described the vehicle's features, options, and price. Neither Defendant, nor any of its agents, dealers, or other representatives informed Mr. Guzman of the existence of the Defect and/or the defective design prior to his purchase.

Similarly, none of the advertising materials Mr. Guzman reviewed contained any information concerning the Defect.

## CLASS ACTION ALLEGATIONS

139.  Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

140.  Pursuant to Fed. R. Civ. Proc. 23(b)(2), (b)(3) or (c)(4), Plaintiffs assert classes based on the applicable state law of the plaintiffs. The Class and Sub-Class are defined as:

**Class**: All persons and entities who purchased or leased a 2013 to 2017 Cadillac ATS, SRX and XTS vehicles and 2014 to 2017 Cadillac CTS, ELR and Escalade vehicles equipped with GM's "Cadillac User Experience" touch screen display (the "CUE System" or "CUE") (Class Vehicle) in the State of California.

**CLRA Sub-Class**: All members of the Class who are "consumers" within the meaning of California Civil Code § 1761(d).

141.  Excluded from the Class and Sub-Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class or any Sub-Class should be expanded or otherwise modified.

142. **Numerosity**: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in GM's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

143. **Typicality**: Plaintiffs' claims are typical of the claims of the Class and Sub-Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM, and equipped with the defective CUE Systems. The representative Plaintiffs, like all Class Members, have been damaged by GM's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective CUE System components. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class as a whole.

144. **Commonality**: There are numerous questions of law and fact common to Plaintiffs, the Class and Sub-Class that predominate over any question affecting only individual Class Members. These common legal and factual issues include the following:

> (a) Whether Class Vehicles contain defects relating to the CUE System;
>
> (b) Whether the defects relating to the CUE System constitute an unreasonable safety risk;
>
> (c) Whether the defective nature of the CUE System constitutes a material fact;
>
> (d) Whether Defendant has a duty to disclose the defective nature of the CUE System to Plaintiffs and Class Members;

(e) Whether Plaintiffs and the other Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

(f) Whether Defendant knew or reasonably should have known of the defects relating to the CUE System before it sold and leased Class Vehicles to Plaintiffs and Class Members and, if so, how long Defendant has known of the defect;

(g) Whether Defendant should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective CUE System;

(h) Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective CUE System; and

(i) Whether Defendant breached the implied warranty of merchantability pursuant to the laws governing each of the Sub-Class jurisdictions; and

(j) Whether Defendant breached express warranties pursuant to the laws governing each of the Sub-Class jurisdictions.

145. **Adequate Representation**:  Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

146. **Predominance and Superiority**:  Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of GM's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of

1   litigating their claims prohibitively high and would therefore have no effective

2   remedy at law. Because of the relatively small size of the individual Class

3   Members' claims, it is likely that only a few Class Members could afford to seek

4   legal redress for GM's misconduct. Absent a class action, Class Members will

5   continue to incur damages, and GM's misconduct will continue without remedy.

6   Class treatment of common questions of law and fact would also be a superior

7   method to multiple individual actions or piecemeal litigation in that class

8   treatment will conserve the resources of the courts and the litigants and will

9   promote consistency and efficiency of adjudication.

10          147.   In the alternative, this action is certifiable under the provisions of

11   Fed. R. Civ. Proc. 23(b)(1) and/or (b)(2) because:

(a)   The prosecution of separate actions by individual members of
the Class would create a risk of inconsistent or varying
adjudications with respect to individual members of the Class
which would establish incompatible standards of conduct for
GM;

(b)   The prosecution of separate actions by individual members of
the Class would create a risk of adjudications as to them
which would, as a practical matter, be dispositive of the
interests of the other members of the Class not parties to the
adjudications, or substantially impair or impede their ability
to protect their interests; and

(c)   GM has acted or refused to act on grounds generally
applicable to the Class, thereby making appropriate final
injunctive relief or corresponding declaratory relief with
respect to the Class as a whole and necessitating that any such
relief be extended to members of the Class on a mandatory,
class-wide basis.

148.   Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

### TOLLING OF THE STATUTES OF LIMITATIONS

149.   Because the defect is undetectable until it manifests and GM failed to disclose or intentionally concealed the Defect, Plaintiffs and Class Members were not reasonably able to discover the problem until the Defect manifested after purchasing the Class Vehicles, despite exercise of due diligence.

150.   Additionally, on information and belief, GM instructed its authorized dealership employees and technicians to inform Class Members that the manifestations of the Defect in the CUE Systems were normal, and therefore not a defect as alleged herein.

151.   Plaintiffs and the Class Members had no realistic ability to discern that the GM CUE Systems in Class Vehicles were defective. Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and the Class Members.

152.   Plaintiffs are informed and believe and based thereon allege that GM has known of the Defect since before the purchases of the Class Vehicles and has concealed from or failed to alert owners and lessees of the Class Vehicles of the defective nature of the CUE Systems.

153.   Any applicable statute of limitations has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein. Defendant is further estopped from relying on any statute of limitations because of its concealment of the Defect.

///

**COUNT I**
**Violation of California's Consumers Legal Remedies Act**
**CAL. CIV. CODE § 1750, *et seq.***
**(On Behalf of the Class)**

154.   Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

155.   Plaintiffs Matt Goldstein, Percy Sutton, Vanessa Rodriguez, and Benito Guzman bring this cause of action on their own behalf and on behalf of the members of the CLRA Sub-Class.

156.   GM is a "person" as defined by California Civil Code § 1761(c).

157.   Plaintiffs and the Class Members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

158.   By failing to disclose and concealing the defective nature of the CUE Systems from the Plaintiffs and Class Members, Defendant violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their CUE Systems had characteristics and benefits that they do not have and represented that the Class Vehicles and their CUE Systems were of a particular standard, quality, or grade when they were of another.  *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

159.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

160.   Defendant knew that the Class Vehicles and their CUE Systems suffered from an inherent safety defect, were defectively designed, and were not suitable for their intended use.

161.   Because of their reliance on Defendant's omissions, owners and/or

1  lessees of the Class Vehicles, including the Plaintiffs and Class Members,

2  suffered an ascertainable loss of money, property, and/or value of their Class

3  Vehicles. Additionally, because of the Defect, the Plaintiffs and Class Members

4  were harmed and suffered actual damages in that the Class Vehicles' CUE

5  Systems are substantially certain to fail before their expected useful life has run.

6      162.   Defendant was under a duty to the Plaintiffs and Class Members to

7  disclose the defective and unsafe nature of the CUE Systems and/or the

8  associated repair costs because:

9          (a)   Defendant was in a superior position to know the true state of

10               facts about the safety defect in the Class Vehicles' CUE

11               Systems;

12         (b)   The Plaintiffs and Class Members could not reasonably have

13               been expected to learn or discover that their CUE Systems

14               had a defect with dangerous safety concerns until it

15               manifested; and

16         (c)   Defendant knew that the Plaintiffs and Class Members could

17               not reasonably have been expected to learn of or discover the

18               safety defect.

19     163.   In failing to disclose the defective nature of CUE Systems,

20  Defendant knowingly and intentionally concealed material facts and breached its

21  duty not to do so.

22     164.   The facts Defendant concealed from or failed to disclose to the

23  Plaintiffs and Class Members are material in that a reasonable consumer would

24  have considered them to be important in deciding whether to purchase or lease

25  the Class Vehicles or pay less.  Had Plaintiffs and Class Members known that the

26  Class Vehicles' CUE Systems were defective, they would not have purchased or

27  leased the Class Vehicles or would have paid less for them.

28     165.   The Plaintiffs and Class Members are reasonable consumers who do

not expect the CUE Systems installed in their vehicles to exhibit problems such as the Defect. This is the reasonable and objective consumer expectation relating to a vehicle's CUE Systems.

166.   Because of Defendant's conduct, Plaintiffs and Class Members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience problems such as the Defect.

167.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiffs and Class Members suffered and will continue to suffer actual damages.

168.   The Plaintiffs and Class Members are entitled to equitable relief.

169.   The Plaintiffs and Class Members provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a). Defendant did not provide appropriate relief for their violation of the CLRA within 30 days. Accordingly, in addition to the injunctive and equitable relief, Plaintiffs seek monetary, compensatory, and punitive damages.

## COUNT II
**Breach of the Implied Warranty Pursuant to the Song-Berly Consumer Warranty Act**
**CAL. CIV. CODE §§ 1792 and 1791.1, *et seq*.**
**(On Behalf of the Class)**

170.   Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

171.   Plaintiff Benito Guzman brings this cause of action on behalf of themselves and the Class.

172.   Plaintiff and the Class Members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

173.   GM is and was at all relevant times a "manufacturer" within the

1  meaning of Cal. Civ. Code § 1791(j).

2      174.   The Class Vehicles are and were at all relevant times "are

3  "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

4      175.   A warranty that the Class Vehicles were in merchantable condition

5  and fit for the ordinary purpose for which vehicles are used is implied by law

6  under Cal. Civ. Code §§ 1791.1(a) & 1792.

7      176.   GM knew or had reason to know of the specific use for which the

8  Class Vehicles were purchased or leased. GM directly sold and marketed

9  vehicles equipped with the CUE Systems to customers through authorized

10  dealers, like those from whom Plaintiff and the Class Members bought or leased

11  their vehicles, for the intended purpose of consumers purchasing the vehicles.

12  GM knew that the Class Vehicles would and did pass unchanged from the

13  authorized dealers to Plaintiff and the Class Members, with no modification to

14  the defective CUE Systems.

15      177.   GM provided Plaintiff and Class Members with an implied warranty

16  that the Class Vehicles and their components and parts are merchantable and fit

17  for the ordinary purposes for which they were sold.

18      178.   GM impliedly warranted that the Class Vehicles were of

19  merchantable quality and fit for such use. This implied warranty included,

20  among other things:  (i) a warranty that the Class Vehicles and their CUE

21  Systems were manufactured, supplied, distributed, and/or sold by GM were

22  luxury, safe, and reliable vehicles for providing transportation; and (ii) a

23  warranty that the Class Vehicles and their CUE Systems would be fit for their

24  intended use while the Class Vehicles were being operated.

25      179.   Contrary to the applicable implied warranties, the Class Vehicles

26  and their CUE Systems at the time of sale and thereafter were not fit for their

27  ordinary and intended purpose of providing Plaintiff and Class Members with

28  reliable, durable, and safe transportation. Instead, the Class Vehicles are

THIRD AMENDED CLASS ACTION COMPLAINT

defective, including, but not limited to, the defective design and manufacture of their CUE Systems and the existence of the Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

180.   As a result of GM's breach of the applicable implied warranties, Plaintiff and the Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiff and the Class Members were harmed and suffered actual damages in that the Class Vehicles' CUE System components are substantially certain to fail before their expected useful life has run.

**COUNT III**
**Breach of the Implied Warranty of Merchantability**
**(Cal. Com. Code § 2314)**
**(On Behalf of the Class)**

181.   Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

182.   Plaintiff Benito Guzman brings this cause of action on behalf of themselves and the Class.

183.   General Motors is and was at all relevant times a merchant with respect to motor vehicles under Cal. Com. Code § 2104.

184.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to Cal. Com. Code § 2314.

185.   Privity of contract is not required in this case because Plaintiff and Class members are intended third-party beneficiaries of contracts between GM and its dealerships; specifically, they are the intended beneficiaries of GM's implied warranties. Plaintiff Benito Guzman purchased vehicles from a network

of Defendant's authorized dealerships, who are Defendant's agents for sales and repairs. The dealers were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers only.

186.   These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that there are defects in the CUE, rendering certain safety, communication, navigational, and entertainment functions inoperative; and the CUE was not adequately designed, manufactured, and tested.

187.   General Motors was provided notice of these issues by numerous complaints filed against it, including this Complaint, and by numerous individual letters, telephone calls, and other communications sent by Plaintiff and other Class members before or within a reasonable amount of time after General Motors issued the TSBs and the allegations of Class Vehicle defects became public.

188.   Plaintiff and the other Class members have had sufficient direct dealings with either General Motors or their agents (dealerships) to establish privity of contract between Plaintiff and the other Class members. Notwithstanding this, privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between General Motors and its dealers; specifically, they are the intended beneficiaries of General Motors' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiff's and the other Class members' Class Vehicles are dangerous instrumentalities due to the aforementioned defects

and nonconformities.

189.   As a direct and proximate result of General Motors' breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT IV
## Violation of California Business and Professions Code § 17200, *et seq.*
### (On Behalf of the Class)

190.   Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

191.   Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Class.

192.   Because of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including the Plaintiffs and Class Members, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Defect, the Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles' CUE Systems are substantially certain to fail before their expected useful life has run.

193.   California Business & Professions Code § 17200, *et seq.*, prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

194.   The Plaintiffs and Class Members are reasonable consumers who do not expect their CUE Systems to be defective.

195.   Defendant knew the Class Vehicles and their CUE Systems were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

196.   In failing to disclose the Defect, Defendant has knowingly and

1    intentionally concealed material facts and breached its duty not to do so.

2        197.   Defendant was under a duty to the Plaintiffs and Class Members to

3    disclose the defective and unsafe nature of the Class Vehicles and their CUE

4    Systems because:

5            (a)   Defendant was in a superior position to know the true state of

6                  facts about the safety defect in the Class Vehicles' CUE

7                  Systems; and

8            (b)   Defendant actively concealed the defective nature of the Class

9                  Vehicles and their CUE Systems from the Plaintiffs and Class

10                 Members.

11       198.   The facts Defendant concealed from or failed to disclose to the

12   Plaintiffs and Class Members are material in that a reasonable person would

13   have considered them to be important in deciding whether to purchase or lease

14   Class Vehicles. Had they known of the Defect, the Plaintiffs and Class Members

15   would have paid less for Class Vehicles equipped with the subject CUE Systems

16   or would not have purchased or leased them at all.

17       199.   Defendant continued to conceal the defective nature of the Class

18   Vehicles and their CUE Systems even after Class Members began to report

19   problems.

20       200.   Defendant's conduct was and is likely to deceive consumers.

21       201.   Defendant's acts, conduct, and practices were unlawful, in that they

22   constituted:

23           (a)   Violations of California's Consumers Legal Remedies Act;

24           (b)   Violations of the Song-Beverly Consumer Warranty Act;

25           (c)   Breach of the Implied Warranty of Merchantability under

26                 California Commercial Code section 2314;

27       202.   By its conduct, Defendant has engaged in unfair competition and

28   unlawful, unfair, and fraudulent business practices.

203.   Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

204.   As a direct and proximate result of Defendant's unfair and deceptive practices, the Plaintiffs and Class Members have suffered and will continue to suffer actual damages.

205.   Plaintiffs do not seek restitution under §§ 17203 and 17204 of the Business & Professions Code. Rather, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies; specifically, to remove and replace Plaintiffs and Class Members' CUE Systems with a suitable alternative product. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement CUE System that does not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of the Class)**

206.   Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

207.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Class against Defendant.

THIRD AMENDED CLASS ACTION COMPLAINT

208.   As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of said vehicles. Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

209.   Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

210.   Defendant has therefore been unjustly enriched due to the known defects in the Class Vehicles through the use of funds that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs and Class Members.

211.   As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

212.   Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies; specifically, to remove and replace Plaintiffs and Class Members' CUE Systems with a suitable alternative product. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement CUE System that does not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

# REQUEST FOR RELIEF

213. Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

(a) An order certifying the proposed Class and Sub-Class designating Plaintiffs as named representatives of the Class and their representative Sub-Class, and designating the undersigned as Class Counsel;

(b) A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the CUE Systems, including the need for periodic inspection and maintenance;

(c) An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, and to remove and replace Plaintiffs and Class Members' CUE Systems with a suitable alternative product; enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement CUE System that does not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class members that such warranty has been reformed;

(d) A declaration requiring Defendant to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

(e) An award to Plaintiffs and the Class for compensatory,

| | | |
|---|---|---|
| 1 | | exemplary, and statutory damages, including interest, in an |
| 2 | | amount to be proven at trial; |
| 3 | (f) | Any and all remedies provided pursuant to the Song-Beverly |
| 4 | | Act, including California Civil Code §1794 and Cal. Comm. |
| 5 | | Code § 2-314; |
| 6 | (g) | Any and all remedies provided pursuant to the consumer |
| 7 | | protection statutes herein alleged, except that Plaintiffs do not |
| 8 | | seek restitution under their California Business Code section |
| 9 | | 17200 claims or their Unjust Enrichment claims; |
| 10 | (h) | An award of attorneys' fees and costs, as allowed by law; |
| 11 | (i) | An award of attorneys' fees and costs pursuant to California |
| 12 | | Code of Civil Procedure §1021.5; |
| 13 | (j) | An award of pre-judgment and post-judgment interest, as |
| 14 | | provided by law; |
| 15 | (k) | Leave to amend the Complaint to conform to the evidence |
| 16 | | produced at trial; |
| 17 | (l) | Plaintiffs demand that GM perform a recall, and repair all |
| 18 | | vehicles; and |
| 19 | (m) | Granting such other and further relief as the Court deems just |
| 20 | | and proper. |

28   ///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY TRIAL DEMANDED**

214.   Pursuant to Federal Rule of Civil Procedure 38(b) and Southern District of California Local Rule 38.1, Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated:  March 5, 2021                    Respectfully submitted,

**CAPSTONE LAW APC**

By: /s/ Cody R. Padgett
   Steven R. Weinmann
   Tarek H. Zohdy
   Cody R. Padgett

**BERGER MONTAGUE PC**
Russell D. Paul (admitted *pro hac vice*)
Amey J. Park (admitted *pro hac vice*)

**CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD, LLP**
Gayle M. Blatt, SBN 122048
gmb@cglaw.com
Jeremy Robinson, SBN 188325
jrobinson@cglaw.com
P. Camille Guerra, SBN 326546
camille@cglaw.com
James M. Davis, SBN 301636
jdavis@cglaw.com

**MOON LAW APC**
Christopher D. Moon, SBN 246622
chris@moonlawapc.com
Kevin O. Moon, SBN 246792
kevin@moonlawapc.com
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (619) 915-9432
Facsimile: (650) 618-0478

**POULOS LOPICCOLO PC**
Joseph LoPiccolo (*PHV App. Forthcoming*)
John N. Poulos *(PHV App. Forthcoming)*
1305 South Roller Road
Ocean, NJ 07712
732-757-0165
lopiccolo@pllawfirm.com
poulos@pllawfirm.com

**LITE DEPALMA GREENBERG, LLC**

Page 70

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bruce D. Greenberg (*PHV App. Forthcoming*)
570 Broad Street, Suite 1201
Newark, New Jersey 07102
973-623-3000
bgreenberg@litedepalma.com

**STULL, STULL & BRODY**
Patrice L. Bishop (182256)
pbishop@ssbla.com
8383 Wilshire Blvd., Suite 900
Beverly Hills, CA  90211
Tel: 310-456-8638
Fax: 310-456-8601

**STULL, STULL & BRODY**
Melissa R. Emert (admitted *pro hac vice*)
6 East 45th Street
New York, NY  10017
Tel:   (212) 687-7230
Fax:   (212) 490-2022
Email:       memert@ssbny.com

**KANTROWITZ GOLDHAMER & GRAIFMAN, P.C.**
Gary S. Graifman (admitted *pro hac vice*)
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Tel: (845) 356-2570
Fax: (845) 356-4335
Email: ggraifman@kgglaw.com

**LEVI & KORSINSKY, LLP**
Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
Rosanne L. Mah (State Bar No. 242628)
Email: rmah@zlk.com
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

Attorneys for Plaintiffs

THIRD AMENDED CLASS ACTION COMPLAINT

# EXHIBIT 1

DocuSign Envelope ID: A0683CBA-3524-4DCC-AC41-FE040372CA03

Mark A. Ozzello (SBN 116595)
Mark.Ozzello@capstonelawyers.com
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Trisha K. Monesi (SBN 303512)
Trisha.Monesi@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:   (310) 943-0396

Russell D. Paul *(admission pending)*
Amey J. Park *(admission pending)*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:  (215) 875-3000
Fax:  (215) 875-4604
Email:  rpaul@bm.net
             apark@bm.net

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT GOLDSTEIN, PERCY SUTTON, JULIAN WILDER, LANA SAVAGE, GLADYS TUBBS, KENDRA PIAZZA, and RAFAEL MARTINEZ, individually, and on behalf of a class of similarly situated individuals,<br><br>        Plaintiffs,<br><br>        v.<br><br>GENERAL MOTORS LLC, a Delaware limited liability company,<br><br>        Defendant. | Case No.:<br><br>**DECLARATION OF MATT GOLDSTEIN IN SUPPORT OF VENUE FOR CLASS ACTION COMPLAINT PURSUANT TO CIVIL CODE § 1780(d)** |

### DECLARATION OF MATT GOLDSTEIN

I, MATT GOLDSTEIN, declare under penalty of perjury as follows:

1.      I make this declaration based upon my personal knowledge except as to those matters stated herein that are based upon information and belief, and as to those matters, I believe them to be true.  I am over the age of eighteen, a citizen of the State of California, and a Plaintiff in this action.

2.      Pursuant to California Civil Code §1780(d), this Declaration is submitted in support of Plaintiff's Selection of Venue for the Trial of Plaintiffs' Cause of Action alleging violation of California's Consumers Legal Remedies Act.

3.      I reside in Carlsbad, California, which is in the County of San Diego. I purchased a 2013 Cadillac SRX that is the subject of this lawsuit in California and accepted delivery of the vehicle in the County of San Diego.

4.      I am informed and believe that Defendant General Motors LLC ("GM" or "Defendant") is a Delaware corporation organized and existing under the laws of the State of Delaware and is registered to conduct business in California.  General Motors LLC's corporate headquarters and principal place of business is located at 300 Renaissance Center, Detroit, Michigan 48265.  On information and belief, Defendant conducts business in San Diego County.

5.      Based on the facts set forth herein, this Court is a proper venue for the prosecution of Plaintiff's Cause of Action alleging violation of California's Consumers Legal Remedies Act because my 2013 Cadillac SRX that is the subject of this lawsuit is situated here, and a substantial portion of the events giving rise to my claims occurred here.

6.      I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on September 13, 2019, in Carlsbad, California.



Matt Goldstein